# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| MICHAEL SACKS;<br>CHRISTOPHER JENSEN; BRENT CARY;<br>BENJAMIN COLE; and KELLY GEE; | Case No. _____ |
| Plaintiffs, | |
| v. | |
| UNIVERSITY OF MINNESOTA;<br>THE BOARD OF REGENTS OF THE<br>UNIVERSITY OF MINNESOTA;<br>THOMAS ADRAHTAS (individual and<br>official capacity);  USA HOCKEY, INC.<br>AMATEUR HOCKEY ASSOCIATION<br>ILLINOIS, INC. | <u>JURY TRIAL REQUESTED</u> |
| Defendants. | |

---

Ryan Peterson (MN 0389607)
PETERSON LEGAL, PLLC
Attorneys for Plaintiffs
5201 Eden Avenue, Suite 300
Edina, Minnesota 55436
Phone: (612) 367-6568
Email:  ryan@peterson.legal

Nicholas Economakos (IL 6308942)
JACOBSON   LEGAL   SERVICES
Attorneys for Plaintiffs
100 N Riverside Plaza, Suite 2400
Chicago, Illinois 60606
Phone:  (312) 698-4466
Email:  nick@jabobsonlegalservices.com
*District of Minnesota Admission Pending*

---

## TABLE OF CONTENTS

COMPLAINT AND JURY DEMAND ................................................................1 – 82

I.  PRELIMINARY STATEMENT AND INTRODUCTION..................................1 – 11

II.  JURISDICTION AND VENUE .......................................................................12 – 13

III.  PARTIES AND KEY INDIVIDUALS ............................................................13 – 15

IV.  SPECIFIC FACTUAL ALLEGATIONS .........................................................15 – 36

    A.  Michael Sacks ....................................................................................15 – 22

    B.  Christopher Jensen .............................................................................22 – 27

    C.  Brent Cary ..........................................................................................27 – 30

    D.  Benjamin Cole ....................................................................................30 – 33

    E.  Kelly Gee ............................................................................................33 – 36

V.  CLAIMS AGAINST UNIVERSITY OF MINNESOTA DEFENDANTS.........36 – 59

    A.  COUNT ONE – Violations of Title IX.............................................36 – 39

    B.  COUNT TWO – Violations of Civil Rights, 42 U.S.C. §1983 ..............39 – 41

    C.  COUNT THREE – Failure to Train and Supervise, 42 U.S.C. §1983 ....41 – 43

    D.  COUNT FOUR – Gross Negligence v. UMN, Adrahtas.........................43 – 44

    E.  COUNT FIVE – Negligence v. UMN, Adrahtas....................................44 – 46

    F.  COUNT SIX – Vicarious Liability........................................................46 – 47

    G.  COUNT SEVEN – Express/Implied Agency .........................................47 – 48

    H.  COUNT EIGHT – Negligent Supervision................................................48 – 49

    I.  COUNT NINE – Negligent Failure to Warn or Protect .........................49 – 50

    J.  COUNT TEN – Nuisance (I 561.01) ....................................................50 – 52

    K.  COUNT ELEVEN – Nuisance (I 609.74) .............................................52 – 54

L.     COUNT TWELVE – Negligent Failure to Train or Educate .................54 – 55

M.    COUNT THIRTEEN – Negligent Retention ...........................................55 – 56

N.     COUNT FOURTEEN – Intentional Infliction of Emotional Distress.....56 – 57

O.     COUNT FIFTEEN – Fraud and Misrepresentation.................................57 – 59

VI.     CLAIMS AGAINST DEFENDANTS AHAI AND USAH ...............................59 – 76

A.     COUNT SIXTEEN – Gross Negligence v. AHAI, USAH, Adrahtas .....59 – 61

B.     COUNT SEVENTEEN – Negligence v. AHAI, USAH, Adrahtas .........61 – 62

C.     COUNT EIGHTEEN – Vicarious Liability............................................62 – 63

D.     COUNT NINETEEN – Express/Implied Agency ..................................63 – 64

E.     COUNT TWENTY – Negligent Supervision .........................................64 – 66

F.     COUNT TWENTY-ONE – Negligent Failure to Warn or Protect.........66 – 67

G.     COUNT TWENTY-TWO – Nuisance (I 561.01) ...................................67 – 69

H.     COUNT TWENTY-THREE – Nuisance (I 609.74) ..............................69 – 71

I.     COUNT TWENTY-FOUR – Negligent Failure to Train or Educate......71 – 72

J.     COUNT TWENTY-FIVE – Negligent Retention ..................................72 – 73

K.     COUNT TWENTY-SIX - Intentional Infliction of Emotional Distress..73 – 74

L.     COUNT TWENTY-SEVEN – Fraud and Misrepresentation.................74 – 76

VII.    CLAIMS AGAINST DEFENDANT ADRAHTAS...........................................76 – 79

A.     COUNT TWENTY-EIGHT – Assault and Battery ................................76 – 78

B.     COUNT TWENTY-NINE – Intentional Infliction of
Emotional Distress ................................................................................78 – 79

VIII.   DAMAGES ........................................................................................................79 – 81

IX.     JURY DEMAND.......................................................................................................82

## COMPLAINT AND JURY DEMAND

NOW COME Plaintiffs, MICHAEL SACKS, CHRISTOPHER JENSEN, BRENT CARY, BENJAMIN COLE, and KELLY GEE, (collectively "Plaintiffs") by and through their attorneys, JACOBSON LEGAL SERVICES, and hereby allege and state as follows:

## I.      PRELIMINARY STATEMENT AND INTRODUCTION

1.      This is a civil action for declaratory, injunctive, equitable, and monetary relief for injuries sustained by Plaintiffs as a result of the acts, conduct, and omissions of Thomas "Chico" Adrahtas ("Adrahtas"), University of Minnesota ("UMN"), The Board of Regents of the University of Minnesota ("Board")(UMN and The Board, collectively as the "UMN Defendants"), USA Hockey, Inc. ("USAH"), Amateur Hockey Association of Illinois, Inc. ("AHAI"), and their respective employees, representatives, and agents, relating to sexual assault, abuse, molestation, and nonconsensual sexual touching and harassment by Defendant Adrahtas against Plaintiffs, all male, many of who were minors when the sexual assaults took place.

2.      Plaintiffs were young athletes participating in ice hockey in various age groups from elite amateur levels through National Collegiate Athletic Association Division One Men's Ice Hockey.

3.      Defendant Adrahtas became known as an excellent recruiter, coach, and developer of hockey players during his nearly forty-year career.  He gained a reputation as one of the best youth hockey coaches in the United States of America during his coaching tenure, helping countless hockey players earn college hockey scholarships and play professional hockey.

4.      Plaintiffs and their parents had no reason to suspect Defendant Adrahtas was anything other than a successful hockey coach who was developing talent to help achieve players' goals in the sport of ice hockey.

5.     In 1984, UMN hired Defendant Adrahtas as an assistant coach for the nationally-renown Men's Varsity Ice Hockey Team.  Defendant Adrahtas helped recruit players, including Michael Sacks, and coached UMN to a 31-13-3 record and NCAA playoff appearance.

6.     From approximately 1982 through his resignation as Head Coach at Robert Morris University Illinois' Men's Ice Hockey Team on November 9, 2018, Defendant Adrahtas was a USA Hockey Coach for numerous hockey programs, many of which were sanctioned by AHAI.

7.     For over thirty-six years, Defendant Adrahtas had unfettered access to young male athletes through his employment at UMN and as an USA Hockey Coach, and used his position to groom players.

8.     To gain Plaintiffs' trust, Defendant Adrahtas would give Plaintiffs gifts, including purchasing a vehicle for Plaintiff Michael Sacks, purchasing alcohol and food for Plaintiffs, giving Plaintiffs money, giving Plaintiffs pornographic movies to watch, and taking Plaintiffs to strip clubs with promises to help them achieve all their goals in the sport of hockey in exchange for obedience and trust.

9.     Defendant Adrahtas used various techniques to target players that would be susceptible to his grooming efforts.   This included giving players questionnaires/tests that purported to help him coach players effectively, but were really designed to target weaknesses in a player's family structures or other areas a player might be emotionally susceptible.

10.     From 1983 to 2018, under the guise of being a mentor and helping Plaintiffs achieve their dreams, while employing deceptive schemes to sexually assault, abuse and molest Plaintiffs, and allow others to sexually assault, abuse and molest Plaintiffs, some of whom were minors, by nonconsensual oral sex, and nonconsensual digital and anal penetration.

11.     Plaintiffs were hockey players seeking coaching from Defendant Adrahtas.

2

12.     Assaults were carried out at UMN, at various residences of Defendant Adrahtas in Minnesota and Illinois, and while on vacation in Florida.

13.     The ages of the Plaintiffs assaulted from 1983 to 2018 ranged from 15 years old to 20 years old.

14.     Defendant began coaching Plaintiff Michael Sacks when he was fifteen (15) years old.  During the winter of 1983, Defendant Adrahtas first approached Michael Sacks, who was then sixteen years old, with an offer to entice Michael Sacks into unknowingly partaking in Defendant Adrahtas' sinister scheme to sexually assault a minor.

15.     Defendant Adrahtas started using this scheme to sexually assault hockey players for decades.  Generally, the scheme involved a fictitious woman named "Sheila," that Defendant Adrahtas told players "gave the best blowjob you've ever had," and that he could arrange for Sheila to give a blowjob if the player wanted.  Defendant Adrahtas explained that if the player received a blowjob from Sheila, he had to be blindfolded and restrained because Sheila was "unattractive and had been sexually assaulted at one point."  "Sheila," did not exist, and was actually Defendant Adrahtas, and other adults paying to give oral sex to players without their knowledge or consent.

16.     Through the remainder of the 1983-1984 season, Defendant Adrahtas arranged for Plaintiff Michael Sacks to receive oral sex from "Sheila" approximately one time a week in Illinois.

17.      In the summer of 1984, Defendant Adrahtas began coaching Plaintiff Chris Jensen. Shortly after Mr. Jensen's sixteenth birthday, Defendant Adrahtas invited Mr. Jensen to his home to talk about his hockey career.  At this time, Defendant Adrahtas asked Mr. Jensen how he would "feel about getting a blowjob from a girl?  I know a woman, she is not attractive, she's been raped and has issues, but she loves sex and loves to perform oral sex on men."  The woman was the fictitious "Sheila."  Plaintiff Chris Jensen received oral sex from the woman he thought was

3

"Sheila,' but in reality was Defendant Adrahtas.

18.     Starting in the summer of 1984, Defendant Adrahtas, while employed by UMN, continued sexual assault schemes for his pleasure and at Plaintiff Michael Sack's expense. Defendant Adrahtas told Michael Sacks that "Sheila" had moved back to Minnesota. The sexual assaults continued.

19.     Defendant Adrahtas, while employed at UMN, also invited Plaintiff Chris Jensen, and UMN Varsity Hockey Team players Tony Kellin, John Labatt, and other UMN players to participate in his sexual assault scheme.

20.     During his time at UMN, Defendant Adrahtas used his access to young men and boys (including minor Plaintiffs) to satisfy his sexual fantasies and carry out his assaults.

21.     In the spring of 1985, a group of UMN hockey players led by Captain Tony Kellin, and including Corey Millen, Wally Chapman, Tim Bergland, Pat Micheletti and Frank Peter Angelow, performed a sting operation to uncover the identify of "Sheila" based on their suspicions that Defendant Adrahtas was actually "Sheila."

22.     Multiple UMN hockey players accepted Defendant Adrahtas' offer to receive oral sex from "Sheila" at one of the UMN hockey player's home. These players went inside the home, while the other players, including Tony Kellin, waited outside at every point of ingress and egress in the apartment, including entrances, exits and the hallways. During the entire time the players were inside the home, no other individuals entered or left the apartment.

23.     With the knowledge that there was no "Sheila," and that Defendant Adrahtas was sexually assaulting players, including minors, the UMN hockey players reported Defendant Adrahtas' sexual assaults and scheme to UMN's Athletic Director, Paul Giel.

4

24.     UMN did not launch an internal investigation, or report the sexual assault claims. Instead, UMN devised and successfully implemented a plan to conceal the sexual assaults perpetrated by its employee, Defendant Adrahtas, by allowing Defendant Adrahtas to resign from his position, eliminating the rest of the Varsity Men Hockey Team coaching staff, and withdrawing Plaintiff Michael Sacks scholarship in an effort to protect UMN's reputation.

25.     UMN and its Board's failure to appropriately respond to Defendant Adrahtas' sexual assault of its hockey players resulted in Defendant Adrahtas' continued sexual assault, abuse, and molestation of young boys, including minors, through approximately 2018.

26.     Defendant Adrahtas coached and held various administrative positions of power and authority for numerous AAA travel hockey programs (Team Illinois and the Chicago Mission), junior hockey teams (Chicago Young Americans and the Danville Wings), and a collegiate hockey team (RMU) located in Illinois following his resignation from UMN through 2018.

27.     In 1988, following his "resignation" from UMN, Defendant Adrahtas accepted the head coaching position for the Chicago Young Americans, a Junior A hockey team participating in the North American Hockey League, made up of players between the ages of seventeen (17) and nineteen (19).

28.     Ira Greenberg, owner of the Chicago Young Americans, confronted Defendant Adrahtas about the rumors circulating regarding his departure from Minnesota before hiring him. Defendant Adrahtas claimed the rumors began because he was not from Minnesota, and these rumors were part of an elaborate vendetta to remove him from his position because he was an outsider.

29.     Prior to hiring Defendant Adrahtas, Ira Greenberg contacted the University of Minnesota on numerous occasions seeking a job reference.  UMN did not inform Ira Greenberg

that Defendant Adrahtas was forced to leave his job after committing sexual assaults while employed at UMN.  Instead, UMN concealed this information regarding Defendant Adrahtas allowing Defendant Adrahtas to receive a job offer from Mr. Greenberg.

30.     During the 1988-89 season, Plaintiff Brent Cary, a minor age seventeen (17) played for Defendant Adrahtas.  It was at this time that Defendant Adrahtas approached Plaintiff Brent Cary with the offer of receiving oral sex from a young woman who loved to perform oral sex.

31.     After coaching the Chicago Young Americans AAA during the 1988-89 season, Defendant Adrahtas was fired by Ira Greenberg after Mr. Greenberg discovered that players were sleeping over at Defendant Adrahtas' home and was able to corroborate, from multiple players, lurid details of Defendant Adrahtas' sexual advances.

32.     On or about March, 1989 Ira Greenberg confronted AHAI's then acting President, Jim Smith (current USAH President) at the amateur National Championship held at McFetridge Ice Arena in Illinois.  Ira Greenberg provided Jim Smith with a detailed account of Defendant Adrahtas' sexual assaults, and demanded that Jim Smith permanently ban Defendant Adrahtas from coaching in Illinois.  In his capacity as AHAI President, or as current USAH President, Jim Smith did not report or adequately investigate Ira Greenberg's allegations of Defendant Adrahtas.

33.     From 1990 through 2000 Defendant Adrahtas coached various AAA levels at Team Illinois.

34.     Team Illinois President, Larry Snyder, heard the same rumors that Ira Greenberg heard, and also asked Defendant Adrahtas about the rumors.  Defendant Adrahtas claimed that the stories were totally blown out of proportion and that he did not do anything.

35.     Despite implanting a rule banning Defendant Adrahtas from being allowed in the locker room unless players were fully dressed because of concerns regarding the rumors of

Defendant Adrahtas' past relationships with youth hockey players, Team Illinois allowed Defendant Adrahtas to coach minor hockey players for their organization for a decade.

