UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Michael Sacks, Christopher Jensen, Brent Cary, Benjamin Cole, Kelly Gee, Frank Pietrangelo, John Doe *A*, and Jeffrey Walker, | File No. 21-cv-01215 (ECT/JFD) |
| Plaintiffs, | |
| v. | **OPINION AND ORDER** |
| University of Minnesota; The Board of Regents of the University of Minnesota; Thomas Adrahtas, *individual and official capacity*; USA Hockey, Inc.; Amateur Hockey Association Illinois, Inc., | |
| Defendants. | |

Nicholas J. Economakos, Jacobson Legal Services, Chicago, IL; and Michael L. Puklich, Neaton & Puklich, P.L.L.P., Chanhassen, MN, for Plaintiffs.

Carrie Ryan Gallia and Timothy Joseph Pramas, Office of the General Counsel, University of Minnesota, Minneapolis, MN; Peter Land, Husch Blackwell, Chicago, IL; and Michael Thomas Raupp, Husch Blackwell, Kansas City, MO, for Defendants University of Minnesota and The Board of Regents of the University of Minnesota.

Jill A. Brisbois, The JAB Firm, Minneapolis, MN; and Paul D. Sellers, Minnesota Legal Defense, Minneapolis, MN, for Defendant Thomas Adrahtas.

Richard A. Duncan and Sarah Vandelist, Faegre Drinker Biddle & Reath LLP, Minneapolis, MN; Steven F. Stapleton, Clark Hill Plc, Grand Rapids, MI; and Maria Dwyer, Clark Hill Plc, Detroit, MI for Defendant USA Hockey, Inc.

Margaret Ann Santos and Margarita Gokhberg, Hinshaw & Culbertson LLP, Minneapolis, MN, for Defendant Amateur Hockey Association Illinois, Inc.

Plaintiffs Michael Sacks, Christopher Jensen, Brent Cary, Benjamin Cole, Kelly Gee, Frank Pietrangelo, John Doe A, and Jeffrey Walker are survivors of sexual abuse committed by Defendant Thomas Adrahtas, a hockey coach. The abuse occurred between 1984 and 2003, when Plaintiffs were in their teens or early twenties.

Plaintiffs brought this case seeking to recover damages and other remedies from Adrahtas and three organizations with which Adrahtas has been associated at various times: the University of Minnesota[1], USA Hockey, Inc., and Amateur Hockey Association Illinois, Inc. ("Hockey Illinois"). Plaintiffs assert three federal claims—two under 42 U.S.C. § 1983 and one under Title IX—and twenty-eight state-law claims. Defendants seek dismissal of Plaintiffs' operative Amended Complaint. Plaintiffs defend the Amended Complaint, but also seek leave to file a proposed Second Amended Complaint.

Plaintiffs' Amended Complaint will be dismissed. The short summary of a longer more complicated story is that Plaintiffs' federal claims fail in part for a mix of jurisdictional reasons, and the Amended Complaint's allegations show that the jurisdiction-worthy aspects of Plaintiffs' federal claims are barred by statutes of limitations. Under this case's circumstances, it makes better sense to dismiss Plaintiffs' remaining state-law claims to be litigated in another proceeding or forum. Plaintiffs' motion for leave to file a Second Amended Complaint will be denied because the amendments Plaintiffs propose would not cure the Amended Complaint's dismissal-prompting deficiencies.

---

[1]   Defendants University of Minnesota and The Board of Regents of the University of Minnesota are functionally the same and will be referred to collectively as "the University." *See* ECF No. 52 at 19 n.9. Plaintiffs neither allege nor identify any fact that might justify treating them separately. *See* Am. Compl. [ECF No. 25] ¶ 1.

I[2]

A

Adrahtas is a youth and college hockey coach who "became known as an excellent recruiter, coach, and developer of hockey players during his nearly forty-year career." Am. Compl. [ECF No. 25] ¶ 3. "From approximately 1982 through his resignation as Head Coach at Robert Morris University Illinois' Men's Ice Hockey Team on November 9, 2018, [] Adrahtas was a [USA Hockey] coach for numerous hockey programs, many of which were sanctioned by [Hockey Illinois]." *Id.* ¶ 7. Hockey Illinois "is an affiliate of [USA Hockey." *Id.* ¶ 137.[3]

Sometime before or in 1981, Adrahtas founded and began coaching at a camp, "the Chicagoland Goalie School, which later became known as the Midwest Goalie School," and some Plaintiffs attended or worked at this school. *Id.* ¶¶ 5, 15, 56, 143, 308, 323, 335. During this time, Adrahtas lived in Illinois, and some hockey players, including some Plaintiffs, lived in, stayed at, or visited his home. *Id.* ¶¶ 16, 146, 175, 218, 300. Adrahtas was also a coach for various youth hockey teams in Illinois from at least 1982 to the

---

[2]    In describing the relevant facts and resolving the motion to dismiss under Rule 12(b)(6), all factual allegations in Plaintiffs' Amended Complaint are accepted as true, and all reasonable inferences are drawn in their favor. *See Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014).

[3]    The Amended Complaint does not include allegations explaining the specific nature of Adrahtas's relationship with USA Hockey or Hockey Illinois. No facts are alleged, for example, suggesting that Adrahtas was an employee or agent of either organization at any particular time. Though the Amended Complaint includes allegations suggesting that USA Hockey and Hockey Illinois are governing organizations with responsibilities for sanctioning or certifying teams, coaches, and participants, no facts are alleged suggesting that the organizations' performance of these functions vested Adrahtas with agency authority at any particular time.

summer of 1984 and coached some of the Plaintiffs on these teams. *Id.* ¶¶ 171, 181, 214. Some of the sexual assaults occurred during these years at Adrahtas's home. *E.g.*, *id.* ¶¶ 16, 150–51, 179–80, 221.

The assaults generally were carried out in the same fashion, a scheme involving a fictitious individual Adrahtas identified as "Sheila": Adrahtas would tell a hockey player that he could arrange for the player to receive oral sex from a woman named Sheila, but the player had to be blindfolded and restrained during the encounter, and, if the player accepted, he would receive oral sex from Sheila under these conditions. *E.g.*, *id.* ¶ 18. But there was no woman named Sheila—Sheila actually was "Adrahtas, and other adults paying to give oral sex to players without their knowledge or consent." *Id.*

Adrahtas used this scheme to assault Walker when Walker was ages fifteen to seventeen, in the summers of 1982 through 1984, while Walker stayed at Adrahtas's home and attended his goalie camp. *Id.* ¶¶ 15–19, 143–54. Adrahtas used this scheme to assault Sacks beginning around January of 1984, when Sacks was sixteen years old, soon after Adrahtas submitted a petition for guardianship of Sacks and Sacks moved into his home, and the encounters with Sheila occurred approximately once a week. *Id.* ¶¶ 20–21, 172–82. Adrahtas used this scheme to assault Jensen in the summer of 1984, when Jensen was sixteen years old. *Id.* ¶¶ 22, 214–22. Later that summer, Jensen told friends about Sheila, and a friend responded by stating "Jensen actually received oral sex from his coach," after which Jensen was confused and ashamed. *Id.* ¶¶ 223–24.

Beginning in summer 1984 and ending in June 1985, Adrahtas was employed by the University as an assistant coach for its "nationally-renown[ed]" varsity team and lived

4

in Minnesota, sometimes traveling for games. *Id.* ¶¶ 6, 23, 25–26, 155–58, 183, 184, 275. During his time at the University, Adrahtas again assaulted or attempted to assault the three Plaintiffs just introduced—Walker, Sacks, and Jensen—and also assaulted Pietrangelo and Doe, as described in the following paragraphs.

In the fall of 1984, Adrahtas arranged to meet with Walker "to discuss potential recruitment to [the University]." *Id.* ¶ 156; *see also id.* ¶ 26.[4]   Walker was living in Massachusetts then, and the University had games there. *Id.* ¶¶ 25–26, 157.  Adrahtas invited Walker to his hotel "to go to lunch, spend the day together, [and] discuss his opportunity at [the University]." *Id.* ¶¶ 27, 158. When Adrahtas and Walker were together, Adrahtas, who "was wearing a pair of red, nylon warm-up pants that made a swishing sound when he walked," told Walker that Sheila was nearby and wanted to come to the hotel to give Walker oral sex again. *Id.* ¶¶ 27–28, 160–61.  "Walker was suspicious of these circumstances, but trusted that his mentor was looking out for his best interests, and did not want to upset [] Adrahtas and ruin a chance at playing hockey at [the University]," and Adrahtas arranged for Walker to meet with Sheila. *Id.* ¶¶ 29, 162.  After Sheila had performed oral sex and was walking away, "Walker became immediately suspicious . . . because he could hear the same swishing sound that [Adrahtas's] pants were making earlier in the visit." *Id.* ¶¶ 30, 163.  Walker was able to get through his restraints and remove his blindfold. *Id.*  Walker "observed no females in the room, and instead saw [] Adrahtas running to escape the hotel room." *Id.* ¶ 163; *see also id.* ¶ 30.  Walker chased Adrahtas,

---

[4]     The Amended Complaint identifies two different dates for this meeting: October and November of 1984. *See* Am. Compl. ¶¶ 25–27, 156–58.

but Adrahtas was able to escape through the fire stairwell. *Id.* ¶¶ 30, 163. Later, Adrahtas drove Walker home and met his family. *Id.* ¶ 158.

During the winter of 1984–1985, Adrahtas invited Jensen to visit him at the University. *Id.* ¶ 225. Jensen accepted because "Adrahtas was a mentor, [and Jensen] wanted to pursue his hockey dream of playing at the next level (college)." *Id.* ¶ 225. During the visit, Adrahtas took Jensen on a tour of the University's facilities and to dinner, where Adrahtas told Jensen that Sheila had moved to Minnesota, and Adrahtas could set up another encounter with her. *Id.* ¶¶ 226–27; *see also id.* ¶ 24. "[T]hrough the presentation of the specific and exact sexual scenarios from his previous experience in Chicago . . .[,] Jensen realized that [] Adrahtas had personally performed oral sex on him previously, [and understood] there was absolutely no way 'Sheila' moved to Minnesota." *Id.* ¶ 228. Jensen refused Adrahtas's offer. *Id.* ¶ 229.

Also during the year Adrahtas was coaching at the University, Adrahtas had arranged for Sacks to continue living with him in Minnesota, as Sacks was playing for a hockey team in St. Paul. *Id.* ¶¶ 183–84. Adrahtas told Sacks that Sheila had moved to Minnesota and wanted to give him oral sex again at their apartment. *Id.* ¶¶ 23, 185. "Sacks was suspicious of these circumstances," so to allay his fears, Adrahtas promised Sacks a spot on the University's varsity team. *Id.* ¶ 186. Sacks, then seventeen years old, "trusted [that Adrahtas] was looking out for his best interests, and the weekly sexual encounters with" Sheila began again. *Id.* ¶¶ 23, 186. Sacks "was confused as the oral sex performed in Minnesota felt different than in Illinois" and "felt different on each occasion," from which Plaintiffs infer and allege that others paid Adrahtas to perform oral sex on Sacks

while he was a minor. *Id.* ¶ 187. During the 1984–1985 season, the sexual assaults on Sacks included activity in addition to oral sex and at least one occasion where Sacks told Sheila to stop. *Id.* ¶ 188. During a three-person sexual encounter with Sheila and another hockey player, Sacks realized Sheila was a man and stopped the encounter. *Id.* Sacks was afraid to say no to encounters with Sheila because he feared Adrahtas would "blackball him in the hockey community, and the promise of playing for [the University] would disappear." *Id.* ¶ 187. But following the three-person encounter, Sacks told Adrahtas that "he would no longer participate in any further activity with 'Sheila.'" *Id.* ¶ 189. That same night, he overheard Adrahtas offering University players encounters with Sheila. *Id.* ¶ 196.