36.     Defendant Adrahtas continued his *modus operandi* during his years at Team Illinois, attempting to lure players into his sex traps, offering blindfolded oral sex from a fictional woman.  Upon information and belief, despite Team Illinois' knowledge of Defendant Adrahtas' sexual assaults of young hockey players, including minors, and his grooming activities, nobody affiliated with Team Illinois ever adequately investigated or reported Defendant Adrahtas to the proper prosecuting authorities.

37.     From 2000-2004 Defendant Adrahtas coached the Danville Wings Junior A hockey team in the North American Hockey League, where he coached players between the ages of sixteen (16) and twenty-one (21).

38.     Josh Mervis, owner of the Danville Wings, questioned Defendant Adrahtas about the rumors before hiring him.

39.     In 2000, Plaintiff Kelly Gee, age seventeen (17), met Defendant Adrahtas.

40.     Plaintiff Kelly Gee tried out and did not make the Danville Wings that season, but Defendant Adrahtas offered to let him stay at his home while he trained.

41.     During this time, Plaintiff Kelly Gee worked for Defendant Adrahtas at his Midwest Goalie School hockey camp.

42.     Soon thereafter, Defendant Adrahtas tricked Plaintiff Kelly Gee into participating in his blindfolded oral sex scheme.

43.     Upon information and belief, the Danville Wings organization was aware of rumors regarding Defendant Adrahtas' sexual assaults of young hockey players, including minors, and his

grooming activities. However, nobody affiliated with the Danville Wings ever adequately investigated or reported Defendant Adrahtas to the proper prosecuting authorities.

44.     From 2005 through 2010, Defendant Adrahtas coached various AAA levels at the Chicago Mission.

45.     Rumors of Defendant Adrahtas' sexual abuse was well-known within the Chicago Mission organization. Upon information and belief, the Chicago Mission was aware of Defendant Adrahtas' sexual assaults of young hockey players, including minors, and his grooming activities. However, nobody affiliated with the Chicago Mission ever adequately investigated or reported Defendant Adrahtas to the proper prosecuting authorities.

46.     In the beginning of 2010, Defendant Adrahtas was being considered for the AHAI Hockey Hall of Fame.

47.     In January of 2010, Plaintiff Chris Jensen informed Mike Mullally, Director of AHAI and a USA Hockey Board Member, of Defendant Adrahtas' sexual assaults. Mr. Mullally admitted that the AHAI Board did not nominate Defendant Adrahtas in the past because of innuendo and rumor. However, AHAI did not conduct an adequate investigation, or report Defendant Adrahtas to all proper authorities.

48.     On February 10, 2010, Plaintiff Chris Jensen sent a formal letter to Mike Mullally regarding Defendant Adrahtas' sexual assault history. In response, Mr. Mullally drafted a report regarding the allegations against Defendant Adrahtas, and communicated with former USA Hockey Legal Counsel, Peter Lindberg, regarding those same allegations.

49.     Jim Smith, USA Hockey President, and Tony Rossi, USA Hockey Vice-President, were both on the AHAI Hall of Fame Committee and were aware of Mike Mullally's report regarding the allegations against Defendant Adrahtas.

8

50.     Peter Lindberg advised Mike Mullally and/or AHAI to: investigate these issues or to report these issues to the appropriate prosecuting authorities; interview all the AAA team personnel and parents of team members that played for Defendant Adrahtas; that RMU's Athletic Department or school administration be immediately contacted so they could take action; and that Rich Butera should be contacted so that he can put "our carriers on notice of a possible claim or claims arising from the investigation.

51.     Upon information and belief, Mike Mullally, Jim Smith, Tony Rossi, AHAI and USA Hockey did not investigate or report these issues to the appropriate prosecuting authorities; interview past AAA team personnel and parents; or contact RMU's Athletic Department. Defendant Adrahtas was suspended indefinitely because he did not attend a hearing with AHAI.

52.     With the aid of the Defendants' complicit conspiracy to cover up Defendant Adrahtas' sexual assaults, Defendant Adrahtas continued to coach and groom young male hockey players as the Varsity Men's Hockey Coach at RMU, which competed in the America Collegiate Hockey Association and was a member of USA Hockey, from 2010 through 2018.

53.     RMU Athletic Director, Don Haynes, was also aware of the rumors surrounding Defendant Adrahtas, and decided not to hire Defendant Adrahtas.  However, after Don Haynes changed positions, Director of Hockey Operations, Tom Wendlandt, who was also aware of the rumors, hired Defendant Adrahtas in 2010.

54.     In 2012, Tony Kellin discovered Defendant Adrahtas was coaching at RMU and immediately filed a police report with the Bensenville Police Department in Illinois.

55.     Sgt. Brian Dooley contacted then RMU Associate Athletic Director, Kurt Melcher, and explained the information regarding Defendant Adrahtas' departure from UMN.

56.     Upon information and belief, Kurt Melcher notified a member of RMU's Human

9

Resources Department, Gregory Tall, about the sexual allegations involving Defendant Adrahtas.

57.     Defendant Adrahtas was allowed to continue coaching at RMU for six more seasons after RMU was aware of the sexual assaults of young hockey players, including minors, and his grooming activities, without RMU conducting any internal investigations or reporting Defendant Adrahtas to the proper prosecuting authorities.

58.     On September 13, 2018, Plaintiff Michael Sacks filed a complaint with RMU and the American Collegiate Hockey Association.

59.     Soon thereafter, in September 2018, the U.S. Center for SafeSport received the first report about the allegations herein from the American Collegiate Hockey Association.

60.     Defendant Adrahtas was allowed to resign from RMU.

61.     On June 3, 2020, following a lengthy investigation by the U.S. Center for SafeSport, Defendant Adrahtas was issued a lifetime ban from USA Hockey. On June 17, 2021, AHAI received another copy of Michael Sacks' complaint, which he sent to RMU, via USPS certified mail from Michael Sacks' legal counsel. To date, AHAI still has not reported to police or local authorities any of the heinous allegations contained in Michael Sacks' complaint.

62.     Defendant Adrahtas carried out his sexual assault under the guise of providing mentorship, with the promises of furthering Plaintiffs' hockey careers, while the Defendants and numerous hockey organizations allowed him to continue to operate from a position of authority and power.  *See* Minn. Stat. §609.341(10).

63.     Defendant Adrahtas used his position of trust and confidence, as a head hockey coach, in an abusive manner causing Plaintiffs to suffer a variety of injuries including shock, humiliation, emotional and psychological distress and related physical manifestations thereof, embarrassment, loss of self-esteem, disgrace, and loss of enjoyment of life.

64.     On February 21, 2020, a story written by Katie Strang was published in The Athletic, detailing decades of allegations against Defendant Adrahtas, including Plaintiffs Michael Sacks, Christopher Jensen, Brent Cary allegations against Defendant Adrahtas.

65.     Following the February 2020 publication, other victims began coming forward after recognizing that they were also victims of Defendant Adrahtas' sexual abuse.

66.     Plaintiffs have been forced to relive the trauma of the sexual assaults.

67.     As early as the summer of 1985, UMN representatives were aware of Defendant Adrahtas' conduct, yet failed to appropriately respond to allegations, resulting in the sexual assault, abuse, and molestation of Plaintiffs and other individuals, through, upon information and belief, approximately 2018.

68.     UMN's deliberate indifference before, during, and after the sexual assault, abuse, and molestation of Plaintiffs was in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 *et seq*., 42 U.S. C. §1983, as well as other Federal and State laws.

69.     UMN's failure to properly supervise Defendant Adrahtas and their negligence was in violation of Minnesota common law.

70.     The acts, conduct, and omissions of Defendants, and their policies, customs, and practices with respect to investigating sexual assault allegations severely compromised the safety and health of Plaintiffs and an unknown number of individuals, and have resulted in repeated instances of sexual assault, abuse, and molestation of Plaintiffs by Defendant Adrahtas, which has been devastating for Plaintiffs and their families, causing Post-traumatic stress disorder.

71.     This action arises from Defendants' blatant disregard for Plaintiffs' federal and state rights, and Defendants' deliberately indifferent and unreasonable response to sexual assault, abuse, and molestation.

II.     **JURISDICTION AND VENUE**

72.     This action is brought pursuant to Title IX of the Educational Amendments of 1972, 20 U.S.C. §1681, *et seq*., as more fully set forth herein.

73.     This is also an action to redress the deprivation of Plaintiffs' constitutional rights under the Fourteenth Amendment of the United States Constitution pursuant to 42 U.S.C. §1983.

74.     Subject matter jurisdiction is founded upon 28 U.S.C. §1331 which gives district courts jurisdiction over all civil actions arising under the Constitution, laws and treaties of the United States.

75.     Subject matter jurisdiction is also founded upon 28 U.S.C. §1343 which gives district courts original jurisdiction over any civil actions authorized by law to be brought by any person to redress the deprivation, under color of any State Law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States, and any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of civil rights.

76.     Plaintiffs further invokes the supplemental jurisdiction of this Court, pursuant to 28 U.S.C.§ 1367(a) to hear and decide claims arising under state law that are so related to the claims within the original jurisdiction of this Court that they form part of the same case or controversy.

77.     The claims are cognizable under the United States Constitution, 42 U.S.C. §1983, 20 U.S.C. §1681 *et seq*., and under Minnesota Law.

78.     Critical events giving rise to this lawsuit occurred in Hennepin County, Minnesota which sits in the District of Minnesota.

79.     The Court has jurisdiction to award nominal and compensatory damages under 28 U.S.C. §1343(a)(4).

80.     The Court has jurisdiction to award reasonable attorneys' fees and costs.  28 U.S.C. §2412, 42 U.S.C. §1988(b).

81.     Venue is proper in the United States District Court for the District of Minnesota, pursuant to 28 U.S.C § 1391 (b)(2), in that this is the judicial district in which the events giving rise to the claim occurred.  Further, the District of Minnesota has jurisdiction over this civil action pursuant to 28 U.S.C. §1331, and 28 U.S.C. §1343 to redress the deprivation, under color of any state law of Plaintiffs' constitutional rights.

## III.    <u>PARTIES AND KEY INDIVIDUALS</u>

82.     Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

83.     All Plaintiffs are citizens of the United States.

84.     Plaintiff Michael Sacks is a male and is a resident of Illinois, but resided in Minnesota between 1984-1985, and was a resident of both Illinois and Minnesota at all times relevant to the allegations in this Complaint.  Plaintiff Michael Sacks was a minor at the times he was sexually assaulted, abused, and molested by Defendant Adrahtas.

85.     Plaintiff Christopher Jensen is a male and is a resident of Florida, but resided in Illinois and visited Minnesota at all times relevant to the allegations in this Complaint.  Plaintiff Christopher Jensen was a minor at the times he was sexually assaulted, abused, and molested by Defendant Adrahtas.

86.     Plaintiff Brent Cary is a male and is a resident of Illinois.  Plaintiff Brent Cary was a minor at the time Defendant Adrahtas attempted to assault, abuse, and molest him.

13

87.   Plaintiff Benjamin Cole is a male and is a resident of Florida, but resided in Illinois at all times relevant to the allegations in this Complaint.  Mr. Cole was a minor at the times he was sexually assaulted, abused, and molested by Defendant Adrahtas.

88.   Plaintiff Kelly Gee is a male and is a resident of Colorado, but resided in Illinois and visited Florida at all times relevant to the allegations in this Complaint.  Kelly Gee was a minor at the times he first was sexually assaulted, abused, and molested by Defendant Adrahtas.

89.   Defendant Adrahtas, is a resident of Florida, but resided in Minnesota and Illinois at all times relevant to the allegations in this Complaint.

90.   Defendant UMN was at all relevant times and continues to be a public university organized and existing under the laws of the state of Minnesota.

91.   Defendant UMN receives federal financial assistance and is therefore subject to Title IX of the Educational Amendments of 1972, 20 U.S.C. §1681(a).

92.   Defendant Board is the governing body for UMN.

93.   Defendant UMN and Defendant Board are hereinafter collectively referred to as the UMN Defendants.

94.   Brad Buetow was the UMN Men's Varsity Head Hockey Coach at all relevant times herein.

95.   Paul Giel was the former Athletic Director at UMN during all relevant times herein.

96.   Defendant USA Hockey was and continues to be an organization incorporated in Colorado, authorized to conduct business and conducting business throughout the United States, including but not limited to Minnesota.

97.   Jim Smith is the current President of Defendant USA Hockey, named on or around June 5, 2015, who is currently responsible for the overall management and strategic planning of

Defendant USA Hockey.  Mr. Smith also held various positions, including President, with AHAI.

98.     Ron DeGregorio was the past President of Defendant USA Hockey and held that position from approximately 2003 through 2015, and during that time was responsible for the overall management and strategic planning of Defendant USA Hockey.

99.     AHAI was and continues to be an organization incorporated in Illinois.

100.    Kevin Bolger is the current President of AHAI named on or around September 23, 2020, who is currently responsible for the overall management and strategic planning of Defendant AHAI.

101.    Mike Mullally was the past President of Defendant AHAI and held that position from approximately 2006 through 2012, and during that time was responsible for the overall management and strategic planning of Defendant USA Hockey.

## IV.    SPECIFIC FACTUAL ALLEGATIONS

### A.    MICHAEL SACKS

102.    Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

103.    Plaintiff Michael Sacks first met Defendant Adrahtas in 1982.

104.    In 1982, Plaintiff Michael Sacks was a minor, age 15 years old.

105.    In 1982 Plaintiff Michael Sacks played hockey for the Budweiser Jets, a "AAA" travel hockey team in Illinois coached by Defendant Adrahtas.

106.    During the 1983-1984 season, Defendant Adrahtas targeted Plaintiff Michael Sacks because of his fractured relationship with his father.  Defendant Adrahtas convinced Michael Sacks and his father that he could help Michael Sacks achieve his dreams in hockey, and provide a positive influence in Michael Sack's life.

15

107.    Defendant Adrahtas convinced Michael Sacks' father that it would be in the best interest for Michael Sacks' hockey career for Defendant Adrahtas to become Michael Sacks' legal guardian.  Defendant Adrahtas convinced Michael Sacks' family that if he became Michael Sacks' legal guardian, and let him train Plaintiff full time, Defendant Adrahtas would provide him with unprecedented career and coaching opportunities.

108.    On November 15, 1983 Defendant Adrahtas submitted a Petition for Guardian in DuPage County, Illinois.  *See* November 15, 1983 Petition for Guardian, Case No. 83 P 929 attached as Exhibit 1.

109.    Plaintiff Michael Sacks moved into Defendant Adrahtas' home located in Lisle, Illinois.  This residence was referred to as the "Hockey House," and other hockey players lived in the home with Defendant Adrahtas.

110.    After Plaintiff Michael Sacks moved in with Defendant Adrahtas, Defendant Adrahtas accelerated his grooming efforts, including writing letters to Michael Sacks claiming to have his best interest, signing "with love," and verbally telling Michael Sacks that he loved him.

111.    Defendant Adrahtas' grooming efforts culminated in his nefarious scheme to sexually assault, abuse and molest Plaintiff Michael Sacks.

112.    In December of 1983, while Plaintiff Michael Sacks was a minor, sixteen years of age, Defendant Adrahtas presented his scheme to sexually assault Michael Sacks.  Defendant Adrahtas told Michael Sacks he knew a girl ("Sheila") that loved giving oral sex.  However, in order to receive oral sex from "Sheila," Michael Sacks would need to be blindfolded and restrained so that he could not touch her.  Defendant Adrahtas explained that "Sheila" had been sexually assaulted in the past and was only comfortable performing oral sex under these conditions so that she could get away quickly if she felt uncomfortable or if Michael Sacks "tried anything."  Further

this act had to be done in complete darkness as "Sheila" wanted complete anonymity as she was "unattractive."