Meanwhile, beginning in August 1984, Sacks received recruiting letters, some from the University's head coach, Brad Buetow, and some from Adrahtas, on University letterhead. *Id.* ¶¶ 190–91. Sacks signed a Letter of Intent to play hockey at the University in April 1985, on a scholarship, and received another letter in May from Adrahtas about housing. *Id.* ¶¶ 192–95. But in June, soon after Adrahtas resigned (more on the circumstances of Adrahtas's resignation in a bit), "the [University's] last remaining [varsity men's hockey] coach" called Sacks "and informed him that he should not come to [the University] and play hockey anymore because of the sexual allegations" and potential negative press, and "bullied" Sacks "to ensure he would not attend [the University] on his full athletic scholarship." *Id.* ¶ 204; *see also id.* ¶ 39 (alleging that the University withdrew Sacks's scholarship). Sacks, eighteen years old, "had no choice but to quit hockey." *Id.* ¶ 208.

During the 1984–1985 season, Adrahtas conducted "weekly special 'visualization practices'" for certain University players, including Pietrangelo and Doe; Adrahtas instructed "that these 'visualization practices' were supplemental to on-ice training, and not optional." *Id.* ¶¶ 244–48, 264–68. During these sessions, Adrahtas told each player, "[R]egardless of what happens, if someone touches you, you need to stay focused and pretend it didn't happen"; Adrahtas massaged a player's shoulders "because he seemed 'uptight,' [and] manipulat[ed] [the player's] body to arch in various ways so that [Adrahtas] could grope, tap, and rub [the player] all over his body, including his buttocks and groin." *Id.* ¶¶ 253–54, 273–74.

In November of 1984, while at a hotel in Colorado for an away game, Adrahtas told Doe to come to his room, where Adrahtas began to massage Doe's back. *Id.* ¶ 275. "After [] Adrahtas began massaging [him], the rubbing, touching, and groping caused [Doe] to feel uncomfortable and violated," and Doe eventually escaped. *Id.* "Adrahtas would appear and attempt to have conversations with [Doe] while he was naked in the shower" at the hockey rink after practices or games, and "[o]n numerous occasions," Adrahtas offered Doe sexual encounters with Sheila. *Id.* ¶¶ 278–79.

At unspecified times, Pietrangelo and Doe each complained about the "visualization practices" to Adrahtas and Buetow; specifically, each "complained . . . that the 'visualization practices' were a waste of time, and that he did not want to partake in them because he was uncomfortable with them." *Id.* ¶¶ 255, 276. Buetow told each player that his reluctance to participate in Adrahtas's visualization practices was a signal that he was not interested in improving as a hockey player. *Id.* ¶¶ 256, 277. Each player "felt

8

uncomfortable and violated" by Adrahtas but was afraid to say anything more "because he was worried about [Adrahtas's] influence on his playing time and ability to play hockey at the next level." *Id.* ¶¶ 257, 280. There is no allegation that Buetow took any other action in response to Doe and Pietrangelo's complaints. *See generally id.*

In the spring of 1985, a group of University hockey players performed a "sting operation" that would lead to Adrahtas's resignation. *Id.* ¶¶ 36–39. The sting operation was led by the University's team captain (who is not a Plaintiff) and was performed "to uncover the identify of 'Sheila' based on [the players'] suspicions that Defendant Adrahtas was actually 'Sheila.'" *Id.* ¶ 36. Multiple players accepted Adrahtas's offer to receive oral sex from Sheila at a player's home; they went into the home, while other players "waited outside at every point of ingress and egress in the apartment, including entrances, exits and the hallways. During the entire time the players were inside the home, no other individuals entered or left the apartment." *Id.* ¶ 37; *see also id.* ¶ 199.[5]

The players reported Adrahtas's sexual assaults "to various individuals, including Chuck Grillo, before personally informing [the University's] Athletic Director, Paul Giel." *Id.* ¶¶ 38, 200.[6] But the University "did not launch an internal investigation, did not report the sexual assault claims internally or externally, or offer any of the players supportive measures" and instead "conceal[ed] the sexual assaults" by allowing Adrahtas to resign,

---

[5]    Though the Amended Complaint does not allege this fact specifically, the inference drawn from this allegation is that "no other individuals [except Adrahtas] entered or left the apartment."

[6]    Chuck Grillo's position with the University is not alleged. *See* Am. Compl. ¶¶ 38, 360. Similarly, Kevin Hartzell is alleged to have known about sexual-assault allegations regarding Adrahtas, but his University role is not clear. *See id.* ¶ 360.

"eliminating the rest of the Varsity Men's Hockey Team coaching staff," and withdrawing the scholarship offer that had been made to Sacks.  *Id.* ¶ 39; *see also id.* ¶¶ 201–02 (describing the University's winning record during Buetow's six seasons and that he was fired by Athletic Director Giel "without explanation"); *id.* ¶ 204 (describing that soon after Adrahtas's resignation, the last remaining coach of the team called Sacks and told Sacks he should not come to the University because of the allegations).  Adrahtas "was allowed to resign from [the University] for 'personal reasons'" on June 6, 1985, but "has since admitted that he was forced to resign because of sexual misconduct with [University] hockey players."  *Id.* ¶ 203.  The Amended Complaint includes no allegations that the University did or said anything affirmatively with regard to Adrahtas's conduct or departure after June 1985.  *See id.*

Sometime before or in 1988, Ira Greenberg, owner of "the Chicago Young Americans, a Junior A hockey team," having heard "rumors surrounding" Adrahtas's departure, contacted the University multiple times seeking a job reference for Adrahtas. *Id.* ¶¶ 42–44, 287–88.  The University "did not inform [] Greenberg that [] Adrahtas was forced to leave his job after committing sexual assaults while employed at" the University and "concealed this information."  *Id.* ¶¶ 43–44; *see also id.* ¶ 289 ("[The University] concealed information regarding [Adrahtas's] criminal activities while employed at [the University], giving Ira Greenberg the green light to hire [] Adrahtas.").  Greenberg "confronted [] Adrahtas about the rumors circulating regarding his departure from Minnesota before hiring him," but Adrahtas explained away the rumors.  *Id.* ¶ 43. Greenberg hired Adrahtas in 1988.  *Id.* ¶¶ 42–43, 287.

In the years after coaching at the University, from about 1988 through 2003, Adrahtas sexually assaulted Plaintiffs Cary, Cole, and Gee while they were, at least for some of the assaults, under the age of eighteen and playing on teams he coached or working for Adrahtas at his camp in Illinois. *Id.* ¶¶ 45, 54–57, 292–302, 315–25, 333–45. The Amended Complaint also includes allegations that various individuals, including individuals at USA Hockey and Hockey Illinois, knew something about Adrahtas's conduct through hearing rumors, discussing Adrahtas's conduct with others, or speaking directly to Adrahtas. *E.g., id.*, ¶¶ 46–47, 49–51, 60, 67–72.

After his time with Adrahtas, each Plaintiff's "trust in people and himself plummeted," and each experienced various harms, such as becoming "uncoachable," post-traumatic stress disorder, "pain of mind and body," and other types of emotional and psychological distress. *Id.* ¶¶ 102, 164–66, 205–09, 230–32, 241, 256–61, 280–84, 304–05, 326–29, 345–47. Each Plaintiff except Cary "was overwhelmed, emotionally and psychologically scarred, and traumatized after his" time with Adrahtas, and each Plaintiff except Jensen and Sacks "blocked" the assaults "out of [their] consciousness until recently when various media outlets began releasing investigative pieces regarding" Adrahtas. *Id.* ¶¶ 165, 258, 260, 281, 283, 304, 328, 346. Jensen "blocked" the assaults "out of his consciousness until 2010 when he learned that [] Adrahtas was up for induction into the Illinois Hockey Hall of Fame," and Sacks did so "until recently when [he] learned that [] Adrahtas was still coaching at [Robert Morris University]." *Id.* ¶¶ 207, 232.

"On September 13, 2018, [] Sacks filed a complaint with [Robert Morris University] and the American Collegiate Hockey Association," and soon after, "the U.S. Center for

SafeSport received the first report about the allegations [against Adrahtas] from the American Collegiate Hockey Association." *Id.* ¶¶ 73–74.  Adrahtas was allowed to resign from Robert Morris University on November 9, 2018.  *Id.* ¶¶ 7, 75.  On June 3, 2020, USA Hockey issued a lifetime ban on Adrahtas, after "a lengthy investigation by the U.S. Center for SafeSport." *Id.* ¶ 76.

Sometime in 2019, a writer for *The Athletic*, a sports-news website, "began investigating rumors surrounding" Adrahtas, and "[d]uring this time, certain Plaintiffs realized they had been sexual assault and sexual harassment victims." *Id.* ¶ 79.  *The Athletic* published a story on February 21, 2020, "detailing decades of allegations," including Sacks's, Jensen's, and Cary's. *Id.*  Following the publication of that story, "other victims began coming forward after recognizing that they were also victims of [Adrahtas's] sexual abuse." *Id.* ¶ 80.  Also in 2020, an investigative report prepared by the Perkins Coie law firm indicated that "members of the [University] athletic department were aware of the allegations against [] Adrahtas and they failed to act, both in investigating the claims and reporting them to law enforcement." *Id.* ¶ 378.[7]

Though they knew of Adrahtas's sexual assaults, many of the organizations and individuals described above—the University, Hockey Illinois itself, USA Hockey itself, individuals at Hockey Illinois and USA Hockey, and individuals at teams for which Adrahtas coached—never adequately investigated or reported Adrahtas to prosecuting

---

[7]     This report is not otherwise mentioned in the Amended Complaint (or in the Proposed Second Amended Complaint) and was not attached as an exhibit, though it is referenced many times in Plaintiffs' brief in opposition to the University's motion. *See, e.g.*, ECF No. 63 at 1, 3, 19, 22, 25.

authorities. *Id.* ¶¶ 39, 47, 51, 58, 60, 62, 66, 72, 76, 234, 240, 362.a–b, 377, 456, 470, 486, 489, 567, 581, 597.

B

Plaintiffs brought this case by filing their original Complaint on May 13, 2021.  ECF No. 1.  After Adrahtas filed a motion to dismiss on July 6, ECF No. 12, Plaintiffs filed an Amended Complaint as of right pursuant to Fed. R. Civ. P. 15(a)(1)(B), ECF No. 25.  The Amended Complaint runs 108 pages, and its factual allegations span 636 paragraphs.  *See* Am. Compl.  Plaintiffs assert federal claims in their first three Counts—two under § 1983 (Counts Two and Three) and one under Title IX (Count One).  *Id.* ¶¶ 349–90.  Plaintiffs assert both § 1983 claims against the University and one against Adrahtas.  *Id.* ¶¶ 366–90.  Plaintiffs assert their Title IX claim against the University.  *Id.* ¶¶ 349–65.  Plaintiffs also assert various claims under state law against each Defendant.  *Id.* ¶¶ 391–631 (Counts Four through Thirty-One).  The Amended Complaint includes no allegations identifying which state's law might govern each of these state-law claims.  *Id.*  Plaintiffs allege subject-matter jurisdiction under 28 U.S.C. § 1331, the general federal-question statute, and 42 U.S.C. § 1343, the civil-rights specific jurisdictional statute.  Plaintiffs allege that there is supplemental jurisdiction over their state-law claims under 28 U.S.C. § 1367(a).  Am. Compl. ¶¶ 104–08.[8]

---

[8]    There is not subject-matter jurisdiction over this case under the diversity statute, 28 U.S.C. § 1332.  Plaintiffs and Defendants lack complete diversity.  For example, Plaintiffs Jensen and Cole are alleged to be citizens of Florida, and so is Adrahtas.  Am. Compl. ¶¶ 118, 122, 124; *Strawbridge v. Curtiss*, 3 Cranch 267, 2 L. Ed. 435 (1806).