113.   One day after presenting this offer, in January of 1984, Defendant Adrahtas informed Plaintiff Michael Sacks that "Sheila" was coming over to the Hockey House.

114.   Defendant Adrahtas explained a detailed process how the experience would occur. To ensure the encounter would be clandestine, "Sheila" would meet Plaintiff Michael Sacks in Defendant Adrahtas' room, out of sight of the other hockey players who lived downstairs. Defendant Adrahtas informed Michael Sacks that he would receive oral sex from "Sheila" first. At this point, Defendant Adrahtas undressed in front of Michael Sacks and told Michael Sacks to blindfold him and tie him to the bed. Defendant Adrahtas instructed Michael Sacks to flicker the lights so that "Sheila" would know she could go into the room. Michael Sacks was to wait on the screened-in porch so that "Sheila" did not see him. After a period of time, Defendant Adrahtas came out of the bedroom and took Michael Sacks to the bedroom while "Sheila" waited outside. Defendant Adrahtas instructed Michael Sacks to undress, and then restrained Michael Sacks to the bed and blindfolded him. Next, Defendant Adrahtas shut off all the lights so that it was so dark that Michael Sacks could not see anything. Eventually, Defendant Adrahtas came into the room and performed oral sex on Michael Sacks.

115.   This arrangement with "Sheila" continued throughout the 1983-1984 season when Plaintiff Michael Sacks played for the Junior "A" Franklin Park Jets in Illinois, coached by Defendant Adrahtas. Approximately once a week "Sheila" performed oral sex on Michael Sacks.

116.   During this time, upon information and belief, "Sheila" was really Defendant Adrahtas disguising his voice to speak very softly in an attempt to sound like a female, and

Defendant Adrahtas was sexually assaulting, abusing, molesting, and performing oral sex on Plaintiff Michael Sacks, who was a minor.

117.    During the spring of 1984, Plaintiff Michael Sacks agreed to play hockey for the Junior "A" St. Paul Vulcans.  In the summer of 1984, Defendant Adrahtas accepted a position as an assistant hockey coach for the UMN Mens Varsity Hockey Team.

118.    Defendant Adrahtas arranged for Plaintiff Michael Sacks to continue living with him in Minnesota for the 1984-1985 season, at a residence located at 1445 Salem Church Road, Apartment 309, in Inver Grover Heights, Minnesota.

119.    Defendant Adrahtas informed Plaintiff Michael Sacks that "Sheila" had moved to Minnesota at the same time as them and wanted to come to their apartment to give him oral sex again.

120.    Plaintiff Michael Sacks was suspicious of these circumstances.  To allay Michael Sacks' fears, Defendant Adrahtas promised Michael Sacks a spot on UMN's Varsity Mens Hockey Team.  Michael Sacks trusted Defendant Adrahtas was looking out for his best interests, and the weekly sexual encounters with "Sheila" began again, while Michael Sacks was still a minor, age seventeen.

121.    Now that Defendant Adrahtas had Plaintiff Michael Sacks living in his apartment in a different state from his parents, was his legal guardian, and earned his trust by promising him a spot on UMN's Varsity Men's Hockey Team, Defendant Adrahtas' expanded his nefarious scheme to sexually assault, abuse and molest Michael Sacks by inviting other adults to perform oral sex on him and pretend to be "Sheila."  During this time, Michael Sacks was confused as the oral sex performed in Minnesota felt different than in Illinois. Additionally, the oral sex performed in Minnesota felt different on each occasion.  Upon information and belief, Defendant Adrahtas

was paid by multiple individuals wanting to perform oral sex on a minor.  Michael Sacks was afraid to say no to continued encounters with "Sheila" out of fear Defendant Adrahtas would blackball him in the hockey community, and the promise of playing for UMN would disappear.

122.    During the 1984-1985 season, these sexual encounters included: an assault where "Sheila" attempted digitally penetrating Michael Sacks anus without his consent, and Michael Sacks told "Sheila" to stop; an assault where "Sheila" put a shaved nipple in Michael Sacks' mouth; and an assault where Michael Sacks participated in a three-way sexual encounter involving "Sheila" and another hockey player.  During this occasion, "Sheila" told Michael Sacks to "come behind doggystyle" to penetrate "Sheila's anus, but Michael Sacks realized "Sheila" was not a woman, but a man, and stopped the encounter."

123.    Following the three-way encounter, Plaintiff Michael Sacks informed Defendant Adrahtas he would no longer participate in any further activity with "Sheila."

124.    On August 16, 1984 Plaintiff Michael Sacks received a recruiting letter from UMN Varsity Men Hockey Head Coach Brad Buetow.  *See* August 16, 1984 recruiting letter attached as Exhibit 2.

125.    Through the 1984-1985, Plaintiff Michael Sacks received multiple recruiting letters from Defendant Adrahtas on UMN letterhead.  *See* Defendant Adrahtas recruiting letters attached as Group Exhibit 3.

126.    In April 1985, Plaintiff Michael Sacks signed a Letter of Intent to play hockey at the UMN.

127.    On April 23, 1985, Defendant Adrahtas sent a letter on UMN letterhead to Plaintiff Michael Sacks' parents regarding a picture showing Michael Sacks signing his Letter of Intent. *See* April 23, 1985 Letter attached as Exhibit 4.

128.    On May 10, 1985 Plaintiff Michael Sacks received a letter from Defendant Adrahtas on UMN letterhead regarding the incoming freshman hockey players and their housing at UMN.  *See* May 10, 1985 Letter attached as Exhibit X.

129.    On May 31, 1985, Plaintiff Michael Sacks received a Certificate of Award for his full athletic scholarship to play hockey at UMN.  *See* Certificate of Award attached as Exhibit 3.

130.    The same night Plaintiff Michael Sacks informed Defendant Adrahtas he would no longer participate in encounters with "Sheila," he overheard Defendant Adrahtas offering UMN Varsity Men Hockey players encounters with "Sheila."

131.    Defendant Adrahtas targeted UMN hockey players that were shy, gullible, and did not have girlfriends.

132.    Defendant Adrahtas approached UMN Captain Tony Kellin approximately four times claiming that he could set up Mr. Kellin with the "best blowjob you've ever had in your life, but your hands will have to be tied behind your back and you could not see or talk to the Sheila." Mr. Kellin was immediately suspicious that Defendant Adrahtas was "Sheila" and was performing oral sex on other UMN hockey players without their knowledge.

133.    Tony Kellin devised a sting operation to expose Defendant Adrahtas as "Sheila." The plan that was implemented was simple.  Some hockey players would accept Defendant Adrahtas' invitation to receive oral sex from "Sheila," and agreed to have "Sheila" come to a hockey player's home.  When those hockey players went in, other hockey players waited outside and inside the apartment at every point of ingress and egress, including every entrance, exit and in the hallways to see if a woman named "Sheila" appeared.  During the sting operation, nobody entered or left the apartment, confirming Mr. Kellin's worst suspicions that Defendant Adrahtas was "Sheila," and was performing oral sex on UMN hockey players without their knowledge.

20

134.    Tony Kellin immediately reported Defendant Adrahtas' sexual assaults, abuse and molestation to UMN employees, including Athletic Director, Paul Giel.

135.    Paul Giel, the Athletic Department, UMN and its Board devised a plan to conceal Defendant Adrahtas' criminal activity to avoid negative press and exposure to civil liability and criminal charges.

136.    Following an incredibly successful six seasons coaching the Varsity Men Hockey Team at UMN, amassing a 171-75-8 record including a 31-13-3 record and NCAA playoff appearance, Head Coach, Brad Buetow was fired by Paul Giel without explanation.   Brad Buetow's .689% winning percentage was the highest at UMN since Emil Iverson's era in the 1920s.  Brad Buetow was responsible for hiring Defendant Adrahtas.

137.    On June 6, 1985 Defendant Adrahtas was allowed to resign from UMN for "personal reasons."  Defendant Adrahtas has since admitted that he was forced to resign because of sexual misconduct with UMN hockey players.

138.    Shortly thereafter, in June 1985, the last remaining coach of the UMN Varsity Men Hockey Team, Bob Shier, called Plaintiff Michael Sacks and informed him that he could not come to UMN and play hockey anymore because of the sexual allegations against Defendant Adrahtas and the negative press that would cause UMN.  UMN bullied Michael Sacks to ensure he would not attend UMN on his full athletic scholarship.

139.    After finding out what happened to him, Plaintiff Michael Sacks' trust in people and himself plummeted.

140.    Plaintiff Michael Sacks became "uncoachable", he was no longer to trust any coach and became openly defiant as a result of the abuse.

21

141.    Plaintiff Michael Sacks was overwhelmed, emotionally and psychologically scarred, and traumatized after the Summer of 1985.

142.    At 18 years old, and in his prime, after UMN rescinded his scholarship, Plaintiff Michael Sacks had no choice but to quit hockey.

143.    Plaintiff Michael Sacks has suffered and continues to suffer pain of mind and body, shock, emotional and psychological distress, physical manifestations of emotional and psychological distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, was prevented and will continue to be prevented from performing his daily activities and obtaining the full enjoyment of life, and has sustained and continues to sustain loss of earnings and earning capacity.

144.    Plaintiff Michael Sacks believes the conduct by Defendant Adrahtas and the conduct of other adults who paid Defendant Adrahtas to perform sexual acts on Plaintiff Michael Sacks without his knowledge or consent, was sexual assault, abuse and molestation and for Defendant Adrahtas' pleasure, self-gratification and financial benefit through prostitution and without Michael Sacks' knowledge or consent.

   **B.    <u>CHRIS JENSEN</u>**

145.    Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

146.    Plaintiff Christopher Jensen first met Defendant Adrahtas in the summer of 1984.

147.    In 1984, Plaintiff Christopher Jensen was a minor, age 15 years old.

148.    In the summer of 1984, Defendant Adrahtas invited Plaintiff Christopher Jensen to play with college players in the Windy City Summer Hockey League in Wilmette, Illinois..

149.    During the 1984 summer season, Defendant Adrahtas targeted Plaintiff Christopher Jensen's father, convincing him he could help his son advance his dreams to become a collegiate and professional athlete as well as provide a positive influence in Christopher Jensen's life.

150.    During this same time, Defendant Adrahtas groomed Plaintiff Christopher Jensen with including him on a summer-league team comprised of all older collegiate athletes while constantly praising his hockey skills and unlimited potential in the sport of hockey.

151.    Defendant Adrahtas' grooming efforts culminated in his nefarious scheme to sexually assault, abuse, and molest Plaintiff Christopher Jensen.

152.    In the summer of 1984, after Plaintiff Christopher Jensen turned 16 years old, Defendant Adrahtas invited Christopher Jensen to the Hockey House in Lisle so they could discuss his hockey career.

153.    Plaintiff Christopher Jensen agreed to go to Defendant Adrahtas' Hockey House. Upon arrival, Defendant Adrahtas ordered pizza and discussed Christopher Jensen's future as a hockey player.  After dinner, Defendant Adrahtas talked about his love for Motown music and Diana Ross.  Defendant Adrahtas' casual conversation were targeted to distract Christopher Jensen from any uneasiness, and mask Defendant Adrahtas' true intentions.

154.    During this visit, while Plaintiff Christopher Jensen was a minor, sixteen years of age, Defendant Adrahtas presented his scheme to sexually assault Christopher Jensen.  Defendant Adrahtas shifted the conversation to sex, telling Christopher Jensen he knew a girl that loved giving oral sex.  However, in order to receive oral sex from "Sheila," Christopher Jensen would need to be blindfolded and could not touch her.  Defendant Adrahtas explained that "Sheila" had been sexually assaulted in the past and was only comfortable performing oral sex under those condition.

23

Further this act had to be done in complete darkness as "Sheila" wanted complete anonymity as she was "unattractive."

155.    During this same visit, Defendant Adrahtas explained a detailed process how the experience would occur.  Plaintiff Christopher Jensen was to wait in the basement while Defendant Adrahtas received oral sex from "Sheila" first.  Then, Defendant Adrahtas brought Christopher Jensen upstairs to a bedroom, sat him on the bed, and blindfolded him.  Next, Defendant Adrahtas shut off all the lights so that it was so dark that Christopher Jensen could not see anything.  Eventually, "Sheila" came into the room and performed oral sex on Christopher Jensen.

156.    During this time, upon information and belief, "Sheila" was really Defendant Adrahtas disguising his voice to speak very softly in an attempt to sound like a female, and Defendant Adrahtas sexually assaulted, abused, molested, and performed oral sex on Plaintiff Christopher Jensen, who was a minor.

157.    Later in the summer of 1984, Plaintiff Christopher Jensen shared the "Sheila" story with some friends.  At this time, a friend responded to the story stating Christopher Jensen actually received oral sex from his coach.

158.    Following this exchange, Plaintiff Christopher Jensen was confused, ashamed, and his hockey performance suffered.

159.    During the winter of 1984-1985, Defendant Adrahtas invited Plaintiff Christopher Jensen to visit him at the UMN, where Defendant Adrahtas was an assistant coach for the Men's Varsity Hockey Team.  Christopher Jensen accepted the invitation because Defendant Adrahtas was a mentor, he wanted to pursue his hockey dream of playing at the next level (college), an as a 16-year-old, he had never visited a college campus before.

160.    After taking Plaintiff Christopher Jensen on a visit and tour of UMN's facilities, Defendant Adrahtas took Christopher Jensen to dinner near campus.

161.    At dinner, Defendant Adrahtas changed the topic of conversation to sex, informing Plaintiff Christopher Jensen that "Sheila" had moved to Minnesota and that he could set up another sexual experience with "Sheila."

162.    It was through the presentation of the specific and exact sexual scenarios from his previous experience in Chicago that Plaintiff Christopher Jensen realized that Defendant Adrahtas had personally performed oral sex on him previously, understand there was absolutely no way "Sheila" moved to Minnesota.

163.    Plaintiff Christopher Jensen refused Defendant Adrahtas' invitation for oral sex.

164.    After finding out what happened to him, Plaintiff Christopher Jensen's trust in people and himself plummeted.

165.    Plaintiff Christopher Jensen became "uncoachable", he was no longer to trust any coach and became openly defiant as a result of the abuse.

166.    Plaintiff Christopher Jensen was overwhelmed, emotionally and psychologically scarred, and traumatized after the Summer of 1984.

167.    In 2010, Plaintiff Christopher Jensen learned incidentally that Defendant Adrahtas was being inducted into the Illinois Hockey Hall of Fame.

168.    In January of 2010, Plaintiff Chris Jensen informed Mike Mullally, President of AHAI and a USA Hockey Board Member, of his personal account of Defendant Adrahtas' 1984 sexual assault.  Mr. Mullally admitted that the AHAI Board did not nominate Defendant Adrahtas in the past because of innuendo and rumor.  However, AHAI never conducted or reported Defendant Adrahtas to any authority.

169.   On February 10, 2010, Plaintiff Chris Jensen sent a formal letter to Mike Mullally regarding Defendant Adrahtas' sexual assault history.

170.   Mike Mullally spoke with Defendant Adrahtas who denied ever performing oral sex on any of his hockey players, but admitted that he procured oral sex for Plaintiff Christopher Jensen and six other hockey players he coached.