The Parties stipulated to and were granted a deadline of September 15, 2021, for Defendants to file motions to dismiss the Amended Complaint, as well as an extended briefing schedule that called for Plaintiffs' responses by November 15 and Defendants' replies by December 6.  ECF Nos. 28, 30.  Each Defendant timely filed a motion to dismiss the Amended Complaint on September 15, 2021.  ECF Nos. 35, 40, 45, 50.

On November 12, 2021, three days before their deadline to respond to Defendants' motions, Plaintiffs filed a motion to amend the Amended Complaint and strike the briefing schedule.  ECF No. 56.  Because this motion did not comply with the Local Rules in several respects, it was denied without prejudice, and Plaintiffs were ordered to re-file the motion in compliance with the Local Rules.  ECF No. 57.  Plaintiffs filed a new motion and supporting papers on November 15, the due date for their responses to Defendants' motions.  ECF Nos. 58–61.  Plaintiffs did not file their responses to Defendants' motions that day.  To the extent Plaintiffs' motion sought to strike the Parties' stipulated briefing schedule, it was denied, though Plaintiffs were given a three-day extension (to November 18, 2021) to respond to Defendants' dismissal motions.  ECF No. 62.  Defendants received a corresponding extension of their reply-brief deadline.  *Id.*

The Parties filed briefs on the motions to dismiss in compliance with the extensions granted in the November 15 Order.  ECF Nos. 63–65, 75–78.  Defendants also timely filed briefs and accompanying submissions in opposition to Plaintiffs' motion seeking leave to amend their Amended Complaint.  ECF Nos. 70–74.  A hearing was held on Defendants' motions to dismiss and Plaintiffs' motion to amend on December 20, 2021.  ECF No. 83.

II[9]

A federal district court has "an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006) (citation omitted); *see also Johnson v. Welsh Equip., Inc.*, 518 F. Supp. 2d 1080, 1085 (D. Minn. 2007) ("Lack of subject matter jurisdiction cannot be ignored by the court or waived by the parties.  A question of subject-matter jurisdiction may be raised by the court *sua sponte* at any time.") (citations omitted).  Here, Defendants' motions implicate two subject-matter jurisdiction questions: (A) whether Plaintiffs' federal statutory claims are sufficiently substantial to trigger subject-matter jurisdiction under 28 U.S.C. § 1331; and (B) whether Plaintiffs' jurisdiction-worthy federal claims and their state-law claims derive from a common nucleus of operative fact so as to trigger supplemental jurisdiction under 28 U.S.C. § 1367.

A

1

Plaintiffs invoke federal subject-matter jurisdiction through their assertion of federal statutory claims under § 1983 and Title IX.  As the Eighth Circuit has explained,

---

[9]     When a motion to amend is filed after a Rule 12 motion to dismiss, the motions may be addressed in either order, or together, provided the motion to amend is considered on its merits.  *See Pure Country, Inc. v. Sigma Chi Fraternity*, 312 F.3d 952, 956 (8th Cir. 2002) (holding that, as a procedural matter, it is plainly erroneous for a district court to grant a motion to dismiss and then deny a pending motion to amend as moot, without consideration of the merits of the motion to amend).  Here, it makes better practical sense to address Defendants' dismissal motions before addressing Plaintiffs' motion for leave to amend. This is because the analysis of the claims in Plaintiffs' Amended Complaint goes a long way toward answering whether Plaintiffs should be granted leave to file their proposed Second Amended Complaint.

however, a federal district "court does not obtain subject-matter jurisdiction just because a plaintiff raises a federal question in his or her complaint.  If the asserted basis of federal jurisdiction is patently meritless, then dismissal for lack of jurisdiction is appropriate." *Biscanin v. Merrill Lynch & Co.*, 407 F.3d 905, 907 (8th Cir. 2005) (citing *Hagans v. Lavine*, 415 U.S. 528, 537–38 (1974), *Bell v. Hood*, 327 U.S. 678, 682–83 (1946), and *Perpetual Securities, Inc. v. Tang*, 290 F.3d 132, 137 (2d Cir. 2002)).  The Supreme Court described the principle in *Hagans*:

> Over the years this Court has repeatedly held that the federal courts are without power to entertain claims otherwise within their jurisdiction if they are 'so attenuated and unsubstantial as to be absolutely devoid of merit,' 'wholly insubstantial,' 'obviously frivolous,' 'plainly unsubstantial,' or 'no longer open to discussion.'  One of the principal decisions on the subject, held, first, that '(i)n the absence of diversity of citizenship, it is essential to jurisdiction that a substantial federal question should be presented'; . . . and third, that '(t)he question, may be plainly unsubstantial, either because it is 'obviously without merit' or because 'its unsoundness so clearly results from the previous decisions of this court as to foreclose the subject and leave no room for the inference that the question sought to be raised can be the subject of controversy.'

*Hagans*, 415 U.S. at 536–37 (citations omitted).  Because the case is at the Rule 12 stage and there is no record beyond the operative Amended Complaint, adjudication of this question occurs in the same fashion as "a facial rather than a factual challenge to jurisdiction," meaning it must be determined "whether the asserted jurisdictional basis is patently meritless by looking to the face of the complaint, and drawing all reasonable inferences in favor of the plaintiff."  *Biscanin*, 407 F.3d at 907 (citations omitted).

2

Plaintiffs' § 1983 claims against the University in Counts Two and Three of the Amended Complaint, Am. Compl. ¶¶ 366–90, are plainly insubstantial, no longer open to discussion, and cannot trigger a federal district court's subject-matter jurisdiction. "Neither the Board [of Regents] nor the University is a 'person' that can be sued under 42 U.S.C. § 1983." *Viewpoint Neutrality Now! v. Regents of Univ. of Minn.*, 516 F. Supp. 3d 904, 916 (D. Minn. 2021) (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64 (1989); *Raymond v. Bd. of Regents of Univ. of Minn.*, 140 F. Supp. 3d 807, 813 (D. Minn. 2015)); *see Treleven v. Univ. of Minn.*, 73 F.3d 816, 818–19 (8th Cir. 1996) (stating that "the Supreme Court has held that 'neither a State nor its officials acting in their official capacities are "persons" under § 1983' when sued for damages" and concluding that University was an arm of the state (quoting *Will*, 491 U.S. at 58, 71)).

Plaintiffs' position on this question confirms the insubstantiality of their § 1983 claims against the University. Plaintiffs cite no contrary authority or authority questioning the correctness of this rule. Instead, they argue: "The time has come for the court to consider reevaluating whether a public university such as [the University] can be held subject to § 1983 liability, as the facts alleged in Plaintiffs' First Amended Complaint present an issue of first impression for this jurisdiction." ECF No. 63 at 23. There are fundamental problems with this argument. It's not a federal district court's place to reevaluate Supreme Court and Eighth Circuit precedent. If Plaintiffs were hoping to preserve this issue for appellate review, then one would expect to read an argument supporting the modification of existing precedent. Plaintiffs advance no such argument.

The suggestion that the issue is one "of first impression for this jurisdiction" is incorrect and contradicted by numerous authorities, including several cited in the University's opening brief.  ECF No. 52 at 18–19.[10]  Especially in light of the University's citations, it is difficult to understand how Plaintiffs could advance their "issue-of-first-impression" argument.  Plaintiffs themselves cite a case from this District rejecting an invitation to "reevaluate" the question.  ECF No. 63 at 22 (citing *Mulla v. Univ. of Minn.*, No. 20-cv-931 (SRN/LIB), 2021 WL 603774, at *14 (D. Minn. Feb. 16, 2021) ("[N]o such 'reevaluation' is necessary here because this is not an issue of first impression, and existing precedent dictates the answer."), *aff'd*, No. 21-1693, 2022 WL 570099 (8th Cir. Feb. 25, 2022)).

The Eighth Circuit and courts in this District have dismissed claims on jurisdictional grounds under similar circumstances—that is, where a federal statutory claim is securely foreclosed by binding precedents.  *See, e.g.*, *Cross v. Fox*, 23 F.4th 797, 802 (8th Cir. 2022) ("Dismissal of Cross's [Voting Rights Act] claims on jurisdictional grounds was appropriate because they are firmly 'foreclosed by circuit precedent,' making them 'obviously doomed to fail,' and leaving 'no room for the inference that the questions sought to be raised can be the subject of controversy.' . . . Cross seeks to enforce federal law against defendants that, as prior precedent makes clear, are not regulated by that law.  Cross does not 'try to distinguish his case' . . . , 'nor does he argue that [prior precedent is] wrong

---

[10]    Plaintiffs describe "a battle between the Eleventh and Fourteenth Amendments," as "an issue of first impression," but the University has not asserted its Eleventh Amendment immunity, and Plaintiffs' discussion of the Fourteenth Amendment and qualified immunity doesn't answer whether the University is a person under § 1983.  *See* ECF No. 63 at 23–24.

. . . . Prior precedent renders Cross's claims patently meritless, meeting the strict standard of constitutional insubstantiality.") (citations omitted); *Spartz v. Menning*, No. 19-cv-2163 (PJS/ECW), 2021 WL 536298, at *8 (D. Minn. Jan. 18, 2021) (quoting *Biscanin*, 407 F.3d at 907) (reasoning that "numerous courts have found that court-appointed attorneys and conservators are not 'state actors' for purposes of § 1983 claims," collecting cases, and concluding that "Spartz's reliance on § 1983 in his Complaint does not establish subject matter jurisdiction, because 'the asserted basis of federal jurisdiction is patently meritless' because Menning (the only remaining Defendant) is not a state actor"), *report and recommendation adopted*, 2021 WL 533682 (D. Minn. Feb. 12, 2021). The bottom line is that the § 1983 claims against the University in Counts Two and Three are not substantial federal claims, so they must be dismissed for want of subject-matter jurisdiction.

3

The Title IX claims in Count One are wholly insubstantial to the extent they are asserted by Plaintiffs Cary, Cole, and Gee. *See* Am. Compl. ¶¶ 349–65. These three Plaintiffs were assaulted by Adrahtas after he left the University in 1985, and they are not alleged to have visited or considered attending the University at any time. *See, e.g.*, *id.* ¶¶ 45, 54, 315. These three Plaintiffs could not possibly have "be[en] excluded from participation in, be[en] denied the benefits of, or be[en] subjected to discrimination under any education program or activity" at the University due to sexual assaults or harassment by Adrahtas because the Amended Complaint's allegations establish that Adrahtas assaulted these Plaintiffs several years after his University employment ended. *See*

20 U.S.C. § 1681(a).[11]  The only thing Plaintiffs allege that might conceivably be relevant to this issue is that the University "fraudulently conceal[ed] from [Adrahtas's] future employers, the public, and generations of youth hockey players, its knowledge of his sexual assault allegations."  ECF No. 63 at 26.  But Plaintiffs identify no authority hinting that an educational institution can be subject to Title IX liability under these circumstances.  Regardless, the Amended Complaint includes no allegations that might possibly support the idea that Cary, Cole, or Gee were denied the benefit of, or discriminated against under, any program or activity of the University.