171.   In response, Mr. Mullally drafted a report regarding the allegations against Defendant Adrahtas and his admissions, and communicated with former USA Hockey Legal Counsel, Peter Lindberg, regarding those same allegations and admissions.

172.   Jim Smith, USA Hockey President, and Tony Rossi, USA Hockey Vice-President, were both on the AHAI Hall of Fame Committee and were aware of Mike Mullally's report regarding the allegations against Defendant Adrahtas.

173.    Peter Lindberg advised Mike Mullally and/or AHAI to: investigate these issues or to report these issues to the appropriate prosecuting authorities; interview all the AAA team personnel and parents of team members that played for Defendant Adrahtas; that RMU's Athletic Department or school administration be immediately contacted so they could take action; and that Rich Butera should be contacted so that he can put "our carriers on notice of a possible claim or claims arising from the investigation.

174.   Upon information and belief, Mike Mullally, Jim Smith, Tony Rossi, AHAI and USA Hockey did not investigate or report these issues to the appropriate prosecuting authorities; interview past AAA team personnel and parents; or contact RMU's Athletic Department. Defendant Adrahtas was suspended indefinitely because he did not attend a hearing with AHAI, and withdrew his name from AHAI Hall of Fame consideration.

175.    Plaintiff Christopher Jensen has suffered and continues to suffer pain of mind and body, shock, emotional and psychological distress, physical manifestations of emotional and psychological distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, was prevented and will continue to be prevented from performing his daily activities and obtaining the full enjoyment of life, and has sustained and continues to sustain loss of earnings and earning capacity.

176.    Plaintiff Christopher Jensen believes the conduct by Defendant Adrahtas was sexual assault, abuse and molestation and for Defendant Adrahtas' pleasure and self-gratification.

C.    **<u>BRENT CARY</u>**

177.    Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

178.    Ira Greenberg hired Defendant Adrahtas to coach the Chicago Young Americans, a Junior "A" hockey team owned by Mr. Greenery.

179.    After hearing rumors surrounding Defendant Adrahtas' departure from UMN, Ira Greenberg contacted UMN multiple times for a reference and background check before hiring Defendant Adrahtas.

180.    UMN concealed information regarding Defendant Adrahtas' criminal activities while employed at UMN, giving Mr. Greenberg the green light to hire Defendant Adrahtas.

181.    Ira Greenberg still had concerns about Defendant Adrahtas because of the rumors surrounding his departure from UMN, so he implemented a zero-tolerance policy with Defendant Adrahtas regarding his relationships with players he coached on the Chicago Young Americans.

182.    Plaintiff Brent Cary first met Defendant Adrahtas in 1989.

183.    In 1989, Plaintiff Brent Cary was a minor, age 17 years old.

27

184.    Prior to meeting Defendant Adrahtas, Plaintiff Brent Cary's father passed away from cancer when Brent Cary was 17 years old.

185.    In 1989, Defendant Adrahtas began targeting Plaintiff Brent Cary's mother. Defendant Adrahtas came to the her home, and pleaded with Ms. Cary to allow Brent Cary to try out for his Chicago Young Americans Junior "A" team, promising he would be a star.  Defendant Adrahtas presented himself as exceptional coach who had won a national championship, coached at the UMN, and was able to help players achieve all of their hockey dreams.

186.    During the 1989-1990 season, Defendant Adrahtas targeted Plaintiff Brent Cary because his father had passed away.  Defendant Adrahtas groomed Brent Cary by giving him special attention on and off the ice—including creating plays specifically for Brent Cary, paying him to work at his hockey school, treating him to pizza dinners, taking him to comedy shows at Second City, and inviting him for sleepovers to talk about his hockey career.  Defendant Adrahtas also showered Brent Cary with emotions, including kisses on the cheek and declarations of love.

187.    Defendant Adrahtas' grooming efforts culminated in his nefarious scheme to sexually assault, abuse and molest Plaintiff Brent Cary.

188.    Eventually, Defendant Adrahtas steered the conversations during a sleepover to the topic of sex, presenting Plaintiff Brent Cary with pornographic movies.  Once again, Defendant Adrahtas presented a minor, this time Brent Cary aged 17, with the "Sheila" sex scheme. Defendant Adrahtas told Brent Cary he knew a girl that loved giving oral sex to minors.  However, in order to receive oral sex from "Sheila," Brent Cary would need to be blindfolded and restrained so that he could not touch her.  Defendant Adrahtas explained that "Sheila" had been sexually assaulted in the past and was only comfortable performing oral sex under these conditions.

189.    After refusing Defendant Adrahtas' offers on numerous occasions, Plaintiff Brent Cary relented and agreed to meet "Sheila."

190.    Defendant Adrahtas explained the same scenario with how the sexual assault would occur—Plaintiff Brent Cary would be blindfolded and restrained so that he could not see or touch "Sheila."

191.    Plaintiff Brent Cary agreed to meet with "Sheila" and went to Defendant Adrahtas' Hockey House in the fall of 1989.  Plaintiff Brent Cary, a virgin at this time, backed out right before he was to be blindfolded, because he wanted his first time to be special.

192.    Defendant Adrahtas attempted arranging a meeting between Plaintiff Brent Cary and "Sheila" two more times during the 1989-1990 season while coaching Brent Cary at the Chicago Young Americans.

193.    During this time, upon information and belief, "Sheila" was really Defendant Adrahtas attempting to sexually assault, abuse, molest, and performing oral sex on Plaintiff Brent Cary, who was a minor.

194.    In the middle of the 1989-1990 season, the owner of the Chicago Young Americans, Ira Greenberg, confronted some of the players on the team about if they were hanging out with and sleeping over at Defendant Adrahtas' apartment.  One of the players became emotional and began crying, and Mr. Greenberg knew Defendant Adrahtas was in violation of his zero-tolerance policy.  Ira Greenberg fired Defendant Adrahtas for his inappropriate behavior with the hockey players he coached.

195.    Plaintiff Brent Cary has suffered and continues to suffer survivor's guilt, pain of mind and body, shock, emotional and psychological distress, physical manifestations of emotional and psychological distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation,

29

and enjoyment of life, was prevented and will continue to be prevented from performing his daily activities and obtaining the full enjoyment of life, and has sustained and continues to sustain loss of earnings and earning capacity.

196.    Plaintiff Brent Cary believes the conduct by Defendant Adrahtas was sexual assault, abuse and molestation and for Defendant Adrahtas' pleasure and self-gratification.

### D.    **BENJAMIN COLE**

197.    Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

198.    Plaintiff Benjamin Cole first met Defendant Adrahtas while attending the Midwest Goalie School, the school Defendant Adrahtas owned and operated, in 1984-1985.

199.    In 1984-1985, Plaintiff Benjamin Cole was a minor, age 9-10 years old.

200.    In the following years, while Plaintiff Benjamin Cole was a minor. Defendant Adrahtas observed that Benjamin Cole's father was very busy with work, and attempted to fill a fatherly role for Benjamin Cole.

201.    As Plaintiff Benjamin Cole became closer to Defendant Adrahtas, he heard rumors regarding Defendant Adrahtas' sexuality.

202.    Jim Smith advised Benjamin Cole's father to make sure that Benjamin Cole was never alone with Defendant Adrahtas.

203.    Defendant Adrahtas began grooming Plaintiff Benjamin Cole's mother, promising to open doors for her son in the hockey world that were closed because he was biracial.

204.    In 1990-1991 Plaintiff Benjamin Cole played hockey for the Chicago Selects, a "AAA" travel hockey spring league team in Illinois coached by Defendant Adrahtas.  Defendant

30

Adrahtas often talked to Benjamin Cole about topics unrelated to hockey, including school and relationships with friends.

205.    During the 1990-1991 season, when Plaintiff Benjamin Cole was 14 years old, Defendant Adrahtas began talking to Benjamin Cole about romantic relationships and sex. Conversations included Defendant Adrahtas questioning Benjamin Cole about his girlfriend—if they were kissing, or touching each other sexually.

206.    At first, Benjamin Cole refused to talk about details of his relationship with his girlfriend, but Defendant Adrahtas was bothered and offended by Benjamin Cole's refusal.  In response, after Benjamin Cole touched the breasts of his girlfriend for the first time, he was excited to go to the ice arena and talk to Defendant Adrahtas about it.  Defendant Adrahtas advised Benjamin Cole they could talk about details after practice, when nobody else was around.  After hearing the story, Defendant Adrahtas gave Benjamin Cole a high-five.

207.    During the 1990-1991 season, Plaintiff Benjamin Cole needed help breaking in a pair of goalie pads.  Defendant Adrahtas offered to help.

208.    While helping break in Plaintiff Benjamin Cole's goalie pads, Defendant Adrahtas began rubbing Benjamin Cole's legs as he put the goalie pads on.  Benjamin Cole, a minor aged 14 at the time, felt violated by Defendant Adrahtas touching his thighs, and asked Defendant Adrahtas to stop.

209.    Defendant Adrahtas was angry and told Plaintiff Benjamin Cole that he was "just trying to help out."

210.    Following this first incident, Defendant Adrahtas routinely sought to help Plaintiff Benjamin Cole with his equipment.  The process was the same every time—Defendant Adrahtas

would hold Benjamin Cole's leg with one hand, and do the straps of his goalie pads with the other hand.

211.    Defendant Adrahtas began using visualization techniques to touch Plaintiff Benjamin Cole inappropriately.  Defendant Adrahtas would advise Benjamin Cole to close his eyes and meditate thinking about making saves, all while rubbing his shoulders and back. Defendant Adrahtas would then stretch Benjamin Cole out, specifically pushing and touching Benjamin Cole's groin and genitals, claiming it was necessary to improve his flexibility.

212.    In the summer of 1990, when Plaintiff Benjamin Cole was 15 years old, he told Defendant Adrahtas after he received oral sex for the first time.  In response, Defendant Adrahtas told Benjamin Cole that he had a girl that gives a blowjob that is incomparable.

213.    Plaintiff Benjamin Cole continued playing for Defendant Adrahtas during spring league seasons, and began working for Defendant Adrahtas at his Midwest Goalie School.  From the time Benjamin Cole, a minor, was age 15-17, Defendant Adrahtas' grooming efforts culminated in his nefarious scheme to sexually assault, abuse and molest Benjamin Cole. Specifically, Defendant Adrahtas continued to have private stretching sessions with Benjamin Cole.  During these stretching sessions, Defendant Adrahtas would come into contact with, and rub, Benjamin Cole's genitals, explaining these massages were necessary to get to the next level in his hockey career.

214.    Additionally, Defendant Adrahtas would invite Benjamin Cole over to his home where he would play pornographic films, talk about sex, and discuss how pleasurable anal sex is, reasoning that if a girl can like it, so can a guy.  Defendant Adrahtas would even slow down pornographic films to emphasize certain scenes involving ejaculations, emphasizing that the girl he knows always swallows ejaculate.

215.     In 1992, when Plaintiff Benjamin Cole was 16 years old, Defendant Adrahtas often invited instructors from the Midwest Goalie School back to his apartment at the end of work days to eat pizza while watching pornographic films.  The abuse continued against Benjamin Cole during this time.

216.     Following the continued abuse by Defendant Adrahtas, Plaintiff Benjamin Cole's trust in people and himself plummeted.

217.     Plaintiff Benjamin Cole became "uncoachable," he was no longer to trust any coach and became openly defiant as a result of the abuse.

218.     Plaintiff Benjamin Cole was overwhelmed, emotionally and psychologically scarred, and traumatized after the continued abuse by Defendant Adrahtas from 1990-1992.

219.     Plaintiff Benjamin Cole has suffered and continues to suffer pain of mind and body, shock, emotional and psychological distress, physical manifestations of emotional and psychological distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, was prevented and will continue to be prevented from performing his daily activities and obtaining the full enjoyment of life, and has sustained and continues to sustain loss of earnings and earning capacity.

220.     Plaintiff Benjamin Cole believes the conduct by Defendant Adrahtas was sexual assault, abuse and molestation and for Defendant Adrahtas' pleasure and self-gratification.

**E.     KELLY GEE**

221.     Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

222.     Plaintiff Kelly Gee first met Defendant Adrahtas in 1999.

223.     In 1999, Plaintiff Kelly Gee was a minor, age 17 years old.

224.    In 1999, Plaintiff Kelly Gee received an invite to try out for the Danville Wings Junior "A" hockey team in Danville, Illinois.  Kelly Gee returned in 2001 to try out for the Danville Wings at age 19.

225.    At this time, Plaintiff Kelly Gee's parents were living in Alaska, and he was living out of his vehicle in the parking lot of an ice rink.  When Defendant Adrahtas learned these details regarding Kelly Gee, Defendant Adrahtas immediately seized the opportunity to offer Kelly Gee a job at his Midwest Goalie School, and the opportunity to live with him at his condominium at Golf Towers, 9001 West Golf Road, Des Plaines, Illinois.

226.    Defendant Adrahtas immediately began grooming Plaintiff Kelly Gee, providing companionship that was missing from Kelly Gee's life as he was living in a different state from all his friends and family.  Additionally, Defendant Adrahtas provided Kelly Gee him with clothes, personal effects, food, and alcohol.

227.    Defendant Adrahtas' grooming efforts culminated in his nefarious scheme to sexually assault, abuse and molest Plaintiff Kelly Gee.

228.    In 1999, while Plaintiff Kelly Gee was a minor, age 17, Defendant Adrahtas took Kelly Gee to strip clubs, and began playing pornographic films at the condominium, at which time Defendant Adrahtas suggested they mutually masturbate together. In 2001, Defendant Adrahtas offered to have "Sheila" come over to perform oral sex on Plaintiff Kelly Gee, with the usual *modus operandi*—Kelly Gee would have to be restrained and blindfolded.

229.    Uncomfortable with the proposal, but afraid to risk losing his living situation and hockey career prospects, Plaintiff Kelly Gee agreed Defendant Adrahtas' offer.

230.    The scenario began with Plaintiff Kelly Gee being blindfolded, with restraints on both his wrists and ankles.  Defendant Adrahtas provided Plaintiff Kelly Gee with alcohol before

"Sheila" came over on every occasion.

231.    In August of 2002, Defendant Adrahtas took Plaintiff Kelly Gee to Florida on vacation before the season started with the Danville Wings as a reward for all Kelly Gee's hard work, and because I never went on a vacation before.  While in Florida, Defendant Adrahtas took Kelly Gee out to eat, to tourist attractions, and swimming with dolphins. When Kelly Gee wanted to go out at night by himself, Defendant Adrahtas became angry and jealous.  One of the nights, Defendant Adrahtas saw Kelly Gee on the beach with two girls.  Defendant Adrahtas became irate, screaming at Kelly Gee, until the two girls ran off.   The next day Defendant Adrahtas guilted Kelly Gee all day, until Kelly Gee agreed to a sexual experience with a person Defendant Adrahtas claimed was a "stripper."   Defendant Adrahtas claimed he had access to a stripper network in various cities, but the rules were the same as the "Sheila" rules.  Kelly Gee agreed to be blindfolded and bound, and received oral sex from a "stripper," that was really Defendant Adrahtas.

232.    From 2001-2003, Plaintiff Kelly Gee participated in approximately 12-20 encounters with "Sheila."

233.    As time went by, the intensity of the encounters escalated.  The restraints became tighter to the point of pain.  Plaintiff Kelly Gee was digitally penetrated.  Defendant Adrahtas also offered to pay Kelly Gee for performing sexual acts while filmed with a camcorder, which Kelly Gee agreed to.  On at least one occasion, in addition to providing liquor to Kelly Gee, he was drugged by Defendant Adrahtas—waking up with no recollection of what happened to him.  Upon information and belief, Defendant Adrahtas sold these videos for a financial gain.