The complete lack of factual allegations to support a federal claim—or, as here, the presence of factual allegations effectively confirming the absence of federal claims' essential elements—can provide grounds for a jurisdictional dismissal.  *See, e.g.*, *Grangruth v. City of Scanlon*, No. 19-cv-2878 (PJS/LIB), 2020 WL 6151632, at *8 (D. Minn. Sept. 23, 2020) (recognizing that "unexplained references and conclusory assertions are insufficient to establish a federal basis for Plaintiff's claims") (citations omitted), *report and recommendation adopted*, 2020 WL 6151101 (D. Minn. Oct. 20, 2020); *Thomas v. Federated Mut.*, No. 18-cv-3491 (JRT/BRT), 2020 WL 1041702, at *2 (D. Minn. Mar. 4, 2020) ("Although Thomas' Amended Complaint cites several federal statutes, it does not articulate how her claims are related to those statutes, and a mere recitation of the United

---

[11]     The University advances essentially this same argument—that Cary, Cole, and Gee were never students at the University—in support of its Rule 12(b)(6) motion, but it directs the argument at these three plus Walker, Jensen, and Sacks.  *See* ECF No. 52 at 15. Acknowledging that the line between an unsubstantial federal claim for purposes of Rule 12(b)(1) and a failed claim under Rule 12(b)(6) can be fuzzy, it seems wiser here to consider this argument as to Walker, Jensen, and Sacks, if necessary, under the Rule 12(b)(6) standard.  They are not entirely without connection to the University.

States Code cannot give rise to a federal question.  Furthermore, the federal statutes that Thomas argues create federal-question jurisdiction . . . either do not include a private right of action or are otherwise inapplicable to the facts pleaded in this case."); *Briks v. Yeager*, No. 19-cv-0001 (NEB/LIB), 2019 WL 2119560, at *2–3 (D. Minn. May 15, 2019) (accepting report and recommendation where complaint was "void of any factual allegations supporting a federal cause of action or relief dependent on federal law" and "raise[d] only state-law claims, and conclusory assertions that any violations 'arise under Federal law' or 'under the Constitution, laws, or treaties of the United States of America' simply fall short of establishing federal-question jurisdiction," and further denying request to amend because the proposed amendment was a "vaguely asserted equal protection and due process claim" and did not allege that defendants were state actors as required for such claims, so amendment was futile), *aff'd*, 789 F. App'x 562 (8th Cir. 2020).  The Title IX claims by Cary, Cole, and Gee will therefore be dismissed for lack of subject-matter jurisdiction.

## B

All but the first three of the Amended Complaint's thirty-one counts assert state-law claims.[12]  Because this case is in federal court on the basis of federal-question

---

[12]     In their proposed Second Amended Complaint, Plaintiffs would drop some thirteen of these claims: gross negligence as to Adrhatas only (Counts Four and Seventeen) and negligence as to Adrahtas only (Counts Five and Eighteen); vicarious liability as to the University and Adrahtas (Count Six); express/implied agency (Count Seven), Nuisance (Minn. Stat. § 561.01) (Count Ten), and intentional infliction of emotional distress (Count Fourteen) as against the University; and vicarious liability as to USA Hockey, Hockey Illinois, and Adrahtas (Count Nineteen); and express and implied agency (Count Twenty), Nuisance (Minn. Stat. § 561.01) (Count Twenty-Three), and intentional infliction of emotional distress (Count Twenty-Seven), as against USA Hockey and Hockey Illinois.

jurisdiction under § 1331—and not on the basis of diversity jurisdiction under § 1332—Plaintiffs must plausibly allege facts showing that there is supplemental jurisdiction over all of these state-law claims under § 1367. "[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). Though the case pre-dates the statute, the Supreme Court's statement on the scope of pendent jurisdiction from *United Mine Workers v. Gibbs* remains the test for whether state-law claims are so related to federal claims as to form part of the same case or controversy under § 1367:

> The state and federal claims must derive from a common nucleus of operative fact. But if, considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is power in federal courts to hear the whole.

383 U.S. 715, 725 (1966) (citation and footnote omitted); *see also Myers v. Richland Cnty.*, 429 F.3d 740, 746 (8th Cir. 2005) (explaining that § 1367 "combines the doctrines of pendent and ancillary jurisdiction under a common heading of supplemental jurisdiction," and that "[c]laims within the action are part of the same case or controversy if they derive from a common nucleus of operative fact") (cleaned up). Courts in this District typically apply the "common nucleus" test from *Gibbs* by determining "whether there is, at

---

*See* Proposed Sec. Am. Compl. Redline [ECF No. 58-2] at 3–5 (table of contents), 82, 84–87, 90–92, 96–97, 101, 103, 104–06, 109–11, 115–16 (showing withdrawn claims). And at the hearing on these motions, Plaintiffs confirmed that Pietrangelo and Doe do not assert claims against USA Hockey or Hockey Illinois.

minimum, a discernable overlap between the operative facts underlying the federal claims and those underlying the appended state claims." *Hunt v. Up N. Plastics, Inc.*, 980 F. Supp. 1042, 1044 (D. Minn. 1997); *see Bos. Sci. SciMed, Inc. v. ev3, Inc.*, No. 05-cv-651 JNE/JSM, 2007 WL 2493117, at *5–7 (D. Minn. Aug. 29, 2007) (adopting report and recommendation) (quoting *Hunt*); *Rasmussen v. Jerry's Enters., Inc.*, No. 07-cv-1730 (JNE/SRN), 2008 WL 11349805, at *9 (D. Minn. Sept. 2, 2008) (same); *Pecore v. Jennie-O Turkey Store, Inc.*, 990 F. Supp. 2d 984, 990 (D. Minn. 2014) (same); *Bondi v. Great S. Bank*, No. 16-cv-1282 (PAM/BRT), 2017 WL 2345664, at *1 (D. Minn. May 30, 2017) (same); *Garcia v. MEND Med. Servs.*, No. 16-cv-4015 (DWF/BRT), 2017 WL 7048897, at *2 (D. Minn. Nov. 17, 2017) (quoting *Bondi*), *report and recommendation adopted*, 2018 WL 580059 (D. Minn. Jan. 26, 2018).  The precise question here, then, is whether (or to what extent) Plaintiffs' state-law claims share a common nucleus of operative fact with their remaining federal claims.

The required common nucleus is absent from the Amended Complaint in one respect: Plaintiffs' state-law claims against USA Hockey and Hockey Illinois share no discernable factual overlap with Plaintiffs' remaining federal claims (the § 1983 claim against Adrahtas individually and the Title IX claim against the University insofar as the claim is asserted by Plaintiffs Sacks, Jensen, Pietrangelo, Doe, and Walker).  The Amended Complaint's factual allegations make it clear that the claims against USA Hockey and Hockey Illinois arose after Adrahtas's University employment terminated and from facts occurring following Adrahtas's return to coaching in Illinois beginning in or about March 1989.  Am. Compl. ¶ 47; *see id.* ¶¶ 61–67, 76, 233–240.  The operative facts underlying

Plaintiffs' federal claims concern Adrahtas's actions directed at students and potential recruits while he was employed at the University, the University's knowledge regarding Adrahtas's sexual assaults, and the University's actions while Adrahtas was employed. It is true that the Amended Complaint includes more general allegations that USA Hockey and Hockey Illinois owed all Plaintiffs a duty arising from the organizations' relationships with Adrahtas. *See id.* ¶¶ 505–614. But a caption-to-signature-block review of the Amended Complaint shows it includes no allegations hinting at how these duties might have arisen before or during Adrahtas's University employment.[13] Plaintiffs' claims against USA Hockey and Hockey Illinois will therefore be dismissed for lack of supplemental jurisdiction.

## III

Adrahtas argues he is not subject to personal jurisdiction in Minnesota with respect to the claims asserted by Plaintiffs Jensen, Walker, Cary, Cole, and Gee, and he seeks dismissal of these claims on this basis under Rule 12(b)(2). ECF No. 35. "Personal jurisdiction . . . is 'an essential element of the jurisdiction of a district . . . court,' without which the court is 'powerless to proceed to an adjudication.'" *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999) (quoting *Emp. Reins. Corp. v. Bryant*, 299 U.S. 374, 382 (1937)). "When personal jurisdiction is challenged by a defendant, the plaintiff bears the burden to show that jurisdiction exists." *Fastpath, Inc. v. Arbela Techs. Corp.*, 760 F.3d 816, 820 (8th Cir. 2014) (citations omitted). "To successfully survive a motion to dismiss

---

[13]    Plaintiffs' in-hearing confirmation that Pietrangelo and Doe do not assert claims against USA Hockey or Hockey Illinois confirms this understanding of the theory underlying Plaintiffs' claims against USA Hockey and Hockey Illinois.

challenging personal jurisdiction, a plaintiff must make a prima facie showing of personal jurisdiction over the challenging defendant." *Id.* (citations omitted). A prima facie showing requires a plaintiff to allege "sufficient facts in the complaint to support a reasonable inference that the defendant can be subjected to jurisdiction within the state." *Dairy Farmers of Am., Inc. v. Bassett & Walker Int'l, Inc.*, 702 F.3d 472, 474–75 (8th Cir. 2012) (quotations omitted). The plaintiff will not have to prove personal jurisdiction by a preponderance of the evidence "until trial or until the court holds an evidentiary hearing." *Epps v. Stewart Info. Servs. Corp.*, 327 F.3d 642, 647 (8th Cir. 2003). A federal court must "look at the facts in the light most favorable to the nonmoving party, and resolve all factual conflicts in favor of that party." *Pangaea, Inc. v. Flying Burrito LLC*, 647 F.3d 741, 745 (8th Cir. 2011) (citation omitted).

Whether there is personal jurisdiction over Adrahtas with respect to these particular Plaintiffs' claims boils down to determining whether the exercise of jurisdiction over them would comport with federal constitutional due process. This is a federal-question case; there is subject-matter jurisdiction under 28 U.S.C. § 1331. As the Supreme Court has explained:

> "Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014). This is because a federal district court's authority to assert personal jurisdiction in most cases is linked to service of process on a defendant "who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located." Fed. R. Civ. P. 4(k)(1)(A).

*Walden v. Fiore*, 571 U.S. 277, 283 (2014). In *Walden*, a federal-question case, the Supreme Court looked to Nevada law to determine whether the federal district court (in

Nevada) was authorized to exercise personal jurisdiction over a defendant sued under *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971). *Walden*, 571 U.S. at 282–83. The need to consult state law is absent in those situations where the federal statute at issue directs otherwise (*e.g.*, where the federal statute provides for nationwide service of process). *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 624 (2d Cir. 2016); *see, e.g.*, *In re Fed. Fountain, Inc.*, 165 F.3d 600, 601 (8th Cir. 1999) (en banc) (holding that the authorization of nationwide service of process in "Fed. R. Bankr. P. 7004(d) is a constitutional exercise of congressional authority"). Here, Plaintiffs assert claims under federal statutes that do not direct otherwise. All of this means Minnesota law must be consulted to determine whether there is personal jurisdiction over Adrahtas with respect to the claims asserted by Plaintiffs Jensen, Walker, Cary, Cole, and Gee, but Minnesota's long-arm statute extends the personal jurisdiction of its courts of general jurisdiction as far as federal constitutional due process allows. *Rilley v. MoneyMutual, LLC*, 884 N.W.2d 321, 327 (Minn. 2016). The question to be answered, then, is whether exercising personal jurisdiction over Adrahtas with respect to these claims is consistent with federal constitutional due process.