234.    During this time, upon information and belief, "Sheila" was really Defendant Adrahtas disguising his voice to speak softly in an attempt to sound like a female, and Defendant Adrahtas was sexually assaulting, abusing, molesting, and performing oral sex on Plaintiff Kelly

Gee.  Upon information and belief, Defendant Adrahtas also prostituted out Kelly Gee, without his knowledge or consent, to other adults for Defendant Adrahtas' own financial gain.

235.    In 2002, after playing just one game with the Danville Wings, Defendant Adrahtas forced Plaintiff Kelly Gee to leave the team as rumors began to swirl around the organization regarding their relationship.  Kelly Gee's hockey career was essentially over because of his association with Adrahtas.

236.    Plaintiff Kelly Gee was overwhelmed, emotionally and psychologically scarred, and traumatized after his time living with Defendant Adrahtas ended in 2003.

237.    Plaintiff Kelly Gee has suffered and continues to suffer pain of mind and body, shock, emotional and psychological distress, physical manifestations of emotional and psychological distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, was prevented and will continue to be prevented from performing his daily activities and obtaining the full enjoyment of life, and has sustained and continues to sustain loss of earnings and earning capacity.

238.    Plaintiff Kelly Gee believes the conduct by Defendant Adrahtas and the conduct of other adults who paid Defendant Adrahtas to perform sexual acts on Kelly Gee without his knowledge or consent, was sexual assault, abuse and molestation and for Defendant Adrahtas' pleasure, self-gratification and financial benefit through prostitution and selling videos without Kelly Gee's knowledge or consent.

## V.    CLAIMS AGAINST UMN DEFENDANTS

### A.    COUNT ONE

**VIOLATIONS OF TITLE IX**
**20 U.S.C. §1681(a), *et seq***
**(UMN DEFENDANTS)**

239.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

240.   Title IX's statutory language states, "No *person* in the United States shall on the basis of sex, be … subject to discrimination under any education program or activity receiving Federal financial assistance …"

241.   Each Plaintiff is a "person" under the Title IX statutory language.

242.   Defendant UMN receives federal financial assistance for its education program and is therefore subject to the provisions of Title IX of the Education Act of 1972, 20 U.S.C. §1681(a), et seq.

243.   Defendant UMN is required under Title IX to investigate allegations of sexual assault, sexual abuse, and sexual harassment.

244.   The U.S. Department of Education's Office of Civil Rights has explained that Title IX covers all programs of a school, and extends to sexual harassment and assault by employees, students and third parties.

245.   Defendant Adrahtas' actions and conduct were carried out under one of Defendant UMN programs, which provides medical treatment to students, athletes, and the public.

246.   Defendant Adrahtas' conduct and actions toward Plaintiffs, that being nonconsensual oral sex and touching of Plaintiff's genital area, constitutes sex discrimination under Title IX.

247.   As early as 1985, an "appropriate person" at Defendant UMN had actual knowledge of the sexual assault, abuse, and molestation committed by Defendant Adrahtas.

248.   Specifically, the UMN Defendants were notified about Defendant Adrahtas' sexual abuse and molestation by various UMN hockey players and Kevin Hartzell in 1985.

249.   The UMN Defendants failed to carry out their duties to investigate and take corrective action under Title IX following complaints of sexual assault, abuse, and molestation in 1985.

250.   The UMN Defendants acted with deliberate indifference to known acts of sexual assault, abuse, and molestation on its premises by:

       a.   failing to investigate and address allegations of Defendant Adrahtas' sexual misconduct brought to their attention by a group of UMN hockey players, as required by Title IX;

       b.   failing to adequately investigate and address the 1985 complaint regarding Defendant Adrahtas' conduct; and

       c.   failing to institute corrective measures to prevent Defendant Adrahtas from violating and sexually abusing other students and individuals, including minors.

251.   Between the dates of approximately May 1985 and January 1986, the UMN Defendants acted in a deliberate, grossly negligent, and/or reckless manner when they failed to reasonably respond to Defendant Adrahtas' sexual assaults and sex-based harassment of Plaintiff Michael Sacks and other UMN hockey players on and off school premises.

252.   The UMN Defendants' failure to promptly and appropriately investigate and remedy and respond to the sexual assaults after they received notice subjected Plaintiff Michael Sacks to further harassment and a sexually hostile environment, effectively denying him all access to educational opportunities at UMN, including Plaintiff Michael Sack's hockey scholarship.

253.   As a direct and/or proximate result of the UMN Defendants' actions and/or inactions, Plaintiff Michael Sacks has suffered and continue to suffer pain of mind and body, shock, emotional and psychological distress, physical manifestations of emotional and psychological distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, were prevented and will continue to be prevented from performing Plaintiff

Michael Sack's daily activities and obtaining the full enjoyment of life, and has sustained and continue to sustain loss of earnings and earning capacity.

**B.**     **COUNT TWO**

**VIOLATION OF CIVIL RIGHTS**
**42 U.S.C. §1983**
**(UMN DEFENDANTS, DEFENDANT ADRAHTAS)**

254.     Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

255.     Plaintiffs are members of a protected class, as gender is protected under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

256.     Plaintiffs enjoy the constitutionally protected Due Process right to be free from the invasion of bodily integrity through sexual assault, abuse, or molestation.

257.     At all relevant times, Defendants UMN, the Board, and Adrahtas were acting under color of law, to wit, under color of statutes, ordinances, regulations, policies, customs and usages of the State of Minnesota and/or Defendant UMN.

258.     The acts as alleged above amount to a violation of these clearly established constitutionally protected rights, of which reasonable persons in the UMN Defendants' positions should have known.

259.     The UMN Defendants have the ultimate responsibility and authority to train and supervise its employees, agents, and/or representatives, in the appropriate manner of detecting, reporting, and preventing sexual abuse, assault, and molestation and as a matter of acts, custom, policy, and/or practice, failed to do so with deliberate indifference.

260.     As a matter of custom, policy, and and/or practice, the UMN Defendants had and have the ultimate responsibility and authority to investigate complaints against their employees,

agents, and representatives from all individuals including, but not limited to students, visitors, faculty, staff, or other employees, agents, and/or representatives, and failed to do so with deliberate indifference.

261. The UMN Defendants had a duty to prevent sexual assault, abuse, and molestation on their campus and premises, that duty arising under the above-referenced constitutional rights, as well as established rights pursuant to Title IX.

262. In 1978, The Department of Health, Education, and Welfare provided institutions of higher education with additional guidance on the requirements for compliance with Title IX in intercollegiate athletic programs. Defendant UMN's internal policies provide that "Employees are required to report allegations of sexual assault to the campus Title IX office if it is possible that the sexual assault: (1) occurred on University property; (2) occurred during a University employment or education program or activity; (3) was directed at a current University member at the time they were a University member; or (4) was committed by a current University member at the time they were a University member."

263. Defendant UMN'S aforementioned internal policies were violated in or around 1985 when various UMN hockey players reported sexual assault, abuse, and molestation by Defendant Adrahtas to UMN representatives including Athletic Director, Paul Giel, and no action was taken to address the complaints.

264. The UMN Defendants' failure to address these complaints led to an unknown number of individuals being victimized, sexually assaulted, abused, and molested by Defendant Adrahtas.

265. Ultimately, the UMN Defendants failed to adequately and properly investigate the complaints of Plaintiffs or other similarly-situated individuals including but not limited to failing

to perform a thorough investigation into improper conduct by Defendant Adrahtas with Plaintiffs after receiving complaint in 1985.

266.   As indicated Perkins Coie's 2020 investigative report, members of the UMN athletic department were aware of the allegations against Defendant Adrahtas and they failed to act, both in investigating the claims and reporting them to law enforcement.

267.   By failing to prevent the aforementioned sexual assault, abuse, and molestation upon Plaintiffs, and by failing to appropriately respond to reports of Defendant Adrahtas' sexual assault, abuse, and molestation in a manner that was so clearly unreasonable it amounted to deliberate indifference, the UMN Defendants are liable to Plaintiffs pursuant to 42 U.S.C. §1983.

268.   The UMN Defendants are also liable to Plaintiffs under 42 U.S.C. §1983 for maintaining customs, policies, practices which deprived Plaintiffs of rights secured by the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. §1983.

269.   The UMN Defendants tolerated, authorized and/or permitted a custom, policy, practice or procedure of insufficient supervision and failed to adequately screen, counsel, or discipline Defendant Adrahtas, with the result that Defendant Adrahtas was allowed to violate the rights of persons such as Plaintiffs with impunity.

270.   As a direct and/or proximate result of the UMN Defendants' actions and/or inactions, Plaintiffs suffered discomfort and continue to suffer pain of mind and body, shock, emotional and psychological distress, physical manifestations of emotional and psychological distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity.

41

C.      **COUNT THREE**

**FAILURE TO TRAIN AND SUPERVISE**
**42 U.S.C. §1983**
**(UMN DEFENDANTS)**

271.    Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

272.    The UMN Defendants have the ultimate responsibility and authority to train and supervise its employees, agents, and/or representatives including Defendant Adrahtas and all faculty and staff regarding their duties toward students, faculty, staff, and visitors.

273.    The UMN Defendants failed to train and supervise its employees, agents, and/or representatives including all faculty and staff, regarding the following duties, which is not an exhaustive list:

      a.      Perceive, report, and stop inappropriate sexual conduct on campus;

      b.      Provide diligent supervision over student-athletes and other individuals;

      c.      Report suspected incidents of sexual abuse or sexual assault;

      d.      Ensure the safety of all students, faculty, staff, and visitors to Defendant UMN's premises free from sexual harassment; and,

      e.      Properly train faculty and staff to be aware of their individual responsibility for creating and maintaining a safe environment.

274.    The UMN Defendants failed to adequately train coaches, trainers, staff, and others regarding the aforementioned duties which led to violations of Plaintiffs' rights.

275.    As a result, the UMN Defendants deprived Plaintiffs of rights secured by the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. §1983.

276.    As a direct and/or proximate result of the UMN Defendants' actions and/or

inactions, Plaintiffs have suffered and continue to suffer pain of mind and body, shock, emotional and psychological distress, physical manifestations of emotional and psychological distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, were prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity.

**D.**    **COUNT FOUR**

**GROSS NEGLIGENCE**
**(UMN DEFENDANTS, DEFENDANT ADRAHTAS)**

277.    Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

278.    The UMN Defendants owed Plaintiffs a duty to use due care to ensure their safety and freedom from sexual assault, abuse, and molestation while interacting with their employees, representatives, and/or agents, including Defendant Adrahtas.

279.    Defendant Adrahtas owed Plaintiffs a duty of due care in carrying out his coaching as an employee, agent, and/or representative of the UMN Defendants.

280.    By becoming coach, in a position of authority, Defendant Adrahtas in the course of his employment, agency, and/or representation of the UMN Defendants, a special and fiduciary relationship between Plaintiffs and Defendant Adrahtas was created, resulting in Defendant Adrahtas owing Plaintiffs a duty to use due care.

281.    The UMN Defendants' failure to adequately supervise Defendant Adrahtas, especially after UMN knew or should have known of complaints regarding his nonconsensual sexual touching and assaults was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiffs or any other hockey players or students at UMN.

43

282.    Defendant Adrahtas' conduct in sexually assaulting, abusing, and molesting Plaintiff in the course of his employment, agency, and/or representation of the UMN Defendants and under the guise of "coaching" was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiffs.

283.    The UMN Defendants' conduct demonstrated a willful disregard for precautions to ensure Plaintiffs' safety.

284.    The UMN Defendants' conduct as described above, demonstrated a willful disregard for substantial risks to Plaintiffs.

285.    The UMN Defendants breached duties owed to Plaintiffs and were grossly negligent when they conducted themselves by the actions described above, said acts having been committed with reckless disregard for Plaintiffs' health, safety, Constitutional and/or statutory rights, and with a substantial lack of concern as to whether an injury would result.

286.    As a direct and/or proximate result of Defendants' actions and/or inactions, Plaintiffs suffered discomfort, and continue to suffer pain of mind and body, shock, emotional and psychological distress, physical manifestations of emotional and psychological distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity.

E.    **COUNT FIVE**

**NEGLIGENCE**
**(UMN DEFENDANTS, DEFENDANT ADRAHTAS)**

287.    Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

44

288.    The UMN Defendants owed Plaintiffs a duty of ordinary care to ensure their safety and freedom from sexual assault, abuse, and molestation while interacting with their employees, representatives and/or agents.

289.    When UMN hired Defendant Adrahtas as a coach, a position of authority, Defendant Adrahtas in the course of his employment, agency, and/or representation of the UMN Defendants, a special and fiduciary relationship between Plaintiffs and Defendant Adrahtas was created, resulting in Defendant Adrahtas owing Plaintiffs a duty to use due care.

290.    Defendant Adrahtas owed Plaintiffs a duty of ordinary care.

291.    The UMN Defendants' failure to adequately train and supervise Defendant breached the duty of ordinary care.

292.    The UMN Defendants had notice through its own employees, agents, and/or representatives in 1985.

293.    The UMN Defendants should have known of the foreseeability of sexual abuse with respect to youth and collegiate sports.

294.    The UMN Defendants' failure to properly investigate, address, and remedy complaints regarding Defendant Adrahtas' conduct was a breach of ordinary care.

295.    Defendant Adrahtas' conduct in sexually assaulting, abusing, and molesting Plaintiffs in the course of his employment, agency, and/or representation of the UMN Defendants was a breach of the duty to use ordinary care.

296.    As a direct and/or proximate result of Defendants' actions and/or inactions, Plaintiffs suffered discomfort, and continue to suffer pain of mind and body, shock, emotional and psychological distress, physical manifestations of emotional and psychological distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, were

prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity.

F.    **COUNT SIX**

**VICARIOUS LIABILITY**
**(UMN DEFENDANTS, DEFENDANT ADRAHTAS)**

297.    Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

298.    Vicarious liability is indirect responsibility imposed by operation of law where an employer is bound to keep its employees within their proper bounds and is responsible if it fails to do so.

299.    Vicarious liability essentially creates agency between the principal and its agent, so that the principal is held to have done what the agent has done.

300.    The UMN Defendants employed and/or held Defendant Adrahtas out to be its agent and/or representative from approximately 1984 to 1985.

301.    The UMN Defendants are vicariously liable for the actions of Defendant Adrahtas as described above that were performed during the course of his employment, representation, and/or agency with the UMN Defendants and while he had unfettered access to young male athletes on UMN's campus and premises through its his personal mission to "train" boys to succeed on his team.

302.    As a direct and/or proximate result of Defendants' actions and/or inactions, Plaintiffs suffered discomfort, and continue to suffer pain of mind and body, shock, emotional and psychological distress, physical manifestations of emotional and psychological distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, were prevented and will continue to be prevented from performing Plaintiffs' daily activities and

obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity.

G.     **COUNT SEVEN**

**EXPRESS/IMPLIED AGENCY**
**(UMN DEFENDANTS)**

303.    Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

304.    An agent is a person who is authorized by another to act on its behalf.

305.    The UMN Defendants intentionally or negligently made representations that Defendant Adrahtas was their employee, agent, and/or representative.

306.    On the basis of those representations, Plaintiffs reasonably believed that Defendant Adrahtas was acting as an employee, agent, and/or representative of the UMN Defendants.