Due process requires that a defendant have sufficient "minimum contacts" with the forum state so that "maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Daimler AG*, 571 U.S. at 126 (cleaned up). This means "actions by the defendant *himself*" must "create a substantial connection with the forum State" and provide "fair warning" to the defendants that they may be subject to jurisdiction there. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 475 (1985) (cleaned up). The "fair

warning" requirement will be met if defendants have "'purposefully directed' his activities at residents of the forum, and the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Id.* at 472–73 (citations omitted). Our Eighth Circuit Court of Appeals has identified five factors that district courts are to consider in determining whether there is personal jurisdiction over a defendant: (1) the nature and quality of contacts with the forum state; (2) the quantity of those contacts; (3) the relationship between the cause of action and the contacts; (4) the state's interest in providing a forum for its residents; and (5) the convenience to the parties. *Johnson v. Arden*, 614 F.3d 785, 794 (8th Cir. 2010) (citation omitted). The first three factors are of primary importance, and the remaining two are secondary. *Burlington Indus., Inc. v. Maples Indus., Inc.*, 97 F.3d 1100, 1102 (8th Cir. 1996).[14] The third factor distinguishes specific jurisdiction from general jurisdiction. *Johnson*, 614 F.3d at 794. Specific jurisdiction exists over causes of action arising out of or related to a defendant's contacts with the forum state; general jurisdiction is broader and reaches any cause of action against a defendant whose forum contacts "are so 'continuous and systematic' as to render [it] essentially at home in the forum [s]tate." *Quality Bicycle Prods., Inc. v. BikeBaron, LLC*, No. 12-cv-2397 (RHK/TNL), 2013 WL 3465279, at *3 (D. Minn. July 10, 2013) (alterations in original) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)).

---

[14]   "[T]he better understanding of the Eighth Circuit's statements that the last two factors are 'not determinative' or 'not dispositive' is that those factors cannot establish jurisdiction when there are not otherwise minimum contacts with the forum." *Blue Cross & Blue Shield of N.C. v. Rite Aid Corp.*, 519 F. Supp. 3d 522, 534 n.3 (D. Minn. 2021) (tracing history of Eighth Circuit's personal-jurisdiction factors).

The Parties' positions with respect to this issue are straightforward. Adrahtas argues there is not personal jurisdiction over him in Minnesota with respect to Jensen, Walker, Cary, Cole, and Gee's claims because "[t]here is no indication that Adrahtas has lived, worked, visited, or conducted other business in Minnesota in the last 36 years," "[t]he Complaint only mentions a single day that Jens[e]n came to Minnesota and makes clear that no cause of action occurred during that day," and "[t]here is no allegation that Plaintiffs Walker, Kelly, Cole, or Gee ever entered Minnesota let alone were sexually abused in Minnesota." ECF No. 37 at 32. In other words, Adrahtas says that these Plaintiffs' claims against Adrahtas have nothing to do with Adrahtas's Minnesota contacts. Plaintiffs, on the other hand, argue that Adrahtas's Minnesota contacts, combined with the University's conduct, are enough to make the exercise of personal jurisdiction over Adrahtas here appropriate regardless of where he may have perpetrated abuse and regardless of the absence of any connection between a victim and Minnesota. Specifically, Plaintiffs assert that some of Adrahtas's conduct "occurred at [Minnesota's] largest public university," that "one of the primary reasons Adrahtas was able to continue his abusive 'activities' across multiple states was because of the well-renowned, blue-blood reputation [the University] holds in the hockey world," and that, as a result, Plaintiffs' injuries "stemmed from the actions and inactions of" the University. ECF No. 65 at 17–18.

There is a fundamental problem with Plaintiffs' argument: there is no affiliation between Minnesota and the claims asserted *against Adrahtas* by Plaintiffs Walker, Jensen, Kelly, Cole, and Gee. In this respect, this case is comparable to *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco County*, ___ U.S. ___, 137 S. Ct. 1773

(2017).  There, the Supreme Court held that California courts lacked personal jurisdiction over the claims of certain individual plaintiffs who alleged personal injuries caused by Plavix, a drug manufactured by Bristol-Myers Squibb.  *Id.* at 1777.  These plaintiffs did not reside in California, "were not prescribed Plavix in California, did not purchase Plavix in California, did not ingest Plavix in California, and were not injured by Plavix in California."  *Id.* at 1781.  Therefore, "a connection between the forum and the specific claims at issue" was "missing."  *Id.*  That is what we have here.  Adrahtas's abuse of these Plaintiffs occurred in other states—in just Illinois against Jensen, Cary, Cole, and Gee, and in Illinois and Massachusetts against Walker.[15]  Plaintiffs' allegations that Adrahtas's University employment, combined with the University's subsequent conduct, made it possible or perhaps easier for Adrahtas to assault these Plaintiffs may be relevant to Plaintiffs' claims against the University, but these allegations have nothing to do with the claims against Adrahtas.  In other words, these Plaintiffs' claims against Adrahtas do not depend on showing that Adrahtas coached at the University.  It might be different had Plaintiffs identified some basis to attribute the University's Minnesota contacts to Adrahtas with respect to these assaults, but Plaintiffs don't advocate for that approach.  Under *Bristol-Myers Squibb Co.*, these Plaintiffs' claims against Adrahtas must be dismissed for lack of personal jurisdiction.

---

[15]    Though Adrahtas attempted to assault Jensen in Minnesota, the Amended Complaint's allegations make it clear that on this occasion Jensen declined Adrahtas's invitation, and neither the Amended Complaint nor Plaintiffs' response to Defendants' motions hinted that Jensen seeks to recover damages for this attempted assault.

Assessment of the Eighth Circuit's factors confirms this determination. The nature and quality of Adrahtas's Minnesota contacts does not favor the exercise of personal jurisdiction. Adrahtas had no Minnesota contacts relevant to these Plaintiffs' claims. The claims depend on assaults that occurred in Illinois and Massachusetts. Though Adrahtas is alleged to have had many contacts with Minnesota, especially when he was coaching at the University, the quantity of those contacts relative to these Plaintiffs' claims is zero. Plaintiffs do not seem to argue—and regardless, have identified no legal authority or factual basis to show—that the exercise of general personal jurisdiction is appropriate over Adrahtas in Minnesota today based on the fact that he made his home here between summer 1984 and June 1985. Against these considerations, the final two factors can't change things. Regardless, they do not favor Plaintiffs' position. There is no meaningful basis to conclude that Minnesota here has an interest in providing a forum for its residents because Walker, Jensen, Cary, Cole, and Gee weren't Minnesota residents when Adrahtas assaulted them, and they aren't now. Am. Compl. ¶¶ 116 (alleging Walker is an Arizona citizen), 118 (alleging Jensen is a Florida citizen), 121 (alleging Cary is an Illinois citizen), 122 (alleging Cole is a Florida citizen), and 123 (alleging Gee is a Colorado citizen). Finally, apart from possible cost savings associated with joinder in one suit, no reason is identified to think Minnesota is a more convenient forum for these Plaintiffs or Adrahtas. The current citizenship of these Plaintiffs and Adrahtas cut the other way. Adrahtas's motion to dismiss these Plaintiffs' claims for lack of personal jurisdiction will be granted.

\*

Before continuing to the 12(b)(6) aspects of Defendants' motions, these jurisdictional determinations deserve a summary.    (1) There is not subject-matter jurisdiction over Plaintiffs' § 1983 claims against the University.    Counts Two and Three will be dismissed as to the University on this basis.    (2) There is not subject-matter jurisdiction over Plaintiffs' Cary, Cole, and Gee's Title IX claims against the University. Count One will be dismissed as to these Plaintiffs on this basis.    (3) There is not supplemental jurisdiction over Plaintiffs' state-law claims against USA Hockey and Hockey Illinois.    Therefore, Counts Seventeen through Twenty-Nine will be dismissed as to USA Hockey and Hockey Illinois for lack of supplemental jurisdiction.    (4) There is not personal jurisdiction over Adrahtas in Minnesota with respect to the claims asserted against him by Plaintiffs Jensen, Walker, Cary, Cole, and Gee.    For this reason, Counts Two, Four through Six, Seventeen through Nineteen, Thirty, and Thirty-One of the Amended Complaint will be dismissed as to these Plaintiffs.    Given their jurisdictional character, all of these dismissals must be without prejudice. *List v. County of Carroll*, 240 F. App'x 155, 156 (8th Cir. 2007) (per curiam) (noting that a dismissal for lack of subject-matter jurisdiction is effectively "a dismissal without prejudice"); *County of Mille Lacs v. Benjamin*, 361 F.3d 460, 464 (8th Cir. 2004) ("A district court is generally barred from dismissing a case with prejudice if it concludes subject matter jurisdiction is absent."); *see also Kowalski v. Boliker*, 893 F.3d 987, 994–95 (7th Cir. 2018) ("[A] dismissal for want of subject-matter jurisdiction is necessarily without prejudice because it does not preclude

pursuit of the action in a different forum.  Such a dismissal is, however, appealable."
(citation omitted)).[16]

IV

A

In reviewing a motion to dismiss for failure to state a claim under Rule 12(b)(6), a
court must accept as true all of the factual allegations in the complaint and draw all
reasonable inferences in the plaintiff's favor.  *Gorog*, 760 F.3d at 792.  Although the factual
allegations need not be detailed, they must be sufficient to "raise a right to relief above the
speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The complaint
must "state a claim to relief that is plausible on its face."  *Id.* at 570.  "A claim has facial
plausibility when the plaintiff pleads factual content that allows the court to draw the
reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v.
Iqbal*, 556 U.S. 662, 678 (2009).

The Parties generally agree that, to the extent state law governs any issue, Minnesota
law applies.  The Parties reach this conclusion in different ways.  For example, in its brief,
the University applies Minnesota law throughout without justifying the choice explicitly.

---

[16]   If one were to infer that Plaintiffs are intent on dropping the Amended Complaint's
claims that do not appear in the proposed Second Amended Complaint, *see supra* n.12,
then the scope of the case has narrowed considerably.  Between these jurisdictional
determinations and Plaintiffs' withdrawal of claims, the following claims from the
Amended Complaint would remain: a Title IX claim against the University asserted by
Sacks, Jensen, Pietrangelo, Doe, and Walker (Count One); a § 1983 claim against Adrahtas
brought by Sacks, Pietrangelo, and Doe (Count Two); state-law claims against the
University apparently asserted by all Plaintiffs (Counts Four, Five, Eight, Nine, Eleven,
Twelve, Thirteen, Fifteen, and Sixteen); and state-law claims against Adrahtas brought by
Sacks, Pietrangelo, and Doe (Counts Thirty and Thirty-One).