307.    Plaintiff were injured as a result of Defendant Adrahtas' sexual assault, abuse, and molestation as described above, acts that were performed during the course of his employment, agency,  and/or representation with the UMN Defendants and while he had unfettered access to young male athletes.

308.    Plaintiff were injured because they relied on the UMN Defendants to provide employees, agents, and or representatives who would exercise reasonable skill and care.

309.    As a direct and/or proximate result of Defendants' actions and/or inactions, Plaintiffs suffered discomfort, and continue to suffer pain of mind and body, shock, emotional and psychological distress, physical manifestations of emotional and psychological distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings

and earning capacity.

### H.    COUNT EIGHT

### NEGLIGENT SUPERVISION
### (UMN DEFENDANTS)

310.    Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

311.    The UMN Defendants had a duty to provide reasonable supervision of their employee, agent, and/or representative, Defendant Adrahtas, while he was in the course of his employment, agency or representation with the UMN Defendants and while he interacted with young male athletes including Plaintiffs.

312.    It was reasonably foreseeable given the known sexual abuse in youth sports and in particular that Defendant Adrahtas, who had prior allegations against him had or would sexually abuse children, including Plaintiffs, unless properly supervised.

313.    The UMN Defendants breached their duty to provide reasonable supervision of Defendant Adrahtas, and permitted Defendant Adrahtas, who was in a position of trust and authority, to commit the acts against Plaintiffs.

314.    The aforementioned sexual abuse occurred while Plaintiffs and Defendant Adrahtas were on the premises of Defendant UMN, and while Defendant Adrahtas was acting in the course of his employment, agency, and/or representation of the UMN Defendants.

315.    The UMN Defendants tolerated, authorized and/or permitted a custom, policy, practice or procedure of insufficient supervision and failed to adequately screen, counsel, or discipline such individuals, with the result that Defendant Adrahtas was allowed to violate the rights of persons such as Plaintiffs with impunity.

316.    As a direct and/or proximate result of Defendants' actions and/or inactions,

48

Plaintiffs suffered discomfort, and continue to suffer pain of mind and body, shock, emotional and psychological distress, physical manifestations of emotional and psychological distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity.

I.      **COUNT NINE**

**NEGLIGENT FAILURE TO WARN OR PROTECT**
**(UMN DEFENDANTS)**

317.    Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

318.    The UMN Defendants knew or should have known that Defendant Adrahtas posed a risk of harm to Plaintiffs or those in Plaintiffs' situation.

319.    As early as 1985, the UMN Defendants had direct and/or constructive knowledge as to the dangerous conduct of Defendant Adrahtas and failed to act reasonably and responsibly in response.

320.    The UMN Defendants knew or should have known Defendant Adrahtas committed sexual assault, abuse, and molestation and/or was continuing to engage in such conduct.

321.    The UMN Defendants had a duty to warn or protect Plaintiffs and others in Plaintiffs' situation against the risk of injury by Defendant Adrahtas.

322.    The duty to disclose this information arose by the special, trusting, confidential, and fiduciary relationship between Defendant Adrahtas as an employee, agent, and representative of the UMN Defendants and Plaintiffs.

323.    The UMN Defendants breached said duty by failing to warn Plaintiffs and/or by

49

failing to take reasonable steps to protect Plaintiffs from Defendant Adrahtas.

324.    The UMN Defendants breached its duties to protect Plaintiff by failing to:

      a.    respond to allegations of sexual assault, abuse, and molestation;

      b.    detect and/or uncover evidence of sexual assault, abuse, and molestation; and,

      c.    investigate, adjudicate, and terminate Defendant Adrahtas's employment with Defendant before Adrahtas was allowed to resign from his position.

325.    The UMN Defendants failed to adequately screen, counsel and/or discipline Defendant Adrahtas for physical and/or mental conditions that might have rendered him unfit to discharge the duties and responsibilities of a coach at an educational institution, resulting in violations of Plaintiffs' rights.

326.    The UMN Defendants willfully refused to notify, give adequate warning, and implement appropriate safeguards to protect Plaintiffs from Defendant Adrahtas' conduct.

327.    As a direct and/or proximate result of Defendants' actions and/or inactions, Plaintiffs suffered discomfort, and continues to suffer pain of mind and body, shock, emotional and psychological distress, physical manifestations of emotional and psychological distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity.

**J.**    **COUNT TEN**

**NUISANCE (COMMON LAW AND MINN. STAT. I 561.01)**
**(UMN DEFENDANTS)**

328.    Plaintiffs reallege and incorporate by reference the allegations contained in the

previous paragraphs.

329.   UMN conspired and engaged in efforts to (1) conceal from the general public the sexual assaults committed by Defendant Adrahtas; and (2) protect Defendant Adrahtas from criminal prosecution from his sexual assaults against children in order to protect the reputation of the University.

330.   The negligence and/or deception and concealment by the UMN Defendants was and is injurious to the health and/or indecent or offensive, residents of Minnesota and all other members of the general public who lived and currently live in communities where Defendant lived. It was and is indecent and offensive to the senses, so as to interfere with the general public's comfortable enjoyment of life in that the general public cannot trust Defendant to warn parents of the presence of the current and/or former credibly accused molesters, nor to identify their current and/or former credibly accused molesters, nor to disclose said credibly accused molesters' assignment histories, nor to disclose their patterns of the conduct in grooming and sexually assaulting children, all of which create an impairment of the safety of children in the neighborhoods in the Twin Cities and throughout the Midwest United States where Defendants conducted, and continue to conduct, their business.

331.   The negligence and/or deception and concealment by the UMN Defendants was especially injurious to Plaintiffs' health as they and their families were unaware of the danger posed to young children left unsupervised with agents of Defendant, and in particular unaware of the immense danger that Adrahtas posed to youth, and as a result of this deception, Plaintiffs were placed in the custody and control of Adrahtas, an agent UMN, who subsequently and repeatedly sexually assaulted Plaintiffs.

332.   The negligence and/or deception and concealment by Defendant also was specially

injurious to Plaintiffs' health in that when Plaintiffs finally discovered the negligence and/or deception and concealment; that Plaintiffs had not been able to help been able to help other minors being molested because of the negligence and/or deception and concealment; and that Plaintiffs had not been able to because of the negligence and/or deception and concealment to receive timely medical treatment needed to deal with the problems Plaintiffs had suffered an continue to suffer as a result of the molestations.

333.    The continuing public nuisance created by Defendant was, was continues to be, the proximate cause of the injuries and damages to the general public and of the Plaintiffs' special injuries and damages as alleged.

334.    In doing the aforementioned acts, Defendant acted negligently and/or intentionally, maliciously and with conscious disregard of Plaintiffs' rights.

335.    As a result of the above-described conduct, Plaintiffs have suffered the injuries and damages described herein.

K.    **COUNT ELEVEN**

**NUISANCE (COMMON LAW AND MINN. STAT. I 609.74)**
**(UMN DEFENDANTS)**

336.    Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

337.    UMN conspired and engaged in efforts to: 1) conceal from the general public the sexual assaults committed by, Adrahtas,; and/or 2) concealed from proper civil authorities sexual assaults and abuse committed by Defendant Adrahtas and other agents against minor children; and/or 4) protected Adrahtas from criminal prosecution for his sexual assaults and abuse against children; and/or 5) allowed a known child molester to live freely in communities across the country without informing the public and/or 6) participated in the concealment of sexual abuse by UMN.

338.     The negligence and/or deception and concealment by the UMN Defendants has maintained or permitted a condition which unreasonably endangers the safety and health of a considerable number of members of the public including, but not limited to, children and residents in Minnesota, Illinois, and Florida where Adrahtas maintained a residence and continued to coach and abuse sexually abuse minors for over four decades after the UMN Defendants were aware that Adrahtas committed sexual assaults on its student athletes. The UMN Defendants failed to report multiple allegations of sexual assault and abuse of children to proper authorities, as well as their failure to inform the public about sexual abuse, or an employee/coach accused of sexual abuse of minors, has prevented the public from knowing of real danger, and has thereby endangered the safety and health of a considerable number of members of the public by allowing a child molester to avoid prosecution and remain living freely in unsuspecting communities and working with and around children.  This child molester, known to the UMN Defendants, but not to the public, poses a threat of additional abuse to a considerable number of members of the public.

339.     The negligence and/or deception and concealment by the UMN Defendants was and is especially injurious to Plaintiffs' health as Plaintiffs were sexually assaulted and/or harmed by one of Defendant's agents.

340.     The negligence and/or deception and concealment by the UMN Defendants also was and is especially injurious to Plaintiffs' health in that when Plaintiffs finally discovered the negligence and/or deception and concealment of Defendant Adrahtas, Plaintiffs experienced mental, emotional, psychological and/or physical distress that they had been victims of the UMN Defendants' negligence and/or deception and concealment.

341.     Plaintiffs have suffered and/or continue to suffer special, particular, and peculiar psychological and emotional harm and/or peculiar pecuniary harm, different in kind from the

53

general public, after learning of the UMN Defendants' concealment of names and information about a coach accused of sexually assaulting minors and as a result of the dangerous condition maintained and/or permitted by the UMN Defendants, which continued concealed until October of 2020, when UMN made a public statement about the matter. As a result of the negligence and/or deception and concealment, Plaintiffs have suffered and continue to suffer lessened enjoyment of life, and/or impaired health, and /or emotional and psychological distress, and/or physical symptoms of emotional and psychological distress and/or pecuniary loss including medical expenses and/or wage loss.

342.    Plaintiffs' injuries are also particular to them and differ from certain members of the public who have not been harmed by the nuisance. People who have not been harmed by the nuisance include those who have not suffered any injury at all, those who are unaware of the nuisance, those who do not believe that the UMN Defendants ever concealed or participated in the concealment of anything about child sex abuse, and that Defendant Adrahtas is still committing these acts without restraint.

343.    The continuing public nuisance created by the UMN Defendants was, and continues to be, the proximate cause of Plaintiffs' special injuries and damages as alleged.

344.    In doing the aforementioned acts, the UMN Defendants acted negligently and or intentionally, maliciously and with conscious disregard of Plaintiffs' rights.

345.    As a result of the above-described conduct, Plaintiffs have suffered the injuries and damages described herein.

**L.    COUNT TWELVE**

**NEGLIGENT FAILURE TO TRAIN OR EDUCATE**
**(UMN DEFENDANTS)**

346.    Plaintiffs reallege and incorporate by reference the allegations contained in the

previous paragraphs.

347.     The UMN Defendants breached their duty to take reasonable protective measures to protect Plaintiffs and other minors from the risk of childhood sexual abuse and/or sexual assault by Defendant Adrahtas, such as the failure to properly train or educate Plaintiffs and other individuals (including minors) about how to avoid such a risk.

348.     The UMN Defendants failed to implement reasonable safeguards to:

a.      prevent acts of sexual assault, abuse, and molestation by Defendant Adrahtas;

b.      avoid placing Defendant Adrahtas in positions where he could be unsupervised contact and interaction with Plaintiffs and other young athletes;

349.     As a direct and/or proximate result of the UMN Defendants' negligent failure to train or educate, Plaintiffs suffered discomfort, and continue to suffer pain of mind and body, shock, emotional and psychological distress, physical manifestations of emotional and psychological distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity.

**M.     COUNT THIRTEEN**

**NEGLIGENT RETENTION**
**(UMN DEFENDANTS)**

350.     Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

351.     The UMN Defendants had a duty when credentialing, hiring, retaining, screening, checking, regulating, monitoring, and supervising employees, agents and/or representatives to

55

exercise due care, but they failed to do so.

352.     The UMN Defendants were negligent in the retention of Defendant Adrahtas as an employee, agent, and/or representative in their failure to adequately investigate, report and address complaints about his conduct of which they knew or should have known.

353.     The UMN Defendants were negligent in the retention of Defendant Adrahtas as an employee, agent, and/or representative when after they discovered, or reasonably should have discovered Defendant Adrahtas' conduct which reflected a propensity for sexual misconduct.

354.     The UMN Defendants' failure to act in accordance with the standard of care resulted in Defendant Adrahtas gaining access to and sexually abusing and/or sexually assaulting Plaintiffs and an unknown number of other individuals.

355.     The aforementioned negligence in the credentialing, hiring, retaining, screening, checking, regulating, monitoring, and supervising of Defendant Adrahtas created a foreseeable risk of harm to Plaintiffs as well as other minors and young adults.

356.     As a direct and/or proximate result of the UMN Defendants' negligent retention, Plaintiffs suffered discomfort, and continue to suffer pain of mind and body, shock, emotional and psychological distress, physical manifestations of emotional and psychological distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life; were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life; have sustained and continue to sustain loss of earnings and earning capacity.

    N.     **COUNT FOURTEEN**

        **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
            **(UMN DEFENDANTS)**

357.     Plaintiffs reallege and incorporate by reference the allegations contained in the

previous paragraphs.

358.    The UMN Defendants allowed Defendant Adrahtas to be in a position where he sexually assaulted, abused, and molested children and young adults.

359.    A reasonable person would not expect the UMN Defendants to tolerate or permit their employee or agent to carry out sexual assault, abuse, or molestation after they knew or should have known of complaints and claims of sexual assault and abuse occurring during Defendant Adrahtas' coaching and mentorship.

360.    The UMN Defendants held Defendant Adrahtas in high esteem and acclaim which in turn encouraged Plaintiffs and others to respect and trust Defendant Adrahtas.

361.    The UMN Defendants protected Defendant Adrahtas in part to bolster and sustain his impressive reputation in the hockey community.

362.    A reasonable person would not expect the UMN Defendants to be incapable of supervising Defendant Adrahtas and/or preventing Defendant Adrahtas from committing acts of sexual assault, abuse, and molestation.

363.    The UMN Defendants' conduct as described above was intentional and/or reckless.

364.    As a direct and/or proximate result of the UMN Defendants' conduct, Plaintiffs suffered discomfort, and continue to suffer pain of mind and body, shock, emotional and psychological distress, physical manifestations of emotional and psychological distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity.

O.     **COUNT FIFTEEN**

## FRAUD AND MISREPRESENTATION
### (UMN DEFENDANTS)

365.    Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

366.    From approximately 1985 to 2020, the UMN Defendants represented to Plaintiffs and the public that Defendant Adrahtas was a competent and safe coach, who simply resigned, and was not terminated for sexual assault allegations.

367.    By representing that Defendant Adrahtas was a former team coach at Defendant UMN and a highly respected and successful USA Hockey coach, the UMN Defendants represented to Plaintiffs and the public that Defendant Adrahtas was safe, trustworthy, of high moral and ethical repute, and that Plaintiffs and the public need not worry about being harmed by Defendant Adrahtas.

368.    The representations were false when they were made as Defendant Adrahtas had and was continuing to sexually assault, abuse, and molest Plaintiffs and an unknown number of other individuals.

369.    As of 1985, the UMN Defendants knew their representations of Defendant Adrahtas were false as multiple UMN hockey players had complained of Defendant Adrahtas' conduct to UMN representatives.

370.    Although UMN was informed Defendant Adrahtas' conduct they failed to investigate, remedy, or in any way address UMN hockey player complaints.

371.    The UMN Defendants continued to hold Defendant Adrahtas out as a competent and safe coach.

372.    Additional complaints against Defendant Adrahtas surfaced over the years, including in a 2010 complaint to USA Hockey, and in 2018 when United States Center for

58

SafeSport began its investigation into Defendant Adrahtas.  Defendant UMN's culture and its failure to address complaints of sexual harassment, including sexual violence in a prompt and equitable manner which in turn caused and may have contributed to a continuation of the sexually hostile environment, Defendant Adrahtas was permitted to continue employment and sexually abuse, assault, and molest Plaintiffs and an unknown number of other individuals.