32

*See* ECF No. 52.  Adrahtas discusses the possible applicability of statutes of limitation

from Minnesota, Illinois, Massachusetts, and Colorado before concluding that Minnesota

law should apply.  ECF No. 37 at 10–15.  And Plaintiffs too seem to agree that Minnesota

law applies.  *See* ECF No. 63 at 13 ("There is no dispute among the Parties that Minnesota

law regarding the statute of limitations should be applied here[.]"), 27–35 (citing

Minnesota cases to enumerate state-law claims' elements).  It is true that Adrahtas and

Plaintiffs suggest incorrectly that Minnesota law should apply because this is a diversity

case.  ECF No. 37 at 14 (Adrahtas); ECF No. 63 at 13 (Plaintiffs).  But there are other

reasons to apply Minnesota law, and no Party has suggested that applying a different state's

law might affect the outcome.  In these circumstances, there is no reason to second-guess

the Parties' agreement on the choice-if-law question.  *See Netherlands Ins. Co. v. Main St.*

*Ingredients, LLC*, 745 F.3d 909, 913 (8th Cir. 2014) ("Because the parties do not dispute

the choice of Minnesota law, we assume, without deciding, Minnesota law applies[.]"); *see*

*also Progressive N. Ins. Co. v. McDonough*, 608 F.3d 388, 390 (8th Cir. 2010).

B

Defendants' primary argument is that a statute of limitations bars Plaintiffs' claims.

*See* ECF No. 52 at 5–13; ECF No. 37 10–21.  A defendant may raise a statute-of-limitations

defense on a motion to dismiss, and the motion should be granted when it "appears from

the face of the complaint itself that the limitation period has run."  *Varner v. Peterson*

*Farms*, 371 F.3d 1011, 1016 (8th Cir. 2004); *see In Re: EpiPen Dir. Purchaser Litig.*, No.

20-cv-827 (ECT/TNL), 2021 WL 147166, at *5 (D. Minn. Jan. 15, 2021).

33

A straightforward analysis shows that Plaintiffs' federal claims are untimely.  (a) Title IX and § 1983 claims are subject to the forum state's general personal-injury statute of limitations, and here that's six years pursuant to Minn. Stat. § 541.05, subd. 1(5). *Egerdahl v. Hibbing Cmty. Coll.*, 72 F.3d 615, 617–18 (8th Cir. 1995) (analogizing Title VI and Title IX to §§ 1981 and 1983 and holding "that the six-year limitations period of Minn. Stat. § 541.05, subd. 1(5) governs Title VI and Title IX claims"); *see also Owens v. Okure*, 488 U.S. 235, 249–50 (1989) (holding that "where state law provides multiple statutes of limitations for personal injury actions, courts considering § 1983 claims should borrow the general or residual statute for personal injury actions").  (b) Title IX and § 1983 do not, however, borrow their accrual rules from state law.  "When a § 1983 cause of action accrues (and the statute of limitations begins to run) is an issue of federal law." *Martin v. Julian*, 18 F.4th 580, 583 (8th Cir. 2021) (citing *Wallace v. Kato*, 549 U.S. 384, 388 (2007)); *see King-White v. Humble Indep. Sch. Dist.*, 803 F.3d 754, 762 (5th Cir. 2015) (applying federal law to question of when § 1983 and Title IX claims accrued); *Stanley v. Trs. of Cal. State Univ.*, 433 F.3d 1129, 1136 (9th Cir. 2006) ("Although Title IX borrows a state statute of limitations period, federal law governs the 'determination of the point at which the limitations period begins to run.'") (citation omitted).  These claims "accrue 'when the plaintiff has a complete and present cause of action, that is, when the plaintiff can file suit and obtain relief.'" *Humphrey v. Eureka Gardens Pub. Facility Bd.*, 891 F.3d 1079, 1081–82 (8th Cir. 2018) (quoting *Wallace*, 549 U.S. at 388) (addressing § 1983 claims); *see also Graham v. City of Manassas Sch. Bd.*, 390 F. Supp. 3d 702, 710 (E.D. Va. 2019) (concluding that federal law governs when § 1983 and Title IX claims accrue,

not state accrual statute, and applying "standard rule" from *Owens* that accrual occurs when the plaintiff knows or has reason to know of his injury); *Maher v. Iowa State Univ.*, No. 4:16-cv-570-HCA, 2018 WL 10344272, at *4 (S.D. Iowa Feb. 13, 2018) (concluding that there was no difference in when the plaintiff's Title IX claim accrued "regardless of which linguistic formulation of the standard" was applied, *i.e.*, "when a plaintiff knew or should have known of the alleged [unlawful] act" or "when a plaintiff can file suit and obtain relief"), *aff'd on other grounds*, 915 F.3d 1210 (8th Cir. 2019).  (c) Here, there isn't any question that Plaintiffs Sacks, Jensen, Pietrangelo, Doe, and Walker could have filed suit and obtained relief sometime in 1985 at the latest, either after Adrahtas committed assaults during his time at the University (for the § 1983 claim against him) or the University had notice of Adrahtas's assaults (for the Title IX claim).  *See* Am. Compl. ¶¶ 36–38, 199–203; *see also id.* ¶¶ 189, 196.  The six-year period for these federal claims thus expired by the summer of 1991.

Plaintiffs argue that their claims survive under Minnesota's Child Victims Act, Minn. Stat. § 541.073, but the law is clear that this statute does not apply to Plaintiffs' federal claims.  The Child Victims Act prescribes a limitations period specific to "[a]n action for damages based on sexual abuse." *Id.*, subd. 2(a).  Accepting Plaintiffs' argument would contravene the rule requiring that the forum state's "general or residual statute for personal injury actions" be borrowed.  *Owens*, 488 U.S. at 250.  In reaching this holding, the Supreme Court acknowledged that states may have multiple personal injury and intentional tort limitations statutes, including statutes governing sexual acts with minors, so there is no reason to think the Supreme Court meant to except a specialized statute of

limitations for sexual abuse claims from its holding. *See Owens*, 488 U.S. at 244–48 & n.8. In other words, it does not matter under *Owens* whether a plaintiff's claims concern conduct that might be subject to a more particular or specialized limitations period under state law; the general statute applies. *See Baxter-Knutson v. Brandt*, No. 14-cv-3796 (ADM/LIB), 2015 WL 4633590, at *3–5 (D. Minn. Aug. 3, 2015) (rejecting argument that Minnesota's wrongful-death statute of limitations applied to § 1983 claim and applying Minn. Stat. § 541.05, subd. 1(5)); *Anderson for Anderson v. City of Minneapolis*, No. 16-cv-04114 (SRN/FLN), 2018 WL 1582262, at *9 (D. Minn. Mar. 30, 2018) (citing *Egerdahl*, 72 F.3d at 618 n.3) ("[A]s the Eighth Circuit has repeatedly recognized, under [*Wilson v. Garcia*, 471 U.S. 261, 276 (1985), *superseded by statute on other grounds by* 28 U.S.C. § 1658(a) *as recognized in Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 377–81 (2004),] and *Owens*, *all* § 1983 actions filed in Minnesota are subject to the six-year statute of limitations contained in the state's personal injury statute, Minn. Stat. § 541.05, subdivision 1(5)."), *aff'd sub nom. Anderson as trustee for next-of-kin of Anderson v. City of Minneapolis*, 934 F.3d 876 (8th Cir. 2019). Other courts addressing the more precise questions here—whether a state statute of limitations specific to child or sexual abuse should apply to federal-law claims borrowing state statutes of limitations— have concluded persuasively that the state's residual personal-injury statute of limitations, and not the specialized statute, applied. *See Bonneau v. Centennial Sch. Dist. No. 28J*, 666 F.3d 577, 579–80 (9th Cir. 2012); *Hampton v. Sabie*, 891 F. Supp. 2d 1014, 1018–19 (N.D. Ill. 2012) (discussing *Owens*, *Bonneau*, and *Blake v. Dickason*, 997 F.2d 749, 751 (10th Cir. 1993)), *aff'd sub nom. Hampton v. Rita*, 545 F. App'x 533 (7th Cir. 2013).

36

Plaintiffs seem to say that each of them repressed memories of Adrahtas's assaults for some period of time, and that their memory repression delayed accrual of the limitations period, but this argument is not persuasive. Plaintiffs cite no federal authority to support the proposition that a plaintiff's alleged repression of his or her memories delays accrual of the applicable limitations period for purposes of Title IX or § 1983. *See Bonneau*, 666 F.3d at 580–81 (rejecting repressed memory as a basis to delay accrual of § 1983 claim). Plaintiffs seem instead to rely on an outdated, superseded version of Minnesota's Child Victims Act. *See* Minn. Stat. § 541.073 (1990) (providing that actions for damages based on personal injury caused by sexual abuse must be commenced within a certain number of years of the time "the plaintiff knew or had reason to know that the injury was caused by the sexual abuse"); *see also Lickteig v. Kolar*, 782 N.W.2d 810, 812–13 (Minn. 2010) (reviewing 1989 enactment of "delayed discovery statute" and amendments); ECF No. 63 at 13; ECF No. 65 at 19. If Plaintiffs are relying on the version of the Child Victims Act adopted in 1989 to argue that their federal claims did not accrue for some period of time, the argument seems flawed for two basic reasons. First, federal law (and not Minnesota law) controls the accrual question. *Martin*, 18 F.4th at 583. Second, if Minnesota law had something to say about the issue, Plaintiffs identify no legal authority or factual basis that might justify applying a version of the Child Victims Act that came off the books in 2013 to a lawsuit filed in 2021. *See* Act of May 24, 2013, ch. 89, § 1, 2013 Minn. Laws; *Anderson v. Unisys Corp.*, 52 F.3d 764, 765 n.1 (8th Cir. 1995).

It is true that when a federal court borrows a state statute of limitations to gap-fill, as with Title IX and § 1983, the general rule is that the federal claims "may be subject to

any tolling rules that [state] courts have applied to that statute." *DeVries v. Driesen*, 766 F.3d 922, 922–24 (8th Cir. 2014). State tolling rules might include equitable estoppel, *e.g.*, *Montin v. Estate of Johnson*, 636 F.3d 409, 413 (8th Cir. 2011), fraudulent concealment, *Beckwith v. City of Houston*, 790 F. App'x 568, 573 (5th Cir. 2019), or perhaps a statute tolling minors' claims until they reach a specified age, *e.g.*, *Bonneau*, 666 F.3d at 580. There are limits, however: "It would no less frustrate 'the federal interest in uniformity and the interest in having firmly defined, easily applied rules' were we to obediently apply the residual statute of limitations, only to then adopt a tort-specific tolling provision." *Bonneau*, 666 F.3d at 580 (quoting *Wilson*, 471 U.S. at 270); *see DeVries*, 766 F.3d at 923–24 (applying Iowa's general personal-injury limitations period and refusing to apply tolling rule from a "separate statutory scheme"); *see also Varnell v. Dora Consol. Sch. Dist.*, 756 F.3d 1208, 1212–13 (10th Cir. 2014) ("Only generally applicable tolling provisions—such as those based on minority, incapacity, and equitable grounds—should be incorporated for use under § 1983.").[17]

The challenge here is that Plaintiffs advance no discernable tolling argument specifically with respect to their federal claims. In their submissions, Plaintiffs seem to argue that all of their claims against the University and Adrahtas survive based on the

---

[17] Minnesota has a statute that tolls limitation periods for claims that accrue or arise when a plaintiff is under eighteen years of age. Minn. Stat. § 541.15(a)(1). Plaintiffs do not rely on this statute. Regardless, applying the statute wouldn't make a difference here. Pietrangelo and Doe were eighteen or older when they were assaulted, and Walker, Jensen, and Sacks were close enough to eighteen that the statute would have tolled their claims for an inconsequential period. *See* ECF No. 75 at 7.

fraudulent-concealment doctrine.  ECF No. 63 at 21–22; ECF No. 65 at 21–23.  This is not persuasive.