373.    Between the time of the 1985 complaint and the 2020, the UMN Defendants continued to hold Defendant Adrahtas out as a competent and safe coach.

374.    Plaintiffs relied on the assertions of the UMN Defendants and several Plaintiffs continued to play hockey for Defendant Adrahtas in the wake of known concerns and dangers.

375.    Plaintiffs were subjected to sexual assault, abuse, and molestation as a result of the UMN Defendants' fraudulent misrepresentations regarding Defendant Adrahtas.

376.    As a direct and/or proximate result of the UMN Defendants' fraudulent misrepresentations, Plaintiffs suffered discomfort, and continue to suffer pain of mind and body, shock, emotional and psychological distress, physical manifestations of emotional and psychological distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life; were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life; have sustained and continue to sustain loss of earnings and earning capacity.

## VI.    CLAIMS AGAINST AHAI AND USAH

### A.    COUNT SIXTEEN

### GROSS NEGLIGENCE
### (DEFENDANTS AHAI, USAH AND ADRAHTAS)

377.    Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

59

378.   Defendants AHAI and USAH owed Plaintiffs Michael Sacks, Christopher Jensen, Brent Cary, Benjamin Cole and Kelly Gee a duty to use due care to ensure their safety and freedom from sexual assault, abuse, and molestation while interacting with their employees, representative, and/or agents.

379.   The above-named Plaintiffs are or were members of AHAI and USAH, participated in AHAI and/or USAH sanctioned events, and were knowledgeable of Defendant Adrahtas through his affiliations with AHAI and USAH.

380.   Defendant Adrahtas owed Plaintiffs Michael Sacks, Christopher Jensen, Brent Cary, Benjamin Cole and Kelly Gee a duty to use due care in carrying out his coaching as an employee, representative, and/or agent of Defendants AHAI and USAH.

381.   By becoming coach, in a position of authority, Defendant Adrahtas in the course of his employment, agency, and/or representation of Defendants AHAI and USAH, a special and fiduciary relationship between Plaintiffs and Defendant Adrahtas was created, resulting in Defendant Adrahtas owing Plaintiffs a duty to use due care.

382.   Defendants AHAI and USAH's failure to adequately supervise Defendant Adrahtas, especially after AHAI and USAH knew or should have known of complaints regarding his nonconsensual sexual touching and assaults was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiffs or any other hockey players associated with AHAI and USAH.

383.   Defendant Adrahtas' conduct in sexually assaulting, abusing, and molesting Plaintiff in the course of his employment, agency, and/or representation of Defendants AHAI and USAH and under the guise of "coaching" was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiffs.

60

384.    Defendants AHAI and USAH's conduct demonstrated a willful disregard for precautions to ensure Plaintiffs' safety.

385.    Defendants AHAI and USAH's conduct as described above, demonstrated a willful disregard for substantial risks to Plaintiffs.

386.    Defendants AHAI and USAH breached duties owed to Plaintiffs and were grossly negligent when they conducted themselves by the actions described above, said acts having been committed with reckless disregard for Plaintiffs' health, safety, Constitutional and/or statutory rights, and with a substantial lack of concern as to whether an injury would result.

387.    As a direct and/or proximate result of Defendants AHAI and USAH's actions and/or inactions, Plaintiffs suffered discomfort, and continue to suffer pain of mind and body, shock, emotional and psychological distress, physical manifestations of emotional and psychological distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity.

B.    **COUNT SEVENTEEN**

**NEGLIGENCE**
**(DEFENDANTS AHAI, USAH AND ADRAHTAS)**

388.    Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

389.    Defendants AHAI and USAH owed Plaintiffs Michael Sacks, Christopher Jensen, Brent Cary, Benjamin Cole, and Kelly Gee a duty of ordinary care to ensure their safety and freedom from sexual assault, abuse, and molestation while interacting with their employees, representatives and/or agents.

61

390.    Plaintiffs Michael Sacks, Christopher Jensen, Brent Cary, Benjamin Cole, and Kelly Gee had a reasonable expectation that AHAI and USAH were recommending competent and ethical coaches who would provide mentorship without sexual assault, abuse, and molestation.

391.    Defendant Adrahtas owed Plaintiffs a duty of ordinary care.

392.    Defendants AHAI and USAH's failure to adequately train and supervise Defendant Adrahtas breached the duty of ordinary care.

393.    Defendants AHAI and USAH had notice through its own employees, agents, and/or representatives as early as 1989, and in writing in 2010.

394.    Defendants AHAI and USAH should have known of the foreseeability of sexual abuse with respect to youth and collegiate sports.

395.    Defendants AHAI and USAH's failure to properly investigate, address, and remedy complaints regarding Defendant Adrahtas' conduct was a breach of ordinary care.

396.    Defendant Adrahtas' conduct in sexually assaulting, abusing, and molesting Plaintiffs in the course of his employment, agency, and/or representation of Defendants AHAI and USAH was a breach of the duty to use ordinary care.

397.    As a direct and/or proximate result of Defendants' actions and/or inactions, Plaintiffs suffered discomfort, and continue to suffer pain of mind and body, shock, emotional and psychological distress, physical manifestations of emotional and psychological distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity.

C.    **COUNT EIGHTEEN**

62

## VICARIOUS LIABILITY
## (DEFENDANTS AHAI, USAH AND ADRAHTAS)

398.     Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

399.     Vicarious liability is indirect responsibility imposed by operation of law where an employer is bound to keep its employees within their proper bounds and is responsible if it fails to do so.

400.     Vicarious liability essentially creates agency between the principal and its agent, so that the principal is held to have done what the agent has done.

401.     Defendants AHAI and USAH employed and/or held Defendant Adrahtas out to be its agent and/or representative from approximately 1982 to 2018.

402.     Defendants AHAI and USAH are vicariously liable for the actions of Defendant Adrahtas as described above that were performed during the course of his employment, representation, and/or agency with Defendants AHAI and USAH and while he had unfettered access to young male athletes.

403.     As a direct and/or proximate result of Defendants' actions and/or inactions, Plaintiffs suffered discomfort, and continue to suffer pain of mind and body, shock, emotional and psychological distress, physical manifestations of emotional and psychological distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity.

D.     **COUNT NINETEEN**

**EXPRESS/IMPLIED AGENCY**

**(DEFENDANTS AHAI, USAH)**

404.     Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

405.     An agent is a person who is authorized by another to act on its behalf.

406.     Defendants AHAI and USAH intentionally or negligently made representations that Defendant Adrahtas was their employee, agent, and/or representative.

407.     On the basis of those representations, Plaintiffs reasonably believed that Defendant Adrahtas was acting as an employee, agent, and/or representative of Defendants AHAI and USAH.

408.     Plaintiffs were injured as a result of Defendant Adrahtas' sexual assault, abuse, and molestation as described above, acts that were performed during the course of his employment, agency, and/or representation with Defendants AHAI and USAH and while he had unfettered access to young male athletes.

409.     Plaintiffs were injured because they relied on Defendants AHAI and USAH to provide employees, agents, and or representatives who would exercise reasonable skill and care.

410.     As a direct and/or proximate result of Defendants' actions and/or inactions, Plaintiffs suffered discomfort, and continue to suffer pain of mind and body, shock, emotional and psychological distress, physical manifestations of emotional and psychological distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity.

E.     **COUNT TWENTY**

**NEGLIGENT SUPERVISION**
**(DEFENDANTS AHAI, USAH)**

64

411.    Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

412.    Defendants AHAI and USAH had a duty to provide reasonable supervision of their employee, agent, and/or representative, Defendant Adrahtas, while he was in the course of his employment, agency or representation with Defendants AHAI and USAH and while he interacted with young male athletes including Plaintiffs.

413.    It was reasonably foreseeable given the known sexual abuse in youth sports and in particular that Defendant Adrahtas, who had prior allegations against him had or would sexually abuse children, including Plaintiffs, unless properly supervised.

414.    Defendants AHAI and USAH breached their duty to provide reasonable supervision of Defendant Adrahtas, and permitted Defendant Adrahtas, who was in a position of trust and authority, to commit the acts against Plaintiffs.

415.    The aforementioned sexual abuse occurred while Defendant Adrahtas was acting in the course of his employment, agency, and/or representation of Defendants AHAI and USAH.

416.    Defendants AHAI and USAH tolerated, authorized and/or permitted a custom, policy, practice or procedure of insufficient supervision and failed to adequately screen, counsel, or discipline such individuals, with the result that Defendant Adrahtas was allowed to violate the rights of persons such as Plaintiffs with impunity.

417.    As a direct and/or proximate result of Defendants' actions and/or inactions, Plaintiffs suffered discomfort, and continue to suffer pain of mind and body, shock, emotional and psychological distress, physical manifestations of emotional and psychological distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, were prevented and will continue to be prevented from performing Plaintiffs' daily activities and

65

obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity.

F.   **COUNT TWENTY-ONE**

**NEGLIGENT FAILURE TO WARN OR PROTECT**
**(DEFENDANTS AHAI, USAH)**

418.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

419.   Defendants AHAI and USAH knew or should have known that Defendant Adrahtas posed a risk of harm to Plaintiffs or those in Plaintiffs' situation.

420.   Defendants AHAI and USAH had direct and/or constructive knowledge as to the dangerous conduct of Defendant Adrahtas and failed to act reasonably and responsibly in response.

421.   Defendants AHAI and USAH knew or should have known Defendant Adrahtas committed sexual assault, abuse, and molestation and/or was continuing to engage in such conduct.

422.   Defendants AHAI and USAH had a duty to warn or protect Plaintiffs and others in Plaintiffs' situation against the risk of injury by Defendant Adrahtas.

423.   The duty to disclose this information arose by the special, trusting, confidential, and fiduciary relationship between Defendant Adrahtas as an employee, agent, and or representative of Defendants AHAI and USAH and Plaintiffs.

424.   Defendants AHAI and USAH breached said duty by failing to warn Plaintiffs and/or by failing to take reasonable steps to protect Plaintiffs from Defendant Adrahtas.

425.   Defendants AHAI and USAH breached its duties to protect Plaintiff by failing to:

a.   respond to allegations of sexual assault, abuse, and molestation;

b.   detect and/or uncover evidence of sexual assault, abuse, and molestation; and,

66

c.   investigate, adjudicate, and terminate Defendant Adrahtas' employment with Defendant before Adrahtas was allowed to resign from his position.

426.   Defendants AHAI and USAH failed to adequately screen, counsel and/or discipline Defendant Adrahtas for physical and/or mental conditions that might have rendered him unfit to discharge the duties and responsibilities of a coach of youth hockey players, resulting in violations of Plaintiffs' rights.

427.   Defendants AHAI and USAH willfully refused to notify, give adequate warning, and implement appropriate safeguards to protect Plaintiffs from Defendant Adrahtas' conduct.

428.   As a direct and/or proximate result of Defendants' actions and/or inactions, Plaintiffs suffered discomfort, and continues to suffer pain of mind and body, shock, emotional and psychological distress, physical manifestations of emotional and psychological distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity.

G.   **COUNT TWENTY-TWO**

**NUISANCE (COMMON LAW AND MINN. STAT. I 561.01)**
**(DEFENDANTS AHAI, USAH)**

429.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

430.   Defendants AHAI and USAH conspired and engaged in efforts to (1) conceal from the general public the sexual assaults committed by, Defendant Adrahtas; and (2) protect Defendant Adrahtas from criminal prosecution from his sexual assaults against children in order to protect the reputation of AHAI and USAH.

431.    The negligence and/or deception and concealment by the Defendants AHAI and USAH was and is injurious to the health and/or indecent or offensive, residents of Minnesota and all other members of the general public who lived and currently live in communities where Defendant Adrahtas lived. It was and is indecent and offensive to the senses, so as to interfere with the general public's comfortable enjoyment of life in that the general public cannot trust Defendants AHAI and USAH to warn parents of the presence of the current and/or former credibly accused molesters, nor to identify their current and/or former credibly accused molesters, nor to disclose said credibly accused molesters' assignment histories, nor to disclose their patterns of the conduct in grooming and sexually assaulting children, all of which create an impairment of the safety of children in the neighborhoods in the Twin Cities and throughout the United States where Defendants AHAI and USAH conducted, and continue to conduct, their business.

432.    The negligence and/or deception and concealment by the Defendants AHAI and USAH was especially injurious to Plaintiffs' health as they and their families were unaware of the danger posed to young children left unsupervised with agents of Defendant, and in particular unaware of the immense danger that Defendant Adrahtas posed to youth, and as a result of this deception, Plaintiffs were placed in the custody and control of Defendant Adrahtas, an agent of Defendants AHAI and USAH, who subsequently and repeatedly sexually assaulted Plaintiffs.

433.    The negligence and/or deception and concealment by Defendants AHAI and USAH also was specially injurious to Plaintiffs' health in that when Plaintiffs finally discovered the negligence and/or deception and concealment; that Plaintiffs had not been able to help been able to help other minors being molested because of the negligence and/or deception and concealment; and that Plaintiffs had not been able to because of the negligence and/or deception and concealment to receive timely medical treatment needed to deal with the problems Plaintiffs had suffered an

continue to suffer as a result of the molestations.

434.    The continuing public nuisance created by Defendants AHAI and USAH was, was continues to be, the proximate cause of the injuries and damages to the general public and of the Plaintiffs' special injuries and damages as alleged.

435.    In doing the aforementioned acts, Defendants AHAI and USAH acted negligently and/or intentionally, maliciously and with conscious disregard of Plaintiffs' rights.

436.    As a result of the above-described conduct, Plaintiffs have suffered the injuries and damages described herein.

**H.    COUNT TWENTY-THREE**

**NUISANCE (COMMON LAW AND MINN. STAT. I 609.74)**
**(DEFENDANTS AHAI, USAH)**

437.    Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

438.    Defendants AHAI and USAH conspired and engaged in efforts to: 1) conceal from the general public the sexual assaults committed by, Defendant Adrahtas; and/or 2) concealed from proper civil authorities sexual assaults and abuse committed by Defendant Adrahtas and other agents against minor children; and/or 4) protected Defendant Adrahtas from criminal prosecution for his sexual assaults and abuse against children; and/or 5) allowed a known child molester to live freely in communities across the country without informing the public and/or 6) participated in the concealment of sexual abuse by Defendants AHAI and USAH.

439.    The negligence and/or deception and concealment by the Defendants AHAI and USAH has maintained or permitted a condition which unreasonably endangers the safety and health of a considerable number of members of the public including, but not limited to, children and residents in Minnesota, Illinois, and Florida where Defendant Adrahtas maintained a residence

69

and continued to coach and abuse sexually abuse minors for over for decades after the Defendants AHAI and USAH were aware that Adrahtas committed sexual assaults on its athletes. The Defendants AHAI and USAH failed to report multiple allegations of sexual assault and abuse of children to proper authorities, as well as their failure to inform the public about sexual abuse, or an employee/coach accused of sexual abuse of minors, has prevented the public from knowing of real danger, and has thereby endangered the safety and health of a considerable number of members of the public by allowing a child molester to avoid prosecution and remain living freely in unsuspecting communities and working with and around children. This child molester, known to Defendants AHAI and USAH, but not to the public, poses a threat of additional abuse to a considerable number of members of the public.

440.   The negligence and/or deception and concealment by Defendants AHAI and USAH was and is especially injurious to Plaintiffs' health as Plaintiffs were sexually assaulted and/or harmed by one of Defendant's agents.