To establish fraudulent concealment, Plaintiffs must plead that there was an affirmative act or statement by a defendant which concealed a potential cause of action, that the statement was known to be false or made in reckless disregard of its truth or falsity, and that concealment could not have been discovered by Plaintiffs' reasonable diligence. *See Anunka v. City of Burnsville*, 534 F. App'x 575, 576 (8th Cir. 2013) (per curiam) (citing *Drobnak v. Andersen Corp.*, 561 F.3d 778, 786 (8th Cir. 2009)) (affirming dismissal of § 1983 claim as untimely under Minnesota law and agreeing with district court that plaintiff failed to allege sufficient facts to support a basis for tolling); *see also Int'l Decision Sys., Inc. v. JDR Sols., Inc.*, No. 18-cv-2951 (ECT/DTS), 2019 WL 2009249, at *6 (D. Minn. May 7, 2019).  "In no case, however, is mere silence or failure to disclose sufficient in itself to constitute fraudulent concealment."  *Helleloid v. Indep. Sch. Dist. No. 361*, 149 F. Supp. 2d 863, 869 (D. Minn. 2001) (quotation omitted); *see also Armstrong v. Sumitomo Rubber USA, LLC*, No. 16-cv-2504 (DSD/HB), 2016 WL 6883194, at *2 (D. Minn. Nov. 18, 2016) (quoting *Wild v. Rarig*, 234 N.W.2d 775, 795 (Minn. 1975)) (same). "Additionally, . . . allegations of fraud, including fraudulent concealment for tolling purposes, [must] be pleaded with particularity" under Rule 9(b).  *Great Plains Tr. Co. v. Union Pac. R.R. Co.*, 492 F.3d 986, 995 (8th Cir. 2007) (citations omitted); *see also Summerhill v. Terminix*, Inc., 637 F.3d 877, 880 (8th Cir. 2011) ("Under Rule 9(b)'s heightened pleading standard, allegations of fraud, including fraudulent concealment for tolling purposes, must be pleaded with particularity.  In other words, Rule 9(b) requires

plaintiffs to plead the who, what, when, where, and how: the first paragraph of any newspaper story.") (cleaned up).[18]

Plaintiffs' Amended Complaint does not include allegations satisfying these rules. They allege the University concealed Adrahtas's conduct from third parties, but the concealment is not tied to tolling or Plaintiffs' federal claims. *See* Am. Compl. ¶¶ 39, 44, 201, 289. Plaintiffs allege no affirmative act or statement by which the University concealed potential claims from Plaintiffs. Plaintiffs allege the University was silent, but that is not sufficient. *See* Am. Compl. ¶¶ 44, 288 (alleging that Greenberg asked for a job reference, but not alleging a response by the University). Beyond that, Plaintiffs seem only to allege the conclusion of concealment. *See Doe v. Ord. of St. Benedict*, 836 F. Supp. 2d 872, 877 (D. Minn. 2011) (quoting *Drobnak*, 561 F.3d at 783) ("[C]onclusory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy the rule."). With respect to their claims against Adrahtas, Plaintiffs allege that Adrahtas concealed his actions, tolling the statute of limitations, but only in Count Thirty for Assault and Battery. Am. Compl. ¶ 618 ("Adrahtas fraudulently concealed his identity throughout his sexual assaults and molestation of the Plaintiffs, and Plaintiffs blocked the true nature

---

[18]   Plaintiffs misunderstand Rule 9(b)'s particularity requirement. Rule 9(b) requires Plaintiffs to plead the alleged *fraud* with particularity. Plaintiffs seem to understand Rule 9(b) to require them to plead Adrahtas's assaults with particularity. *See* ECF No. 65 at 21 ("Plaintiffs have pled sufficient facts demonstrating Adrahtas ('who') is the proximate cause of their injuries ('what') the time period and location in which they were injured ('when' and 'where'), and the method in which Adrahtas' actions subjected them to assault, and then attempted to conceal these facts to avoid liability until the investigations by US Center for SafeSport and UMN were released in 2020 ('how')."). As far as Rule 9(b) is concerned, whether Plaintiffs allege Adrahtas's assaults with particularity is beside the point.

of their encounters with [] Adrahtas from their consciousness until recently, which tolls the statute of limitations period."). Deeming these allegations to have been made with respect to the federal-law claims doesn't change things because other allegations render fraudulent concealment plainly implausible. As to Pietrangelo and Doe, Adrahtas did not assault them while pretending to be Sheila; they knew it was Adrahtas who was groping them. *Id.* ¶¶ 254–55, 274–76. For Walker, Jensen, and Sacks, the Amended Complaint includes allegations that each realized at some point that Sheila was Adrahtas, or at least was someone different from who Adrahtas represented the individual to be. *See id.* ¶¶ 30, 163 (alleging that Walker removed his blindfold and saw Adrahtas in fall 1984); *id.* ¶¶ 63, 223, 225–28, 234 (alleging friends told Jensen in summer 1984 that he had received oral sex from Adrahtas, and that Jensen understood after talking to Adrahtas while at the University during winter 1984–1985 that Adrahtas had performed oral sex on him); *id.* ¶ 188 (alleging that Sacks stopped an encounter after realizing Sheila was a man).[19]

---

[19]    In their opposition briefs, Plaintiffs include a section captioned "Continuing Violation Doctrine." *See, e.g.*, ECF No. 63 at 18. Under Minnesota law, if a plaintiff's allegations involve "'a sufficiently integrated pattern to form, in effect, a single discriminatory act' that spans over time, [then] the clock does not run in that circumstance until the final act under the continuing-violations doctrine. *Larkins v. Dep't of Revenue*, No. A21-0905, 2022 WL 663351, at *3 (Minn. Ct. App. March 7, 2022) (quoting *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 440–41 n.11 (Minn. 1983)). Plaintiffs don't, however, discuss or apply this doctrine. They instead discuss a case they describe as "Judge Barry Anderson's unpublished opinion in *Doe 1 v. Archdiocese of St. Paul and Minneapolis, Diocese of Winona, and Thomas Adamson*." *E.g.*, ECF No. 64 at 18. Research has identified two cases possibly matching portions of the case Plaintiffs describe: *Doe 76C v. Archdiocese of St. Paul and Minneapolis*, 817 N.W.2d 150 (Minn. 2012), and *Doe 28B v. Archdiocese of St. Paul and Minneapolis*, No. C9-99-2164, 2000 WL 781362 (Minn. Ct. App. June 20, 2000). The problem is that neither of these cases discuss or apply the continuing violation doctrine. Regardless, Plaintiffs do not articulate how the continuing violation doctrine might apply here to save their claims.

C

Though not necessary to the Rule 12(b)(6) dismissal of Plaintiffs' federal claims, it seems worth mentioning that, if they were timely, Plaintiffs' federal claims would remain dismissal-worthy on their merits in at least certain key respects. (1) If it weren't proper to dismiss Plaintiffs' § 1983 claims against the University or the Title IX claims of Plaintiffs Cary, Cole, and Gee on subject-matter jurisdictional grounds, they plainly would fail on their merits under Rule 12(b)(6) for essentially the same reasons that warranted their jurisdictional dismissal under Rule 12(b)(1). (2) Plaintiffs' § 1983 claims against Adrahtas fail to the extent these claims are alleged in connection with assaults Adrahtas perpetrated when he was not coaching at the University. "'State employment is generally sufficient to render the defendant a state actor,'" and a defendant necessarily "acts under color of state law when he abuses the position given to him by the State." *West v. Atkins*, 487 U.S. 42, 49–50 (1988) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 936 n.18 (1982)). "The dispositive issue is whether the defendant acted pursuant to power he or she possessed by state authority." *Ottman v. City of Indep.*, 341 F.3d 751, 762 (8th Cir. 2003). Specifically with respect to claims against a University athletic coach, the issue is whether the individual was "functioning in his capacity as a coach" when he engaged in the assertedly unlawful behavior. *Jennings v. Univ. of N.C.*, 482 F.3d 686, 701 (4th Cir. 2007). Here, the Amended Complaint includes allegations establishing that Adrahtas's assaults of Plaintiffs Jensen, Cary, Cole, and Gee occurred before or after Adrahtas coached at the University. Plaintiffs advance no argument that might conceivably justify concluding that these Plaintiffs' § 1983 claims against Adrahtas survive. (3) The Amended Complaint does

not include allegations plausibly showing that the University had actual knowledge of sexual harassment or assaults that preceded further harassment or assaults, a necessary element of Plaintiffs' Title IX claims. "The Supreme Court and the Eighth Circuit have both made clear that, to be held liable under Title IX for sexual assault, a funding recipient must have actual knowledge of *sexual assaults* and be deliberately indifferent to those *sexual assaults*. *Shank v. Carleton Coll.*, 232 F. Supp. 3d 1100, 1109 (D. Minn. 2017) (citations omitted). In their opposition submissions, Plaintiffs assert that Pietrangelo and Doe complained of "sexual groping and assaults," that other student-athletes complained about leering in the shower and the Sheila scheme, and that the Perkins Coie report determined that the University was aware of assault allegations during Adrahtas's employment. ECF No. 63 at 25. But none of that is in the Amended Complaint. Its allegations are plain: the first knowledge alleged by the University of sexual assaults was when (non-Plaintiff) players reported Adrahtas after their sting operation, Adrahtas resigned soon after, and no assaults are alleged to have occurred between the report and the resignation. Am. Compl. ¶¶ 38–39, 199–203. As alleged in the Amended Complaint, Pietrangelo and Doe did not complain of groping or assaults; they complained about the visualization practices but said that they were a waste of time and made them "uncomfortable." *Id.* ¶¶ 255, 276. That is not a complaint of sexual assault.[20]

---

[20]      Adrahtas argues he is entitled to qualified immunity against the remaining Plaintiffs' § 1983 claims. ECF No. 37 at 27–29. This issue turns on "(1) whether the facts shown by the plaintiff make out a violation of a constitutional . . . right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009) (citations omitted); *see also Watson v. Boyd*, 2 F.4th 1106, 1109 (8th Cir. 2021). Adrahtas's argument is directed to the second question. Whether a right alleged to have been violated was "clearly established" must be

D

As for the remaining state-law claims, a district court "may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Barstad v. Murray Cnty.*, 420 F.3d 880, 888 (8th Cir. 2005) (quoting *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)). And the Eighth Circuit has instructed district courts not to exercise supplemental jurisdiction over state-

---

"assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Jenkins v. Univ. of Minn.*, 838 F.3d 938, 947 (8th Cir. 2016) (citation omitted). "To be clearly established, the contours of the right must be sufficiently clear such that every 'reasonable official would have understood that what he is doing violates that right.'" *Id.* (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011)). "Existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (citation omitted). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Id.* (quoting *Nord v. Walsh Cnty.*, 757 F.3d 734, 739 (8th Cir. 2014)). The right identified in the Amended Complaint is the "Due Process right to be free from invasion of bodily integrity through sexual assault, abuse, or molestation." Am. Compl. ¶ 368. Adrahtas argues that no such right was clearly established by Eighth Circuit or Supreme Court precedent in 1984, suggesting that the first use of the term "bodily integrity" was in a 1979 concurrence and "remained in doubt" as of 1998. ECF No. 37 at 28–29. Plaintiffs did not respond in kind to Adrahtas's argument. Plaintiffs merely assert in a conclusory heading that Adrahtas is not entitled to qualified immunity and suggest that the argument conflicts with Adrahtas's argument that he is not a state actor. ECF No. 65 at 23. The insubstantial character of Plaintiffs' response to this argument opens the door to finding that Plaintiffs have waived the issue. *E.g.*, *Mendez v. FMC Rochester*, No. 20-cv-1717 (KMM/JFD), 2022 WL 1110137, at *3 (D. Minn. Jan. 12, 2022). Rather than go that direction, it makes better sense given the case's posture and Plaintiff's insubstantial response to hold off deciding the issue.

law claims when, as here, all federal claims are dismissed well before trial. *See Hervey v. Cnty. of Koochiching*, 527 F.3d 711, 726–27 (8th Cir. 2008). There is no reason to deviate from this general rule here. Though Plaintiffs filed the case almost one year ago, it remains in its earliest stages. Finally, it seems likely that Plaintiffs will advance arguments—particularly regarding statutes of limitation—that implicate the resolution of potentially several novel or complex state-law questions.