441.   The negligence and/or deception and concealment by Defendants AHAI and USAH also was and is especially injurious to Plaintiffs' health in that when Plaintiffs finally discovered the negligence and/or deception and concealment of Defendant Adrahtas, Plaintiffs experienced mental, emotional, psychological, and/or physical distress that they had been victims of Defendants AHAI and USAH's negligence and/or deception and concealment.

442.   Plaintiffs have suffered and/or continue to suffer special, particular, and peculiar psychological and emotional harm and/or peculiar pecuniary harm, different in kind from the general public, after learning of Defendants AHAI and USAH's concealment of names and information about a coach accused of sexually assaulting minors and as a result of the dangerous condition maintained and/or permitted by Defendants AHAI and USAH, which continued

concealed until June of 2020, when the U.S. Center for Safe Sport issued a lifetime ban for Defendant Adrahtas. As a result of the negligence and/or deception and concealment, Plaintiffs have suffered and continue to suffer lessened enjoyment of life, and/or impaired health, and /or emotional and psychological distress, and/or physical symptoms of emotional and psychological distress and/or pecuniary loss including medical expenses and/or wage loss.

443.    Plaintiffs' injuries are also particular to them and differ from certain members of the public who have not been harmed by the nuisance. People who have not been harmed by the nuisance include those who have not suffered any injury at all, those who are unaware of the nuisance, those who do not believe that Defendants AHAI and USAH ever concealed or participated in the concealment of anything about child sex abuse, and that Defendant Adrahtas is still committing these acts without restraint.

444.    The continuing public nuisance created by Defendants AHAI and USAH was, and continues to be, the proximate cause of Plaintiffs' special injuries and damages as alleged.

445.    In doing the aforementioned acts, Defendants AHAI and USAH acted negligently and or intentionally, maliciously and with conscious disregard of Plaintiffs' rights.

446.    As a result of the above-described conduct, Plaintiffs have suffered the injuries and damages described herein.

I.      **COUNT TWENTY-FOUR**

**NEGLIGENT FAILURE TO TRAIN OR EDUCATE**
**(DEFENDANTS AHAI, USAH)**

447.    Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

448.    Defendants AHAI and USAH breached their duty to take reasonable protective measures to protect Plaintiffs and other minors from the risk of childhood sexual abuse and/or

71

sexual assault by Defendant Adrahtas, such as the failure to properly train or educate Plaintiffs and other individuals (including minors) about how to avoid such a risk.

449.   Defendants AHAI and USAH failed to implement reasonable safeguards to:

a.   prevent acts of sexual assault, abuse, and molestation by Defendant Adrahtas;

b.   avoid placing Defendant Adrahtas in positions where he could be unsupervised contact and interaction with Plaintiffs and other young athletes;

450.   As a direct and/or proximate result of Defendants AHAI and USAH negligent failure to train or educate, Plaintiffs suffered discomfort, and continue to suffer pain of mind and body, shock, emotional and psychological distress, physical manifestations of emotional and psychological distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity.

**J.     COUNT TWENTY-FIVE**

**NEGLIGENT RETENTION**
**(DEFENDANTS AHAI, USAH)**

451.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

452.   Defendants AHAI and USAH had a duty when credentialing, hiring, retaining, screening, checking, regulating, monitoring, and supervising employees, agents and/or representatives to exercise due care, but they failed to do so.

453.   Defendants AHAI and USAH were negligent in the retention of Defendant Adrahtas as an employee, agent, and/or representative in their failure to adequately investigate,

report and address complaints about his conduct of which they knew or should have known.

454.    Defendants AHAI and USAH negligently retained of Defendant Adrahtas as an employee, agent, and/or representative when after they discovered, or reasonably should have discovered Defendant Adrahtas' conduct which reflected a propensity for sexual misconduct.

455.    Defendants AHAI and USAH's failure to act in accordance with the standard of care resulted in Defendant Adrahtas gaining access to and sexually abusing and/or sexually assaulting Plaintiffs and an unknown number of other individuals.

456.    The aforementioned negligence in the credentialing, hiring, retaining, screening, checking, regulating, monitoring, and supervising of Defendant Adrahtas created a foreseeable risk of harm to Plaintiffs as well as other minors and young adults.

457.    As a direct and/or proximate result of Defendants AHAI and USAH's negligent retention, Plaintiffs suffered discomfort, and continue to suffer pain of mind and body, shock, emotional and psychological distress, physical manifestations of emotional and psychological distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life; were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life; have sustained and continue to sustain loss of earnings and earning capacity.

K.    **COUNT TWENTY-SIX**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(DEFENDANTS AHAI, USAH)**

458.    Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

459.    Defendants AHAI and USAH allowed Defendant Adrahtas to be in a position where he could sexually assault, abuse, and molest children and young adults.

460.    A reasonable person would not expect Defendants AHAI and USAH to tolerate or permit their employee or agent to carry out sexual assault, abuse, or molestation after they knew or should have known of complaints and claims of sexual assault and abuse occurring during Defendant Adrahtas' coaching and mentorship.

461.    Defendants AHAI and USAH held Defendant Adrahtas in high esteem and acclaim which in turn encouraged Plaintiffs and others to respect and trust Defendant Adrahtas.

462.    Defendants AHAI and USAH protected Defendant Adrahtas in part to bolster and sustain his impressive reputation in the hockey community.

463.    A reasonable person would not expect Defendants AHAI and USAH to be incapable of supervising Defendant Adrahtas and/or preventing Defendant Adrahtas from committing acts of sexual assault, abuse, and molestation.

464.    Defendants AHAI and USAH's conduct as described above was intentional and/or reckless.

465.    As a direct and/or proximate result of Defendants AHAI and USAH's conduct, Plaintiffs suffered discomfort, and continue to suffer pain of mind and body, shock, emotional and psychological distress, physical manifestations of emotional and psychological distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity.

## L.    COUNT TWENTY-SEVEN

### FRAUD AND MISREPRESENTATION
### (DEFENDANTS AHAI, USAH)

466.    Plaintiffs reallege and incorporate by reference the allegations contained in the

previous paragraphs.

467.    From approximately 1982 to 2020, Defendants AHAI and USAH represented to Plaintiffs and the public that Defendant Adrahtas was a competent and safe coach, who simply resigned from jobs, and was not terminated for sexual assault allegations.

468.    By representing that Defendant Adrahtas was a former team coach at Defendant UMN, and a highly respected and successful AHAI and USAH coach, Defendants AHAI and USAH represented to Plaintiffs and the public that Defendant Adrahtas was safe, trustworthy, of high moral and ethical repute, and that Plaintiffs and the public need not worry about being harmed by Defendant Adrahtas.

469.    The representations were false when they were made as Defendant Adrahtas had and was continuing to sexually assault, abuse, and molest Plaintiffs and an unknown number of other individuals.

470.    As early as 1989, and in writing in 2010, Defendants AHAI and USAH knew their representations of Defendant Adrahtas were false, as multiple hockey players had complained of Defendant Adrahtas' conduct to Defendants AHAI and USAH representatives.

471.    Although Defendants AHAI and USAH were informed Defendant Adrahtas' conduct they failed to investigate, remedy, or in any way address AHAI and USAH player complaints.

472.    Defendants AHAI and USAH continued to hold Defendant Adrahtas out as a competent and safe coach.

473.    Additional complaints against Defendant Adrahtas surfaced over the years, including in a 2010 complaint to USAH, and in 2018 when United States Center for SafeSport began its investigation into Defendant Adrahtas.  Defendants AHAI and USAH's culture of failing

to address complaints of sexual harassment, including sexual violence in a prompt and equitable manner which in turn caused and may have contributed to a continuation of the sexually hostile environment, Defendant Adrahtas was permitted to continue employment and sexually abuse, assault, and molest Plaintiffs and an unknown number of other individuals.

474.    Between 1982 and the U.S. Center for Safe Sport lifetime ban of Defendant Adrahtas in June of 2020, Defendants AHAI and USAH continued to hold Defendant Adrahtas out as a competent and safe coach.

475.    Plaintiffs relied on the assertions of Defendants AHAI and USAH and several Plaintiffs continued to play hockey for Defendant Adrahtas in the wake of known concerns and dangers.

476.    Plaintiffs were subjected to sexual assault, abuse, and molestation as a result of the Defendants AHAI and USAH'S fraudulent misrepresentations regarding Defendant Adrahtas.

477.    As a direct and/or proximate result of Defendants AHAI and USAH's fraudulent misrepresentations, Plaintiffs suffered discomfort, and continue to suffer pain of mind and body, shock, emotional and psychological distress, physical manifestations of emotional and psychological distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life; were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life; have sustained and continue to sustain loss of earnings and earning capacity.

## VII.    CLAIMS AGAINST ADRAHTAS

### A.    COUNT TWENTY-EIGHT

#### ASSAULT AND BATTERY
#### (DEFENDANT ADRAHTAS)

478.    Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

479.    The acts committed by Defendant Adrahtas against Plaintiffs described herein constitute assault and battery, actionable under the civil laws of Minnesota.

480.    Defendant Adrahtas committed assault and battery against the Plaintiff through acts of sexual assault and molestation, against their will and without their consent.

481.    Defendant Adrahtas fraudulently concealed his identity throughout his sexual assaults and molestation of the Plaintiffs, which tolls the statute of limitations period.

482.    As the Plaintiffs were injured by Defendant Adrahtas' sexual assaults and molestations, they were sexually abused under Minnesota law.

483.    Defendant Adrahtas committed nonconsensual sexual acts which resulted in harmful or offensive contact with the bodies of Plaintiffs.

484.    Specifically, Defendant Adrahtas committed acts which caused injury to Plaintiffs by subjecting them to an imminent battery and/or intentional invasions of their rights to be free from offensive and harmful contact, and said conduct demonstrated that Defendant had a present ability to subject Plaintiffs to an immediate, intentional, offensive and harmful touching.

485.    Defendant Adrahtas assaulted and battered Plaintiffs by nonconsensual and unwanted oral sex, digital and anal penetration.

486.    Plaintiffs did not consent to the contact, which caused injury, damage, loss, and/or harm.

487.    As a direct and/or proximate result of Defendant Adrahtas' assault and battery, Plaintiffs suffered discomfort, and continue to suffer pain of mind and body, shock, emotional and psychological distress, physical manifestations of emotional and psychological distress,

embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity.

B.   **COUNT TWENTY-NINE**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(DEFENDANT ADRAHTAS)**

488.    Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

489.    Defendant Adrahtas used his authority and position with Defendants UMN, AHAI, and USAH, to sexually assault, abuse, and molest Plaintiffs, and an unknown number of other individuals, minors, and young adults.

490.    Defendant Adrahtas in committing acts of sexual assault, abuse, and molestation as described above under the guise of coaching and mentorship exhibited conduct that is extreme, outrageous and/or reckless in nature.

491.    A reasonable person would not expect their coach to sexually assault, abuse, or molest them, and to do so under the guise of coaching and mentorship without proper notice or explanation, and without giving the player the opportunity to think about the sexual propositions.

492.    Defendant Adrahtas' conduct was intentional or reckless as he repeatedly sexually assaulted, abused, and molested Plaintiffs over several years, from approximately 1982 to 2018.

493.    Defendant Adrahtas' conduct has caused and continues to cause Plaintiffs to suffer emotional and psychological distress.

494.    As a direct and/or proximate result of Defendant Adrahtas' outrageous conduct Plaintiffs suffered discomfort, and continue to suffer pain of mind and body, shock, emotional and

psychological distress, physical manifestations of emotional and psychological distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity.

## IX.    <u>DAMAGES – FOR ALL AFOREMENTIONED CAUSES OF ACTION</u>

495.    Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

496.    As a direct and/or proximate result of Defendants' actions and/or inactions stated above, Plaintiffs suffered discomfort, and continue to suffer pain of mind and body, shock, emotional and psychological distress, physical manifestations of emotional and psychological distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life; were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life; have sustained and continue to sustain loss of earnings and earning capacity.

497.    The conduct, actions and/or inactions of Defendants as alleged in the above stated counts and causes of action constitute violations of Plaintiffs' Constitutional and Federal rights as well as the common and/or statutory laws of the State of Minnesota, and the United States District Court has jurisdiction to hear and adjudicate said claims.

498.    As a result of the above actions and/or inactions of Defendants, Plaintiffs have and continue to suffer irreparable harm as a result of the violations.

499.    The amount in controversy for each Plaintiff exceeds the jurisdictional minimum of $75,000.00.

WHEREFORE, Plaintiffs request this Court and the finder of fact to enter a Judgment in Plaintiffs' favor against all named Defendants on all counts and claims as indicated above in an amount consistent with the proofs of trial, and seeks against Defendants all appropriate damages arising out of law, equity, and fact for each or all of the above counts where applicable and hereby requests that the trier of fact, be it judge or jury, award Plaintiffs all applicable damages, including but not limited to compensatory, special, exemplary and/or punitive damages, in whatever amount the Plaintiffs are entitled, and all other relief arising out of law, equity, and fact, also including but not limited to:

a. Compensatory damages in an amount to be determined as fair and just under the circumstances, by the trier of fact including, but not limited to medical expenses, loss of earnings, mental anguish, anxiety, humiliation, and embarrassment, violation of Plaintiffs' Constitutional, Federal, and State rights, loss of social pleasure and enjoyment, and other damages to be proved;

b. Punitive and/or exemplary damages in an amount to be determined as reasonable or just by the trier of fact;

c. Reasonable attorney fees, interest, and costs; and,

d. Other declaratory, equitable, and/or injunctive relief, including, but not limited to implementation of institutional reform and measures of accountability to ensure the safety and protection of young athletes and other individuals, as appears to be reasonable and just.

Dated:  May 11, 2021                    By:       /s/  Ryan Peterson _____
                                                  Ryan Peterson  (MN ###)
                                                  PETERSON LEGAL, PLLC
                                                  Attorneys for Plaintiffs
                                                  5201 Eden Avenue, Suite 300
                                                  Edina, Minnesota 55436
                                                  Phone: (612) 367-6568
                                                  Email:  ryan@peterson.legal

Dated:  May 11, 2021                    By:       /s/  Nicholas Economakos (with permission)
                                                  Nicholas Economakos  (IL 6308942)
                                                  JACOBSON LEGAL SERVICES
                                                  100 N Riverside Plaza, Suite 2400
                                                  Chicago, Illinois 60606
                                                  Phone:  (312) 698-4466
                                                  Email:  nick@jacobsonlegalservices.com
                                                  *District of Minnesota Admission Pending*

## JURY DEMAND

Plaintiffs, MICHAEL SACKS, CHRISTOPHER JENSEN, BRENT CARY, BENJAMIN

COLE, and KELLY GEE, hereby demand a trial by jury on all claims set forth above.


Dated:  May 11, 2021          By:          /s/ Ryan Peterson_____
                                           Ryan Peterson (MN 0389607)
                                           PETERSON LEGAL, PLLC
                                           Attorneys for Plaintiffs
                                           5201 Eden Avenue, Suite 300
                                           Edina, Minnesota 55436
                                           Phone: (612) 367-6568
                                           Email:  ryan@peterson.legal


Dated:  May 11, 2021          By:          /s/ Nicholas Economakos (with permission)
                                           Nicholas Economakos (IL 6308942)
                                           JACOBSON LEGAL SERVICES
                                           100 N Riverside Plaza, Suite 2400
                                           Chicago, Illinois 60606
                                           Phone: (312) 698-4466
                                           Email:  nick@jacobsonlegalservices.com
                                           *District of Minnesota Admission Pending*