V

Rule 15 requires a federal court to "freely give leave" to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2). Though this standard is liberal, parties do not have an absolute right to amend. *See Sherman v. Winco Fireworks, Inc.*, 532 F.3d 709, 715 (8th Cir. 2008). A motion to amend may be denied for "compelling reasons such as undue delay, bad faith, or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the non-moving party, or futility of the amendment." *Id.* (citation omitted). "In most cases, '[d]elay alone is insufficient justification for denying a motion to amend; prejudice to the nonmovant must also be shown.'" *In re EpiPen Direct Purchaser Litig.*, No. 20-cv-00827 (ECT/JFD), 2021 WL 4892231, at *3 (D. Minn. Oct. 20, 2021) (quoting *Bell v. Allstate Life Ins. Co.*, 160 F.3d 452, 454 (8th Cir. 1998)). A proposed amendment is futile if it could not survive a motion to dismiss under Rule 12(b)(6). *Hillesheim v. Myrom's Cards & Gifts, Inc.*, 897 F.3d 953, 955 (8th Cir. 2018). The proposed amended complaint must allege "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (citation omitted).

45

Considered in light of the Parties' stipulations regarding the presentation of Defendants' motions, there really isn't much question that Plaintiffs' motion for leave to amend was the product of undue and potentially prejudicial delay.  A recap of relevant procedural history provides necessary background on this issue.  Plaintiffs filed their original Complaint on May 13, 2021.  ECF No. 1.  Adrahtas filed his first motion to dismiss not quite two months later, on July 6.  ECF No. 12.  Evidently in response to Adrahtas's motion, Plaintiffs properly filed their operative Amended Complaint on July 23.  ECF No. 25; Fed. R. Civ. P. 15(a)(1)(B).  On August 16, all Parties executed and filed a stipulation that would govern the presentation of Defendants' dismissal motions.  ECF No. 28.  Under that stipulation, Defendants would file their motions and supporting documents on September 15, 2021.  *Id.* at 1.  Plaintiffs would file their responses on November 15.  *Id.* at 2.  Defendants would file replies on December 6.  *Id.*  And a hearing on the motions would occur December 20.  *Id.*  There are two important take-aways from this stipulation as it relates to Plaintiffs' motion for leave to amend: (1) Obviously owing to the number of motions and issues and their relative complexity, the agreed-on schedule was considerably longer than the schedule established by rule.  LR 7.1(c).  (2) The stipulation did not provide for the filing of a Second Amended Complaint or account for the possibility that Plaintiffs might seek leave to do that.  In other words, Plaintiffs clearly signaled their intention to stand by their then-operative Amended Complaint in opposing Defendants' motions.

Things went sideways November 15—some sixty days after Defendants timely filed their motions in compliance with the Stipulation, ECF Nos. 35, 40, 45, and 50, and *the same day* Plaintiffs' opposition papers were due, ECF No. 28 at 2.  That day, Plaintiffs

filed their Local-Rule-compliant motion seeking leave to file their proposed Second Amended Complaint, accompanied by a request to strike the briefing schedule established in the Parties' stipulation.  ECF Nos. 58, 59, and 61.  Plaintiffs did not file any papers in opposition to Defendants' dismissal motions on that date.  Insofar as it sought to strike the agreed-on briefing schedule, Plaintiffs' motion was denied the same day (November 15), except that Plaintiffs were given a three-day extension to file their submissions in opposition to Defendants' dismissal motions, and Defendants were given a corresponding three-day extension to file their replies.  ECF No. 62.  The Parties met those deadlines. ECF Nos. 63–65, 75–78.

Judged against the relevant procedural history, Plaintiffs delayed unreasonably in filing their motion for leave to amend.  The bottom line is that Plaintiffs agreed to an extended briefing schedule that did not contemplate a motion to amend the Amended Complaint.   True, it might be incorrect to understand the stipulation as embodying Plaintiffs' waiver to seek leave to amend.  But for several reasons, waiting to the last minute to raise the issue can't be an option in that situation.  The November 15 motion violated the terms and spirit of the stipulation, as did Plaintiffs' failure to file their opposition papers on that date.  The motion threatened to inject significant inefficiency into the process.  *In Plaintiffs' view*, granting the motion would have meant returning to dismissal-motion start line.  ECF No. 61.  For Defendants, that would have meant filing a second round of opening briefs.  Work that Defendants put into their first round of briefs would have been wasted to some perhaps substantial degree.  It would have delayed consideration of Defendants'

motions and the issues they raised by some months.  It's difficult to imagine a more unjust, expensive, and less speedy process for resolving Defendants' motions.  Fed. R. Civ. P. 1.

Notwithstanding these substantial concerns, the same-day denial of Plaintiffs' request to throw out the stipulated briefing schedule sufficiently minimized the prejudice resulting from Plaintiffs' ill-considered approach so that it seems wiser not to deny Plaintiffs' motion based on undue delay.  As things have developed, Plaintiffs' motion is in functionally the same procedural posture it would have been had Plaintiffs filed it more promptly or as part of their submissions in opposition to Defendants' motions.

The denial-worthy problem is that Plaintiffs' proposed Second Amended Complaint does not cure the jurisdictional or limitations issues analyzed above.  *See generally* Proposed Sec. Am. Compl. [ECF No. 58-1].  It couldn't—and doesn't attempt to—include new allegations somehow showing that the University is suable under § 1983.  It adds no new allegations addressing Plaintiffs Cary, Cole, and Gee's ability to assert Title IX claims against the University.  It doesn't seem to include any new or revised allegations tending to show a discernable overlap in the factual basis between Plaintiffs' state-law claims against USA Hockey and Hockey Illinois and Plaintiffs' remaining federal claims (the § 1983 claim against Adrahtas individually and the Title IX claim against the University insofar as the claim is asserted by Plaintiffs Sacks, Jensen, Pietrangelo, Doe, and Walker).  It includes no new allegations addressing whether there might be some personal-jurisdiction-triggering connection between Minnesota and the claims asserted against Adrahtas by Jensen, Walker, Kelly, Cole, and Gee.

It is true that the proposed Second Amended Complaint includes new material that

Plaintiffs describe as relevant to "repressed memories, coping mechanism, and recovered memories" and showing "Defendants' concealment and knowledge of [Adrahtas's] sexual assaults." ECF No. 59 at 4. But a close examination shows that these allegations fall well short of showing fraudulent concealment with the requisite particularity and do not plausibly show the timeliness of Plaintiffs' federal claims in some other way. None of this should be surprising. Plaintiffs in their supporting brief describe their motion for leave to amend as necessary, not to cure deficiencies in the Amended Complaint, but to provide new information. *Id.* at 2.[21] For these reasons, Plaintiffs' motion for leave to file their proposed Second Amended Complaint will be denied.

---

[21] The proposed Second Amended Complaint comes closest to remedying a problem with the Amended Complaint where it adds allegations relevant to Plaintiffs' Title IX claims to the effect that Pietrangelo and Doe told the University's head coach they had been groped. Specifically, the proposed Second Amended Complaint alleges that, when Pietrangelo and Doe complained about the "visualization practices," they informed the University's head coach of, and objected to, Adrahtas's groping and inappropriate sexual conversations, only to have their concerns disregarded. Proposed Sec. Am. Compl. ¶¶ 306, 307, 309, 311, 329, 334, 336. It is questionable whether these changes are appropriate or inconsistent with the Amended Complaint. "[L]eave to amend is [only] warranted if the deficiencies can be cured with additional allegations that are consistent with the challenged pleading and that do not contradict the allegations in the original complaint." *ecoNugenics, Inc. v. Bioenergy Life Sci., Inc.*, 355 F. Supp. 3d 785, 794 (D. Minn. 2019) (quoting *United States v. Corinthian Colls.*, 655 F.3d 984, 995 (9th Cir. 2011)) (collecting cases). The limitations problems make it unnecessary to resolve this question.

**ORDER**

Therefore, based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1.    Defendant Thomas Adrahtas's motion to dismiss [ECF No. 35] is **GRANTED**.  Pursuant to Rule 12(b)(2), all claims in the Amended Complaint brought against Adrahtas by Plaintiffs Christopher Jensen, Jeffrey Walker, Brent Cary, Benjamin Cole, and Kelly Gee are **DISMISSED WITHOUT PREJUDICE** for lack of personal jurisdiction.  Pursuant to Rule 12(b)(6), Count Two of the Amended Complaint as against Adrahtas is **DISMISSED WITH PREJUDICE**.

2.    Defendant USA Hockey, Inc.'s Motion to Dismiss [ECF No. 40] is **GRANTED**.  Pursuant to Rule 12(b)(1), Plaintiffs' state-law claims against USA Hockey in Counts Seventeen through Twenty-Nine of the Amended Complaint are **DISMISSED WITHOUT PREJUDICE** for lack of subject-matter/supplemental jurisdiction.

3.    Defendant Amateur Hockey Association Illinois, Inc.'s Motion to Dismiss [ECF No. 45] is **GRANTED**.  Pursuant to Rule 12(b)(1), Plaintiffs' state-law claims against Hockey Illinois in Counts Seventeen through Twenty-Nine of the Amended Complaint are **DISMISSED WITHOUT PREJUDICE** for lack of subject-matter/supplemental jurisdiction.

4.    Defendants University of Minnesota and The Board of Regents of the University of Minnesota's Motion to Dismiss [ECF No. 50] is **GRANTED**.  Pursuant to Rule 12(b)(1), Count One to the extent brought by Plaintiffs Cary, Cole, and Gee, and Counts Two and Three of the Amended Complaint are **DISMISSED WITHOUT**

**PREJUDICE** for lack of subject-matter jurisdiction.  Pursuant to Rule 12(b)(6), Count One of the Amended Complaint to the extent brought by Plaintiffs Michael Sacks, Jensen, Frank Pietrangelo, John Doe A, and Walker is **DISMISSED WITH PREJUDICE**.

5.   Pursuant to 28 U.S.C. § 1367(c), the Court declines to exercise supplemental jurisdiction over the remaining state-law claims asserted against the University and/or Adrahtas in Counts Four through Nineteen and Thirty through Thirty-One of the Amended Complaint.  Counts Four through Nineteen and Thirty through Thirty-One of the Amended Complaint are therefore **DISMISSED WITHOUT PREJUDICE**.

6.   Plaintiffs' Motion for Leave to File a Second Amended Complaint [ECF No. 58] is **DENIED**.

7.   This action is **DISMISSED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  April 26, 2022                         s/ Eric C. Tostrud
                                                                   Eric C. Tostrud
                                                                   United States District Court